UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) ) | Criminal No. 14-10121-DPW |
| JOHN S. ALPHAS, a/k/a "YANNI," | ) ) | |
| Defendant. | ) ) ) | |

**Government's Sentencing Memorandum**

The United States submits this memorandum in support of its sentencing recommendation and to respond to defendant John Alphas's arguments regarding the proper loss calculation, as expressed in his objections to the Presentence Report (PSR).

The government respectfully recommends that the Court impose a sentence of incarceration of twenty-seven months, the low end of the Guidelines range, as the government calculates it. That calculation is based on an intended loss amount of $482,024.72, the same figure reached by the PSR. As described in greater detail below, under the terms of the governing policies, the insurance companies that Alphas defrauded would have been entitled to pay him nothing, even if he did suffer actual losses. For that reason, the government believes the intended loss amount should be the entire quantity Alphas sought from his insurers, $482,024.72. Even if Alphas were entitled to a reduction of that number for losses he legitimately suffered, the evidence would still support a finding of loss in excess of $400,000. A sentence within the resulting Guidelines range would be reasonable, and not greater than necessary to achieve the aims of sentencing set forth in 18 U.S.C. § 3553(a).

I.      **The Offense Conduct**

John Alphas is the president of the Alphas Company, a wholesale distributor of produce that operates out of the Chelsea Produce Market. During the period relevant to this case, the Alphas Company bought produce in bulk, usually from producers on the west coast, and resold it to local customers. To protect itself from commercial property loss, the Alphas Company routinely took out insurance on the shipments of produce it ordered. Zurich North American and Selective Insurance Company were two of its insurers.

Between 2007 and 2008, and again in 2011, Alphas submitted at least ten fraudulent claims to the Alphas Company's insurers. In each claim, he represented that a shipment of produce either had not arrived or had arrived spoiled. In at least some instances, that representation was false. To increase his insurance payout, Alphas often sent his insurers fraudulent, inflated invoices for the ostensibly spoiled or missing produce. PSR ¶¶ 17, 29, 32, 42, 55. Likewise, he often submitted fraudulent invoices for replacement produce (produce that he said he needed to purchase to satisfy existing orders from customers). PSR ¶¶ 24, 36, 39, 42, 45, 51. The invoices for the replacement produce were much larger than the invoices for the original produce—larger even than the inflated invoices for original produce. More importantly, they were fake, and the costs they represented were, at a minimum, inflated. Alphas also submitted fake invoices for disposing of the supposedly spoiled produce, PSR ¶¶ 28, 39, 45, 55, 60, another cost he did not always incur.[1]

In addition to all this, Alphas informed the insurance companies that he had paid (or would pay) invoices that he never paid, sometimes supporting these lies by sending his insurers

---

[1] As described in greater detail below, Alphas has acknowledged that the invoices for replacement produce and disposal fees were fraudulent, but he maintains that, in most instances, he actually incurred some replacement and disposal costs. *See* Objection 1.

fraudulent copies of checks ostensibly proving his payment. PSR ¶¶ 18, 22, 33, 35, 55. Alphas stamped some invoices as "paid" when they were not. PSR ¶ 54.

In all, Alphas made insurance claims on Zurich and Selective totaling $482,024, and he received insurance payouts from Zurich of $178,568. PSR ¶ 63.

## II.     The Intended Loss Exceeds $400,000

Alphas should not get credit for truthful elements of his fraudulent insurance claims, assuming any truthful elements existed. When Alphas submitted fraudulent claims to his insurers, he voided his insurance policies, turning the entire amounts he claimed into intended losses. He may not go back through his fraudulent claims now, identifying ostensibly truthful elements in them and subtracting those elements from the intended loss figure. Even if he could, the evidence would justify an intended loss figure in excess of $400,000. The evidence of Alphas's fraudulent conduct goes beyond phony invoices, and all he offers in opposition to it is his word, which the Court should not credit.

### A.     Alphas's Assertions Regarding Intended Loss

In his objections to the PSR, Alphas argues that the intended loss figure should be reduced by the amount of any "legitimate, reimbursable costs" he paid or losses he suffered. *See* Objection 1. By legitimate costs or losses, he seems to mean any expenditures that would have been covered by his insurance policies had he told his insurers the truth about the losses. Into this category, Alphas puts three classes of ostensible losses: (1) the true value of produce that was stolen or arrived in unusable condition, (2) the cost of disposing of that produce, and (3) the costs associated with replacing that produce on the spot market.[2] *See id.* The values he

---

[2] For some claims, such as the 447 claim, the amounts in these classes are lower than the "actual costs" for which Alphas takes credit. *See* Objection 14. He does not explain why the difference should also be considered legitimate, actual costs.

3

assigns to the costs in the last two classes—disposal costs and replacement costs—are estimates based on his recollection of his activities in 2007–2011. *See* Objection 1. Alphas has no documentation to support the figures he uses.

Alphas's position regarding the losses in the 514 and 759 claims is different. As discussed in the PSR ¶¶ 41–43, the 514 claim was a near duplicate of the 447 claim. (The only difference was the omission of a charge for a USDA inspection fee that Alphas had included in the 447 claim. *See* PSR ¶ 42.) When Zurich discovered that Alphas was recycling a claim he had already filed, it confronted him, and he withdrew the claim. *See* PSR ¶ 43. According to Alphas, the 514 claim was "an administrative error," not an attempt to defraud Zurich, therefore it "should not be included in the fraud loss calculations." Objection 11.

Alphas's position regarding the 759 claim is similar. In support of the 759 claim, Alphas had originally sent Zurich a sales confirmation showing that he had purchased roughly $26,000 of lettuce from West Coast Distributing, a produce broker. *See* PSR ¶ 16. Later, Alphas sent Zurich an invoice for a lower amount, saying that the West Coast invoice had been revised. *See* PSR ¶ 19. In his objections to the PSR, Alphas maintains that neither the sales confirmation nor the "revised" invoice was fraudulent, and that the payment Alphas sought with the 759 claim was only the amount on the "revised" invoice, not the higher amount that appears in the PSR. *Compare* Objections 3, 14 *with* PSR ¶¶ 14, 63.

By subtracting the supposedly legitimate costs and the value of the 514 and 759 claims from the PSR's intended loss figure, Alphas arrives at a much lower number than the PSR did: $177,661.05, as opposed to $482,024.72. *See* Objection 14.

**B.     Alphas Was Not Entitled to Any Payment On His Insurance Claims, So The Intended Loss Is The Full Amount He Sought**

Most of Alphas's arguments concerning loss are based on the faulty premise that, if there were any truthful elements in his insurance claims, the intended loss figure should be decreased because he was entitled to insurance payouts for those elements. *See* Opposition at 1. Under the terms of his insurance policies, however, any fraud by Alphas rendered the policies void, meaning that Alphas was not entitled to any payment on his fraudulent claims, even if some aspects of those claims were not fraudulent. As a result, all the money Alphas sought via fraudulent insurance claims should be held against him, resulting in an intended loss figure of $482,024.72.[3] *See* PSR ¶ 63.

Each of Alphas's insurance policies with Zurich and Selective said that the policy was "void in any case of fraud by you as it relates to [the policy]." *See* Exs. 1 (Zurich policy, General Conditions Section A) and 2 (Selective policy, Common Policy Conditions Section C). Likewise, each policy said it was void if Alphas "intentionally conceal[ed] or misrepresent[ed] a material fact" concerning, among other things, a claim under the policy. *See* Exs. 1 and 2. As Alphas has by now either explicitly or implicitly acknowledged, each of the insurance claims described in the PSR involved at least one material, fraudulent element. The policies that governed those claims, therefore, were all void, and Alphas was not entitled to any payments under them.[4]

Consequently, the intended loss in this case equals the full value of Alphas's fraudulent insurance claims. Under the Sentencing Guidelines, *intended loss* means "the pecuniary harm

---

[3] Like the PSR, the government subtracts from Alphas's total the $1,000 deductible that automatically would have been withheld from any payouts under the terms of his insurance policies.

[4] Fraud provisions like those in Alphas's insurance policies are enforceable, and insurance companies do seek to enforce them. *See, e.g.*, *Espedito Realty, LLC v. Nat'l Fire Ins. Co. of Hartford*, 935 F. Supp. 2d, 319 (D. Mass. 2013).

that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). As the First Circuit has commented, *expected loss* "would be a better term" than *intended loss*. *United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007). This is because the loss inquiry focuses "on the objectively reasonable expectation of a person in [the defendant's] position at the time he perpetrated the fraud, not on his subjective intentions or hopes." *United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008); *accord United States v. Alli*, 444 F.3d 34, 38 (1st Cir. 2006) (equating intended loss to reasonably foreseeable loss).

Given the terms of Alphas's insurance policies, a reasonable person in his position would have expected that his insurers would be harmed by the full amount of his fraudulent claims. If his insurers believed his fraudulent assertions, as he hoped they would, they would pay claims—in their entirety—that, under the terms of the policies, they did not have to pay. Any resulting payments would constitute pecuniary harm—harm that was more than reasonably foreseeable to Alphas at the time he submitted his claims. Those payments were his aim.

At least two circuit courts have considered this scenario and concluded that intended loss should not be reduced to reflect ostensibly valid elements of fraudulent insurance claims. In *United States v. Torlai*, 728 F.3d 932 (9th Cir. 2013), the Ninth Circuit considered fraudulent claims under the Federal Crop Insurance Program. The defendant argued, as Alphas now does, that there were truthful, compensable components to his insurance claims, and that he should be given credit for them. *See Torlai*, 728 F.3d at 939–40. The Ninth Circuit denied the defendant's argument "because it assumes a premise he cannot sustain: that Torlai retained a valid crop insurance policy despite his misrepresentations." *Id.*

In *Torlai*, as here, the relevant insurance policy contained a clause saying that the policy would be void if the policy holder intentionally concealed or misrepresented any material fact.

*See id.* Torlai *had* misrepresented a material fact, so he "was not an intended recipient of the . . . crop insurance indemnity payments." *Id.* In those circumstances, the Ninth Circuit held, the sentencing court was justified in concluding that the defendant "was not entitled to any portion of the indemnity payments," and that the intended loss was the entire value of the payments the defendant had sought. *Id.*

The Tenth Circuit reached an equivalent result in *United States v. Ostrom*, 80 Fed. App'x 67, 71–72 (10th Cir. 2003) (unpublished). As here, the defendant in *Ostrom* admitted he had lied about some elements of an insurance claim, but contended that other elements were properly included in it, such that the insurer "suffered no loss in paying out [that] portion of the claim." 80 Fed. App'x at 71. In denying his argument, the Tenth Circuit cited the terms of his insurance policy, which said that the insurer would "not pay for any loss or damage" in cases of fraud. *Id.* The court concluded that, by virtue of his fraud, the defendant had forfeited "any right" to a payout on the relevant claim. *Id.*

The holdings in these cases were not simply prudent—discouraging fact-intensive disputes at sentencing, when evidence may have deteriorated or disappeared—but also consonant with the examples given in the Application Notes for § 2B1.1 of the Sentencing Guidelines. As Probation notes in its response to Alphas's Objection 2, *see* Addendum to PSR, the Guidelines articulate several exclusions from and credits against loss, *see* U.S.S.G. § 2B1.1 cmt. n.3(D)–(E). Offsets for truthful aspects of otherwise fraudulent insurance claims are not among them.

### C.     There Is Ample Evidence For The Court To Find That Alphas Lied About The Elements Of His Claims He Now Says Were Truthful

Even if it were proper for the Court to give Alphas credit for truthful elements of his fraudulent claims, the Court may find, based on the evidence presented, that the fraudulent elements in Alphas's insurance claims far outnumbered those to which he is now willing to

7

admit. Based on those findings about the nature and extent of the other fraudulent elements of Alphas's insurance claims, the Court may conclude, by a preponderance of the evidence, that the intended losses in this case exceeded $400,000, meriting a 14-level increase in offense level. *See, e.g.*, *United States v. Curran*, 525 F.3d 74, 78 (1st Cir. 2008) (stating that "[t]he government bears the burden of proving a victim's losses by a preponderance of evidence," although the final amount of loss need only be approximate). The only counterweight to the evidence against Alphas is found in his unsworn objections to the PSR. Those statements should be given no weight.

At the root of Alphas's fraudulent insurance claims lie shipments of produce that Alphas maintains were spoiled or lost, but the Court need not accept that they actually were. As noted in the PSR, at least two trucking companies disputed Alphas's allegations that they had delivered unusable loads of produce. *See* PSR ¶¶ 47, 56 (discussing the 563 and 652 claims). Both companies said that Alphas had forged the signatures of their employees on documents that tended to establish the improper delivery. *See* Exs. 3 (Zurich notes *re* 12/16/08 conversation with U-W) and 4 (exhibit to Amber Trucking's civil complaint against Alphas for nonpayment). From the records that survive,[5] the trucking companies appear to have been correct. *Compare* Ex. 5 (signature submitted to Zurich by Alphas) *with* Ex. 6 (signature attached to Amber Trucking's civil complaint against Alphas).

One of the trucking companies that fought Alphas, Amber Trucking, enlisted the assistance of Blue Book Services, a company that, among other things, offers dispute resolution

---

[5] Zurich's notes suggest that U-W Logistics sent Zurich copies of documents evidencing the forgery, but Zurich did not locate those documents or produce them to the government. Neither did U-W.

8

services to companies in the produce industry.[6] Blue Book concluded that the evidence Alphas had submitted, which included a certification from a USDA inspector, was inconsistent with his allegation that the load of lettuce Amber delivered had frozen. *See* Ex. 7. The USDA certification showed bruising, not freezing.[7] Moreover, the amount of damage to the lettuce, Blue Book concluded, was within commercially acceptable levels, meaning the shipment was usable, not spoiled. *See id.*(concluding that "the product arrived within industry standards").

Whether or not Alphas's shipments were actually spoiled or lost, the Court may conclude that Alphas was not entitled to indemnification for some of them because Alphas never intended to pay for them. Neither did he intend to pay for various of the other costs he now argues were legitimate. The record is replete with instances in which Alphas claimed a loss, but then never paid (or never fully paid) for the goods or shipments he supposedly lost. His unpaid invoices included original invoices for produce shipments, as well as invoices for other costs he now contends were legitimate expenditures, such as trucking costs.[8] Given Alphas's nonpayment, these were not expenditures, but liabilities that Alphas never intended to meet. His attempts to

---

[6] For a description of some of these services, see https://www.producebluebook.com/services/resolve-disputes/.

[7] Even valid certifications of spoilage from the USDA, as Alphas sometimes presented to his insurers, are no guarantee that a shipment had arrived spoiled. Produce vendors like Alphas in the Chelsea Produce Market usually receive their shipments early in the morning, hours before USDA inspectors report to work in the morning. By the time the inspectors arrive, most shipments have been unloaded out of the trucks and into the vendors' bays. This means that USDA inspectors are unable to confirm the source of any given batch of produce in a vendor's bay. Produce vendors who routinely order the same kinds of produce can easily claim that an old load they were unable to sell is actually a new, spoiled load they just received.

[8] *See* PSR ¶ 17 (West Coast Distributing invoice, paid only in part); ¶ 22 (unpaid Manny Lawrence Sales invoice for $16,331.40); ¶ 34 (unpaid Greenfield Fresh invoice for $7,485.50); ¶ 47 (unpaid U-W Logistics invoice for $5,600); ¶ 51 (unpaid NCD Transport invoice $5,000); ¶ 55 (unpaid Greenfield Fresh invoice for $1,283.50); ¶ 56 (unpaid Amber Trucking invoice for $7,400); ¶ 61 (Fresh Roots invoice, paid only in part); ¶ 61 (unpaid Freightquote.com invoice for $9,000).

seek insurance payments for them, therefore, were attempts to get his insurers to compensate him for harms he did not suffer. The amount of those unpaid invoices should be included in the intended loss amount.

Likewise, the Court may conclude that Alphas did not incur the replacement or disposal costs he now says were legitimate, which account for approximately $134,000 of the difference between his and the PSR's calculations of the intended loss. His contention that he needed the replacement produce to fill existing orders does not comport with the usual practices at the Chelsea Produce Market, where vendors like Alphas usually place produce orders based on projected sales, not existing orders.[9] In addition, James Stewart, whom Alphas identifies as someone who made overnight trips to New York to buy replacement produce for Alphas, *see* Objection 1, has denied ever making such a trip, or buying replacement produce for Alphas from any location. Finally, neither replacement nor disposal costs should be necessary if there never was a spoiled load of produce in the first place, as seems to have been the case on at least a few occasions.

All Alphas offers in support of his account of the facts are his own, unsworn statements, which the Court should discredit. In this case, Alphas has admitted to lying repeatedly to serve his own interests. And in an unrelated, civil matter handled by another session of this Court—one that arose out of Alphas's nonpayment of business debts—a magistrate judge found that Alphas committed fraud on the court, recommending that Alphas be referred to the United States Attorney's Office for prosecution for obstruction of justice and perjury. *See* Oct. 3, 2013 Report and Recommendation (Dkt. 85) at 1, 17, in *The Alphas Company, Inc. v. Dan Tudor & Sons*

---

[9] When placing those orders, they sometimes overestimate how much they will need, leaving themselves with spoiled, unused produce through no fault of any trucker.

*Sales, Inc.*, No. 10-cv-10831-PBS (D. Mass.). Under these circumstances, his word should be afforded no weight.

> **D.     The 514 And 759 Claims Were Both Attempts To Defraud Zurich, And Their Full, Original Amounts Should Count As Intended Loss**

Alphas's arguments concerning the 514 and 759 claims are also incorrect. For those claims, he disagrees with the PSR's assessment of the size of the insurance claims, contending that the full amount of the claims should not count toward his intended loss because he withdrew or amended them before they were adjudicated by his insurer. For both of these claims, however, there is ample evidence that Alphas's intentions, as well as his paperwork, were fraudulent. The Court should include in the intended loss figure the full, original value of these two claims

> *1.     Alphas Only Amended The 759 Claim After Zurich Questioned Its Veracity*

The proper loss amount for the 759 claim is approximately $26,000. *See* PSR ¶ 63. Alphas originally sought $27,000 in April 2007, and supported that claim with a sales confirmation for $25,760.25 of lettuce and a copy of the front of a check made out to the produce broker, West Coast Distributing, for the same amount.[10] *See* PSR ¶¶ 14–16, 18; Ex. 8 (sales confirmation submitted by Alphas). Suspicious, Zurich requested further proof of payment from Alphas for months afterward, asking for copies of the back of the check and of his bank statements as proof that Alphas had actually paid for the produce in question. *See* Ex. 9. Instead of providing those, Alphas eventually sent Zurich what he called a revised invoice in September 2007, reducing the value of the lost produce to $14,227.15. *See* Ex. 10.

The so-called revised invoice was actually the original invoice. The sales confirmation Alphas had originally submitted was fake, created by changing the price of the lettuce on the true

---

[10] This check was never negotiated, *see* PSR ¶ 18, a fact that Alphas does not contest in his objections to the PSR, *see* Objection 3.

11

invoice from $14.75 a unit to $26.75 a unit (and omitting a charge for a $23.50 temperature recorder). *Compare* Ex. 11 (West Coast Distributing records) at ALPHAS-GOV-001920 *with* Ex. 8. As West Coast Distributing's records reflect, there had never been a sales confirmation for a greater amount because there had never been a transaction for that amount. *See generally* Ex. 11.

Alphas's current contention about the 759 claim—that the sales confirmation was legitimate and included both the costs of the produce and the shipping, *see* Objection 3—is false. West Coast's invoices were itemized and detailed, *see* Ex. 8, yet none of them make any reference to shipping charges that Alphas says explain the high figure in the sales confirmation, *see* Objection 3.[11] As Alphas's own communications to Zurich demonstrate, he paid for shipping separately, via a freight broker called 2K Logistics. *See* Ex. 12.

Alphas did not "openly and honestly" provide Zurich with invoices—revised or otherwise—in the 759 claim. He fraudulently sought payment for an exaggerated loss, was questioned about it, and lowered his ambitions. The pecuniary harm he intended was the full amount he originally sought: approximately $26,000.[12]

2.  *Alphas Only Withdrew The 514 Claim After Zurich Noticed It Was A Duplicate*

The story of the 514 claim is very similar. In September 2008, Alphas submitted a claim for approximately $78,000 of spoiled produce. *See* PSR ¶ 41. Alphas had submitted a nearly identical claim just three months earlier, in June, *see* PSR ¶ 30, and had been paid on that claim

---

[11] The entries in those records referring to bad debt reveal that Alphas never paid the invoiced amount in full. He paid only $12,385.75, leaving $1,842 to be written off as bad debt.

[12] The slight difference between this approximate amount and the amount on the forged sales confirmation that Alphas submitted to Zurich is inconsequential to the intended loss calculation under the Guidelines, which may be approximate. *See* U.S.S.G. § 2B1.1 cmt. n.3(C) ("The court need only make a reasonable estimate of the loss.").

12

in July, *see* Ex. 13. Suspecting fraud, Zurich questioned Alphas several times about the 514 claim. In response, Alphas gave the company both written and oral statements about the claim, detailing the facts behind it. *See* Ex. 14–15. It was not until Zurich confronted Alphas about the duplicative claims that he withdrew the 514 claim. *See* Ex. 16. The reason Alphas gave for not recognizing the duplication earlier—that he thought the trucking companies involved in the two claims were different, so the claims must have been different, too—is not credible (among other reasons, because the evidence shows that Alphas knew the trucking company for both claims was White Hawk, *compare* Ex. 17 (documents submitted with 447 claim) at ALPHAS-GOV-003302 (listing White Hawk as the carrier) *with* Ex. 14).

Alphas submitted the 514 claim with the hope and intention that Zurich would pay it in full. The 514 claim, like all the others in this case, was materially false, and Alphas should be held accountable for the full amount of the claim. *See Torlai*, 728 F.3d at 941–42 (including a claim in the intended loss calculation even though the defendant withdrew the claim after it was found to be illegitimate).

### E. Restitution Should Be Analyzed In The Same Manner As Loss

For the reasons given in Parts B and C, above, Alphas should not be given credit for ostensibly legitimate costs when calculating the restitution he owes to Zurich. His offense caused an identifiable victim (Zurich) pecuniary loss (payment of money it was not obligated to pay him), and he is therefore obligated to pay restitution under 18 U.S.C. § 3663A. The amount of that restitution cannot exceed the money paid to Alphas, but it should include all that money, which totaled $178,568.41.

### III. Conclusion

For the foregoing reasons, the government recommends a sentence of incarceration of twenty-seven months, the low end of the Guidelines range, calculated as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1) | + 7 |
| Specific Offense Characteristics (U.S.S.G. § 2B1.1(b)(1)(H)) | + 14 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1) | -3 |
| **Total Offense Level** | **18** |
| Criminal History Category | **I** |
| Applicable Guidelines Range | **27–33 months** |

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Brian Pérez-Daple*
BRIAN A. PÉREZ-DAPLE
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated: October 31, 2014

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Brian A. Pérez-Daple*
BRIAN A. PÉREZ-DAPLE
Assistant United States Attorney