IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
)
UNITED STATES OF AMERICA,                )
)
      Plaintiff                )
)    No. 1:14-cr-10121-DPW
v.                                       )
)
JOHN S. ALPHAS, a/k/a YANNI,             )
)
      Defendant.               )
_____)

**DEFENDANT JOHN S. ALPHAS'**
**SENTENCING MEMORANDUM**

      Mr. Alphas pleaded guilty to one count of wire fraud as a result of his scheme to inflate the value of insurance claims for loads of spoiled produce that were delivered to his business, The Alphas Company. This Court initially calculated the amount of loss using the entire amount of Mr. Alphas' claims. However, in light of Mr. Alphas' demonstrated commitment to the community and his employees, the Court found that a downward departure from the sentencing guidelines range was appropriate.

      On appeal, the First Circuit found that only the illegitimate portions of Mr. Alphas' claims should be considered in the loss calculation, and remanded for resentencing. Crediting Mr. Alphas for the legitimate portion of his claims, the intended loss attributable to Mr. Alphas' scheme is $139,891.46. With a base offense level of 7, a loss enhancement of 10, a 3 point reduction for acceptance of responsibility, Mr. Alphas' total offense level is 14, 4 points lower than the total offense level that the Court found at the initial sentencing. The sentencing guidelines range is therefore 15 to 21 months of incarceration as Mr. Alphas' criminal history

category is I.

During the pendency of the appeal, Mr. Alphas has worked to live up to his obligations to society and his employees.  Although he was not obligated to, he has made regular restitution payments, totaling $50,000 to date.  Additionally, he has made $5,000 in payments towards his fine.  He has also continued to demonstrate his commitment to helping others by hiring additional veterans who may not have found work otherwise.  During this record breaking winter when The Alphas Company was unable to receive or deliver expected produce loads, Mr. Alphas did not lay off a single employee.

In light of the reduced sentencing guidelines range and Mr. Alphas' post-sentencing rehabilitation, Mr. Alphas respectfully requests that the Court impose a sentence of probation with sixty days of intermittent confinement or six months of home confinement, a fine within the guidelines range of $4,000 to $40,000, a $100 special assessment, and restitution in the amount of $58,439.30.  Such a sentence is sufficient, but no greater than necessary, to effect the goals of 18 U.S.C. § 3553(a).

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Alphas is the President and sole owner of The Alphas Company, a wholesale produce distributor located in Chelsea, Massachusetts.  As discussed in detail below, Mr. Alphas is devoted to his family and his employees, and has a long track record of helping his employees and community.  Unfortunately, Mr. Alphas also engaged in a scheme to defraud two insurance companies by submitting inflated claims when his company received spoiled loads of produce.  All but one of these claims were filed during the financial crisis of 2007 and 2008.  Mr. Alphas deeply regrets his actions.

Mr. Alphas waived indictment and has plead guilty to one count of wire fraud in violation of 18 U.S.C. § 1343.  In their plea agreement, Mr. Alphas and the government agreed that Mr. Alphas' base offense level was 7 pursuant to U.S.S.G. § 2B1.1(a)(1).  See Plea Agreement at 2. The parties also agreed at sentencing that Mr. Alphas is entitled to a 3 point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 and that the appropriate criminal history category is I.

The parties disagreed, however, on the amount of actual and intended loss attributable to Mr. Alphas' offense.  Counsel for Mr. Alphas argued that he should be credited for legitimate portions of his insurance claims.  The government, on the other hand, argued that Mr. Alphas should not be credited for the legitimate portions of his claims because his insurance policies were void in the event of fraud.  The government therefore urged that actual loss was the entire amount the insurance companies paid ($178,568.41) and intended loss was the entire amount Mr. Alphas claimed ($482,024.72).

The Court recognized at the initial sentencing that some portions of Mr. Alphas' claims were legitimate.  See Sentencing Tr. 16:7-8 ("There was some flesh in this as well as lard."). However, because the Court adopted the government's view that Mr. Alphas should not be credited for the legitimate portions of his claims, the Court did not determine which portions were legitimate.  The Court found that intended loss was over $482,000 and that the applicable specific offense characteristic enhancement was 14 points.  Therefore, the Court found that the total offense level was 18.[1]  With a criminal history category of I, the advisory guidelines sentence under the Court's calculation was 27 to 33 months incarceration, 1 to 3 years supervised release, a fine between $6,000 and $60,000, and a $100 special assessment.  Id. at 25:2-12.

---

[1] The Court also sustained Mr. Alphas' objection to an obstruction enhancement.  Sentence Tr. 23:5-6.  That determination is not at issue on remand.

At sentencing, the Court recognized the seriousness of Mr. Alphas' offense and the costs imposed on others.  Id. at 39:5-40:9.  On the other hand, the Court also credited the "compelling" letters submitted on Mr. Alphas' behalf, recognizing that those letters were "not cookie-cutter in character" and covered "the wide gamut of [Mr. Alphas'] role in the community."  Id. at 40:12-14.  In particular, the Court "credit[ed] heavily" a letter from Mr. Alphas' priest as evidence that he is "someone who clearly has been involved in his church in a way that is evidence of a very substantial sense of who he wants to be in his community."  Id. 41:1-5.  The Court also "treat[ed] as extraordinarily serious" Mr. Alphas' role with respect to his family.  Id. at 40:15-17.  The Court also expressed concern "about the dislocation that is going to be visited upon" Mr. Alphas' employees should he be unable to run to company.  Id. at 38:23-24.  This dislocation is particularly serious in light of Mr. Alphas' willingness to hire "people who are quite vulnerable and have very great difficulty finding their way into the workforce."  Id. at 40:18-20.  As the Court recognized, Mr. Alphas has been "prepared to stand up for [homeless veterans]."  Id. at 40:20-21.  He did not simply "drop a little money" to support them; Mr. Alphas "actually employ[ed] the people, [got] them back into the workforce."  Id. at 40:21-23.

With respect to specific deterrence, the Court found that Mr. Alphas is unlikely to engage in similar behavior in the future because his conviction "is presumably a sufficiently arresting kind of set of circumstances to make clear what the consequences can of that or, perhaps, raise the risk."  Id. at 41:17-19.  However, the Court also determined that general deterrence is "particularly important" in a tight community like the produce market.  Id. at 41:20-23.  Finally, the Court also expressed a concern with sentencing disparities, although noting that the sentencing guidelines "are not as nuanced as they should be."  Id. at 43:2-3.

The Court ultimately concluded that a downward departure from the guidelines range was appropriate, and sentenced Mr. Alphas to incarceration for a period of one year and one day incarceration, three years of supervised release, the maximum guidelines fine of $60,000, and a $100 special assessment.  Id. at 44:11-13; 44:25-45:3.   The Court also imposed restitution in the amount of $178, 568.41, representing the entire amount that Mr. Alphas' insurers paid on the partially fraudulent claims.  Id. at 25:10-11; 45:2-3.

On appeal, the First Circuit held that intended loss in an insurance fraud case "excludes any sums that the fraudster would have been paid absent the fraud."  United States v. Alphas, No. 14-2228, slip op. at 16 (1st Cir. May 7, 2015).  The First Circuit also held that the insurance companies are entitled to recover as restitution only "the amount they insurer would not have paid but for the fraud."  Id. at 24.  The First Circuit vacated and remanded for resentencing so that this Court may determine which portions of Mr. Alphas' claims were legitimate and accordingly recalculate the guidelines range and restitution award.  Id. at 18, 24-25.  The First Circuit noted that on remand the Government still bears the burden of proving the applicability of any sentencing enhancements by a preponderance of the evidence, although the defense may bear a burden of production to offer some evidence of the amounts of Mr. Alphas' claims that were legitimate.  Id. at 18-19.  Once "the record is fully formed," this Court "must determine the amount of loss that the government (which retains the burden of proof) is able to establish," and "need only make a reasonable estimate of the loss."  Id. at 19.

## **LEGAL BACKGROUND**

As a threshold matter, Mr. Alphas cannot be subjected to a more severe sentence on remand than the Court originally imposed.  As the Supreme Court has held, due process forbids "vindictiveness against a defendant for having successfully attacked his first conviction."  North

Carolina v. Pearce, 395 U.S. 711, 725 (1969).  For this reason, "[w]hile sentencing discretion permits consideration of a wide range of information relevant to the assessment of punishment, . . . it must not be exercised with the purpose of punishing a successful appeal."  Alabama v. Smith, 490 U.S. 794, 798 (1989) (internal citations omitted); see also United States v. Clark, 84 F.3d 506, 508 (1st Cir. 1996) ("[A] court violates the Due Process Clause when it imposes a heavier sentence upon a reconvicted defendant for the purpose of penalizing the defendant for having successfully appealed from his original conviction.").

A more severe sentence in the present case would unjustifiably punish Mr. Alphas for successfully appealing his first sentence.  The Government did not appeal any aspect of the initial sentence, and no aspect of the First Circuit's ruling would support a more severe sentence. The sentencing guidelines range on remand is lower than at the initial sentencing, and, as will be discussed below, Mr. Alphas has undergone post-sentencing rehabilitation.  There are no facts before the Court on remand that would support anything other than a lower sentence.  Due process, therefore, prohibits increasing Mr. Alphas' sentence because the only reason for a more severe punishment would be judicial vindictiveness.

The Court may also consider changes in law and fact that have occurred since Mr. Alphas' initial sentencing.  The Supreme Court has held that "when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." Pepper v. United States, 562 U.S. 476, 481 (2011).  This Court is also permitted to consider on remand changes in law that are relevant under the First Circuit's decision.  See United States v. Ticchiarelli, 171 F.3d 24, 32 (1st Cir. 1999).

## ARGUMENT

The Sentencing Guidelines are advisory, and are but one factor for this Court's consideration in imposing a sentence.  United States v. Booker, 543 U.S. 220 (2005).  The Supreme Court held in Gall that a district court should begin all sentencing proceedings by calculating the guideline range; and, after arguments by the parties, the "district judge should then consider all of the § 3553(a) factors to determine whether they support a sentence requested by a party" and in so doing, the district judge "may not presume that the Guidelines range is reasonable."  United States v. Gall, 552 U.S. 38, 49-50 (2007).  Instead, the Court must craft a sentence that is "minimally sufficient to achieve the broad goals of sentencing."  United States v. Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008).  Taking into account the specific circumstance of Mr. Alphas as instructed by the statute, and weighing the guidelines calculation as but one factor, supports Mr. Alphas' requested sentence of probation with 60 days of intermittent confinement or 6 months of home confinement, a fine within the guideline range of $4,000 to $40,000, a $100 special assessment, and restitution in the amount of $58,439.30.

## I.  History and Characteristics of John Alphas, 18 U.S.C. § 3553(a)(1)

Mr. Alphas is devoted to his family, his business, his employees, and his community, as discussed at length in Defendant's original sentencing memorandum.  See Docket No. 21.  Mr. Alphas is a life-long resident of Massachusetts, where he and his wife of 21 years have raised their four teenage children.  He is also an active parishioner and volunteer at Saint Demetrios Greek Orthodox church in Weston, Massachusetts.

Mr. Alphas started in the produce industry when he joined his uncle's company after graduating from Boston University in 1982.  He went on to found The Alphas Company in 1999.  Mr. Alphas has worked extremely hard to build his company and support his family, arriving at work at 3 a.m. and working 12-hour days 5 or 6 times a week for over 30 years.  His presence is

essential to the company.  The business will almost certainly close if Mr. Alphas is incarcerated, leaving his 16 employees without work.

Mr. Alphas has shown extraordinary dedication to employing veterans who are struggling to recover from addiction and homelessness, including many who struggled to find employment before they were hired by the Alphas Company.  The Court reviewed letters from several such veterans prior to Mr. Alphas' first sentencing.  Mr. Alphas' commitment to employing vulnerable veterans has not waivered since his initial sentencing.  He currently employees five veterans, including three (two full time and one part time) who were hired after Mr. Alphas' initial sentencing.  David Dejesus, one of the veterans Mr. Alphas hired after his initial sentencing, has been able to turn his life around with Mr. Alphas' help.  Mr. Dejesus, a veteran of the United States Marines, suffers from PTSD, depression, and drug addiction related to his service.  Mr. Alphas was the only person who would hire him after Mr. Dejesus was placed in a halfway house.  As a result of Mr. Alphas' help, Mr. Dejesus now has a job, his own apartment, and looks forward to meeting his grandchildren for the first time this summer.  (Ex. 33, Dejesus Letter.)

Mr. Alphas' commitment to his employees is also demonstrated by his remarkable efforts to avoid staff reductions.  As the Court learned during his first sentencing, Mr. Alphas did not lay off any employees during the Market Basket strike.  Market Basket is a major customer for Mr. Alphas, and the strike was a significant financial burden for The Alphas Company.  Mr. Alphas' dedication to his employees continued after his conviction.  He again refused to lay off a single employee during this past winter, even though the severe snow meant that there was no produce to unload or deliver.  As the company's Controller Judith Wilson writes in a letter to the Court, she recommended that Mr. Alphas lay off a third of his employees over the winter when cash

flow was tight.  (Ex. 31, Wilson Letter.)  Mr. Alphas refused to lay off a single person, and

instead used his own money to meet payroll.  Mr. Alphas also hired three more veterans when

asked to do so by the veterans' shelter, despite the hardship the business faced over the winter.

As Ronald Gullick, another of Mr. Alphas' veteran employees, says in his letter to the Court, Mr.

Alphas nearly had to lay off the veterans until the First Circuit stayed his sentence.  He was very

relieved when the sentence was stayed and lay offs became unnecessary, but is very concerned

that Mr. Alphas will be unable to continue employing veterans if he is incarcerated.  (Ex. 32,

Gullick Letter.)

Mr. Alphas' dedication to charitable works has also continued since his initial sentencing.

As his wife tells the Court her newest letter, Mr. Alphas and his children were the first to help

shovel out homebound neighbors this winter.  He was also the first to offer a donation for the

high school graduation committee when it was needed this June.  (Ex. 34, Alphas Letter.)  Mr.

Alphas is very generous with his employees, as described by Angel Rodriguez who writes on

behalf of the company's 8 Hispanic employees.  Mr. Alphas lent money to one employee this

year so he could return to the Dominican Republic to bury his mother and brother, and gave

money to another employee so he could buy braces for his daughter.  (Ex. 35, Rodriguez Letter.)

Mr. Alphas recognized at his initial sentencing the pain and suffering his actions have

caused.  As he told the Court:

> Your Honor, I stand before you as a humble and remorseful man.  I
> will live with and regret the crime I committed for the rest of my
> life.  I did not need to commit this crime, I did not have to commit
> this crime, I should never have committed this crime, but I did, and
> I take full responsibility for my actions.
>
> We are here today because of me, what I did.  I would like to
> apologize to everyone here:  the Court, the Government, the
> insurance companies, all my employees who I have put at risk, my
> family, who I have embarrassed and hurt more than words can ever
> explain.  I am the one who put my business and my employees and

my family at risk.  I have no one else to blame but myself.

Sentencing Tr. 36:13-25.  Mr. Alphas deeply regrets his actions.  He pled guilty even though admitting his wrongdoing resulted in great humiliation and embarrassment in front of his family, his employees, and his community.  He knows that he has put his business at risk, as well as the financial well-being of his family.  He is sorry for the trouble and injury he has caused to his insurers.  He has worked to be a role model for his children and his employees, and knows that his actions are a great disappointment to them.  He has learned his lesson, and will not take such a risk again in the future.

## II.  Need for the Sentence Imposed, 18 U.S.C. § 3553(a)(2)

Mr. Alphas asks the Court for a sentence of probation with intermittent or home confinement.  There is no need for a sentence of continuous incarceration.  Mr. Alphas has undergone noticeable rehabilitation since his initial sentencing.  As the Court recognized at his initial sentencing, there is little risk that Mr. Alphas will reoffend.  As described above, Mr. Alphas has demonstrated that he will continue to contribute to the community by hiring veterans in need of employment and through charitable works.  Mr. Alphas has also made significant efforts to fulfill his restitution obligations to Zurich Insurance ("Zurich").  He has made regular restitution payments since his first sentencing.  As of today, Mr. Alphas has paid $50,000.00 in restitution, approximately 86% of the $58,439.30 actual loss that he caused, and intends to pay the remainder prior to sentencing.  (Ex. 1, ALPHAS-DEF-00192-97; Ex. 2, ALPHAS-DEF-00198-201 at 198-200.)  Mr. Alphas has also paid $5,000 towards the fine ordered by the Court. (Ex. 2, ALPHAS-DEF-00198-201 at 198-99, 201.)  In light of Mr. Alphas' continued rehabilitation, a term of continuous incarceration is not necessary to protect the public or to dissuade him from future crimes.

With respect to general deterrence, probation with sixty days intermittent or six months of home confinement is sufficient to send a message to others in the produce industry that fraud is unacceptable, without risking damage to the livelihood of Mr. Alphas' innocent employees. Both intermittent and home confinement are substantial punishments, with significant restrictions on Mr. Alphas' liberty.  If intermittent confinement is imposed, Mr. Alphas will be forced to go to a halfway house on weekends when others go home to spend leisure time with their families.  If home confinement is imposed, Mr. Alphas will be forced to wear a GPS monitoring device, which the Massachusetts Supreme Judicial Court has referred to as a "modern day scarlet letter." Commonwealth v. Hanson, 464 Mass. 807, 815 (2013) (internal quotation marks omitted).  Moreover, if Mr. Alphas is able to continue work at the produce market, he will be a continual reminder to his colleagues that fraud has serious consequences.

**III. Guidelines Calculation, 18 U.S.C. § 3553(a)(4)**

Mr. Alphas and the Government have agreed that the applicable base offense level is 7. The parties also agree that Mr. Alphas is entitled to a 3 point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 and that the appropriate criminal history category is I.  The sole guidelines calculation issue for the Court at resentencing is the amount of loss after Mr. Alphas is credited for the legitimate portions of his claims.  As detailed below, intended loss in this case is $139,891.46 and actual loss is $58,439.30.  Loss, the greater of actual or intended loss, is therefore $139,891.46.  See U.S.S.G. § 2B1.1 cmt. 3(A).  The appropriate specific offense characteristic enhancement is 10 points, for a loss greater than $120,000 and less than $200,000.  See id. at § 2B1.1(b)(1)(F).  The total offense level is therefore 14.  With a criminal history category of I, the guideline sentencing range is 15-21 months incarceration, 1 to 3 years of supervised release, a fine between $4,000 and $40,000, and a $100 special assessment.  See id. at §§ 5D1.2(a)(2), 5E1.2(c)(3), 5E1.3.

It is worth noting that the applicable Sentencing Guidelines loss table has not been amended to account for inflation.  As the United States Sentencing Commission has noted, "monetary losses in current offenses reflect, to some degree, a lower degree of harm and culpability than did equivalent amounts when the monetary tables were establish or last substantively amended."  (Ex. 3, Proposed Sentencing Guidelines Amendments at 25.)  Under the proposed amendments scheduled to go into effect on November 1, 2015, an intended loss greater than $95,000 and less than $150,000 would qualify for only an 8 point sentencing enhancement.  (Ex. 3, Proposed Sentencing Guidelines Amendments at 15-16.)  Accordingly, the enhancement applicable to Mr. Alphas' intended loss of $139,891.46 will decrease by 2 points (from 10 to 8 points) once the amended guidelines go into effect.  Under the amended guidelines, Mr. Alphas' total offense level would be 12, with a guidelines range of 10 to 16 months imprisonment.  A downward departure from the applicable range is therefore in line with the current thinking of the Sentencing Commission.

The losses caused by Mr. Alphas are summarized in the following chart.

| Claim Number | Claim Minus Deductible | Amount Insurer Owed | Amount Insurer Paid | Actual Loss | Intended Loss |
|---|---|---|---|---|---|
| Zurich 759 | $24,760.25 | $13,225.75 | $13,204.25 | $0.00 | $11,534.50 |
| Zurich 869 | $31,750.00 | $22,035.50 | $30,200.00 | $8,164.50 | $9,714.50 |
| Zurich 257 | $19,435.00 | $12,985.00 | $19,435.00 | $6,450.00 | $6,450.00 |
| Zurich 447 | $50,096.10 | $20,185.58 | $36,181.16 | $15,995.58 | $29,910.52 |
| Zurich 312 | $37,094.00 | $27,206.88 | $30.994.00 | $3,787.12 | $9,887.12 |
| Zurich 514 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Zurich 563 | $48,554.00 | $24,511.90 | $48,554.00 | $24,042.10 | $24,042.10 |
| Zurich 246 | $21,480.00 | $20,137.50 | $0.00 | $0.00 | $1,342.50 |
| Zurich 652 | $52,933.50 | $8,433.50 | $0.00 | $0.00 | $44,500.00 |
| Selective 609 | $48,220.00 | $45,709.78 | $0.00 | $0.00 | $2,510.22 |
| **TOTAL** | **$334,322.85** | **$194,431.39** | **$178,568.41** | **$58,439.30** | **$139,891.46** |

The insurers paid a total of $178,568.41 on Mr. Alphas' fraudulently inflated claims.

Had Mr. Alphas not inflated his claims, after the $1,000 deductible is taken into account, his

insurers would have owed him $194,431.39 on those claims.  Actual loss, the amount of money

the insurers paid above what they would have owed Mr. Alphas absent any fraud, is $58,439.30.

Mr. Alphas submitted claims totaling $334,322.85, after the $1,000 deductible is taken

into account.  Mr. Alphas would have been entitled to receive $194,431.39 in the absence of

fraud.  Intended loss, therefore, is $139,891.46 – i.e., the difference between what Mr. Alphas

claimed, minus the $1,000 deductible, and the amount the insurers would have been obligated to

pay in the absence of fraud.

In further detail, Mr. Alphas submitted the following claims:

**Zurich Claim No. 573-0019759 (the "759 Claim")**

Mr. Alphas submitted his first inflated claim (claim number 573-0019759) to Zurich

North America ("Zurich") on April 2, 2007 after a load of lettuce was stolen in transit to The

Alphas Company.  (Ex. 4, ALPHAS-GOV-002761-62.)  An employee of the shipping broker, 2K

Logistics, confirmed to Zurich investigators that the load was "diverted" over a payment dispute.

(Ex. 5, ALPHAS-GOV-002051.)  Mr. Alphas provided an initial estimate that the produce was

worth approximately $27,000.  (Ex. 4, ALPHAS-GOV-002761-62 at 62.)  That same day, Mr.

Alphas faxed to Zurich his actual claim, a sales confirmation from West Coast Distributing, Inc.

in the amount of $25,760.25.  (Ex. 5, ALPHAS-GOV-002051; Ex. 6, ALPHAS-GOV-000057-58

at 57.)

The West Coast sales confirmation was forged.  Mr. Alphas submitted the legitimate

invoice from West Coast on September 26, 2007, in the amount of $14,227.75.  (Ex. 7,

ALPHAS-GOV-000059-60 at 60.)

Mr. Alphas submitted an inflated claim for $25,760.25.  However, his legitimate losses

were $14,225.75.  After the $1,000 deductible, Mr. Alphas sought a payment of $24,760.25

although he was only entitled to $13,225.75.  Mr. Alphas therefore intended to cause a loss of

$11,534.50 on the 759 claim.  Zurich paid $13,204.25 for the 759 claim, less than the $13,225.75

that Mr. Alphas would have been entitled to absent the fraud.  Therefore, there is no actual loss

associated with the 759 claim.

**Zurich Claim No. 557-0053869 (the "869 Claim")**

Mr. Alphas submitted the 869 claim on February 4, 2008 after a truck driver drove off

with a load of produce.  (Ex. 8, ALPHAS-GOV-003094-102.)  In support of the claim, Mr.

Alphas submitted invoices totally $49,081.40, including an invoice for $16,331.40 in produce

from Manny Lawrence Sales, Inc. and an invoice for replacement produce from Premier Produce

for $32,750.00.  Both of those invoices were fraudulent.

The legitimate original produce invoice, as verified to Zurich by a Manny Lawrence

employee, is number 98539 in the amount of $15,357.00.  (Ex. 9, ALPHAS-DEF-00001; Ex. 10,

ALPHAS-DEF-00002; Ex. 11 ALPHAS-GOV-002009-11 at 2011.)

Although the Premier Produce invoice is fraudulent, Mr. Alphas did incur legitimate

replacement costs in connection with the 869 claim.[2]  When The Alphas Company does not

receive a load of produce on schedule, or receives a spoiled load, the company is in danger of not

fulfilling its customers' orders.  Grocery stores will not continue doing business with suppliers

that cannot provide quality produce in a timely manner.  When a load is spoiled or otherwise not

suitable for sale, Mr. Alphas is forced to obtain replacement produce immediately at retail prices.

_____

[2] Mr. Alphas was not allowed to be reimbursed for both original and replacement produce costs.  Although Mr.
Alphas frequently submitted invoices for both the original produce and the replacement produce, he did not intend to
defraud his insurance companies by submitting both.  He did so because Mr. Alphas believed that his insurers
required all of the paperwork relating to his losses.  For example, shortly after the 869 claim was filed, a Zurich
employee processing a claim asked Mr. Alphas to provide "copies of the original invoice for the celery shipment,
then copies of the invoice or estimate for replacement of the load that was spoiled."  (Ex. 12, ALPHAS-GOV-3025-
31 at 3025.)  Mr. Alphas was transparent with his insurers that certain invoices were for original produce costs and
others were for replacement costs.  Mr. Alphas intended that his insurers would reimburse him for his original or
replacement produce as appropriate.

Angela Ciolino, the former office manager and bookkeeper at The Alphas Company, conservatively estimates that retail prices in the industry typically include a 50% markup (if not higher) over the total wholesale cost.  (Ex. 13, Ciolino Affidavit at ¶ 3.)  Therefore, a reasonable estimate of the cost of replacement produce for the 869 claim is $23,035.50, a 50% markup from the original wholesale produce price of $15,357.00.

The 869 claim was also subject to a $1,000 deductible.  Mr. Alphas claimed $32,750.00, and expected Zurich to pay $31,750.00 after the deductible.  Mr. Alphas was in fact entitled to be reimbursed only for his legitimate replacement costs, $23,035.50, minus the $1,000 deductible – i.e., $22,035.50.  Mr. Alphas' intended loss with respect to the 869 claim is therefore $9,714.50.

Zurich paid $30,200.00 in total on the 869 claim, although it would have only been required to pay $22,035.50 had Mr. Alphas not inflated the claim.  Actual loss with respect to the 869 claim is therefore $8,164.50.

**Zurich Claim No. 573-0028257 (the "257 Claim")**

Mr. Alphas filed the 257 claim on February 14, 2008 after the refrigeration unit on a delivery truck failed, resulting in a load of spoiled celery and other items.  (Ex. 14, ALPHAS-GOV-003033-35.)  Mr. Alphas claimed various losses associated with the spoiled load, including $11,225.00 for purchase of the celery from Manny Lawrence Sales, Inc., $2,870.00 in miscellaneous produce purchased from Lucky Star Marketing, LLC, $5,300.00 in freight, $900.00 in storage and fuel costs, $800.00 in disposal costs from William Dooley Disposal, and $140.00 for a refrigerator unit inspection from Always Cool.  Mr. Alphas also deducted $800.00 in sales revenue from the claim.  In total, Mr. Alphas claimed $20,435.00 in losses for the spoiled load.

The Manny Lawrence and the William Dooley Disposal invoices were forged.  The true cost of the celery, as reflected in an invoice located in Manny Lawrence's files, was $4,825.00. (Ex. 15, ALPHAS-GOV-001311-13 at 1312.)

The William Dooley Disposal invoice was forged, but it does reflect legitimate disposal costs.  Mr. Alphas could not dispose of large loads of spoiled produce in typical dumpsters. Instead, The Alphas Company routinely paid William Dooley at least $750 per load to dispose of the produce on his farm.  (Ex. 13, Ciolino Affidavit at ¶ 4.)  Mr. Dooley only accepted cash payments and did not issue receipts.  Therefore, Mr. Alphas forged invoices to reflect actual payments that he made to Mr. Dooley.  Mr. Alphas also inflated those invoices, in this instance by $50.00.  However, because most of the disposal costs represent legitimate cost associated with the spoiled load, $750.00 in claimed disposal costs should not count towards intended or actual loss.

In sum, excluding the inflated portion of the Manny Lawrence invoice, Mr. Alphas suffered $13,985.00 in losses.  Mr. Alphas submitted claim 257 for $20,435.00.  After the $1,000 deductible, Mr. Alphas intended for Zurich to pay $19,435.00 although the insurance company owed only $12,985.00.  Intended loss on the 257 claim is therefore $6,450.00.

Zurich in fact paid the full amount of the 257 claim after the deductible, and mailed Mr. Alphas a check for $19,435.00.  Zurich actually owed only $12,985.00 on the 257 claim. Therefore, actual loss is also $6,450.00.

**Zurich Claim No. 573-0030447 (the "447 Claim")**

Mr. Alphas filed the 447 claim on June 5, 2008 after a refrigerated truck broke down en route to The Alphas Company, spoiling a load of lettuce.  The next day, he faxed Zurich a copy of the invoices in support of his claim, including a Greenfield Fresh invoice for $27,485.50 of

lettuce, a Fastrac Logistics, Inc. invoice for $9,000.00 in freight incurred in obtaining replacement produce, an invoice for a USDA inspection charge of $207.48, an invoice for $488.62 in disposal costs, and a Premier Produce invoice for $41,400.00 in replacement lettuce. (Ex. 16, ALPHAS-GOV-000001-14.)  In total, Mr. Alphas submitted $78,581.60 in invoices in support of the 447 claim.  The invoices from Greenfield Fresh, and Premier Produce were fraudulent.  The Fastrac invoice was not fraudulent, but the check that Mr. Alphas submitted demonstrating payment on that invoice was not negotiated because Mr. Alphas paid Fastrac in rent and other office support.

Mr. Alphas altered the Greenfield Fresh invoice for the original load of produce.  The legitimate Greenfield Fresh invoice shows that the original produce load cost $7,452.17.  (Ex.17, ALPHAS-GOV-003349-52 at 51.)

The $41,400.00 Premier Produce invoice, like the other Premier Produce invoices Mr. Alphas submitted, was fraudulent.  However, as with the other Premier Produce invoices, it does reflect some legitimate replacement produce costs.  As Ms. Ciolino states in her affidavit, Mr. Alphas had to pay retail prices to replace certain spoiled loads.  (Ex. 13, Ciolino Affidavit at ¶ 3.) Retail prices are typically a markup of 50% or more over wholesale costs, including the wholesale cost of buying the produce and any associated fees.  In the case of the 447 claim, the total wholesale cost was $7,659.65, including $7,452.17 for the original produce and $207.48 for the USDA inspection.  Assuming a conservative retail markup of 50%, a reasonable estimate of Mr. Alphas' legitimate replacement produce costs is $11,489.48.  The claimed produce amount therefore is $41,400.00, as reflected in the inflated Premier Produce invoice.[3]

---

[3] As with the 869 claim, Mr. Alphas submitted invoices for both the original and replacement produce because Zurich asked for all of the paperwork relating to his losses.  When he submitted those invoices to Zurich, he referred to the Premier Produce charges as "Replacement Product."  (Ex. 16, ALPHAS-GOV-000001-14 at 2.)  Mr. Alphas

Mr. Alphas also submitted an invoice from Fastrac Logistics and a check made out to that company with the 447 claim.  The invoice is legitimate.  However, the check was never negotiated because The Alphas Company pays Fastrac in the form of rent, utilities, employee time, and other costs.  Fastrac uses office space located at The Alphas Company and used The Alphas Company employees at various times.  As The Alphas Company's former bookkeeper states in her affidavit, The Alphas Company did pay for Fastrac's services in obtaining replacement produce.  (Ex.13, Ciolino Affidavit at ¶ 5.)  At the end of the fiscal year, Ms. Ciolino would tally up the cost of services Fastrac provided to The Alphas Company that year, and compare it to the rent, utility, and other bills that Fastrac would have otherwise owed The Alphas Company.  Generally, the amounts that were due to Fastrac and owed by Fastrac netted out to close to zero in most years.  In other words, The Alphas Company did pay Fastrac for its services, but did not issue a check for each individual Fastrac invoice.  Instead, the bills were netted out at the end of each year.  Therefore, while Mr. Alphas did submit to Zurich a copy of a check for Fastrac's services that was not legitimate, Mr. Alphas did pay Fastrac $9,000 in freight for the replacement load.  The Fastrac component of the 447 claim is accordingly legitimate, and should not count towards intended or actual loss.

In sum, Mr. Alphas claimed $51,096.10 as part of the 447 claim, including $41,400.00 for replacement produce from Premier Produce, $9,000.00 in freight from Fastrac, $207.48 for a USDA inspection, and $488.62 in disposal costs.  Of that amount, Mr. Alphas was only entitled to claim $21,185.58, for $11,489.48 in legitimate replacement produce costs, $9,000.00 in freight, $207.48 in inspection costs and $488.62 in disposal costs.  After the $1,000.00

---

only intended the insurance company to reimburse him for the invoice (albeit inflated) that he was entitled to be reimbursed for.  Zurich would typically only pay the replacement product invoice, and therefore the original produce invoice for $27,485.50 should not be considered part of the 447 claim.

deductible, Mr. Alphas intended for Zurich to pay $50,096.10 even though Zurich only owed $20,185.58.  Intended loss on the 447 claim is therefore $29,910.52.

Zurich in fact paid $36,181.16, although it would have owed only $20,185.58 in the absence of fraud.  Actual loss on the 447 claim is therefore $15,995.58.

**Zurich Claim No. 557-0064312 (the "312 Claim")**

Mr. Alphas submitted the 312 claim to Zurich on August 1, 2008 after another refrigerator unit broke down and spoiled a load of produce.  Later that month, Mr. Alphas submitted invoices for the original load of lettuce from Adam Bros Produce Sales, Inc. in the amount of $7,906.25, a $6,100.00 freight invoice from Jora & Sons Freight, $52.00 and $87.00 in USDA inspection costs, a $1,500.00 invoice for disposal from William Dooley Disposal, and a Premier Produce invoice for $30,355.00 in replacement produce.  In total, Mr. Alphas submitted $46,000.25 worth of invoices.  Both the William Dooley and the Premier Produce invoices were fake.

The William Dooley invoice was fraudulent, but it reflects some legitimate disposal costs.  Mr. Alphas typically paid Mr. Dooley at least $750.00 per load for disposal of spoiled produce.  (Ex. 13, Ciolino Affidavit at ¶ 4.)  Therefore, $750.00 of the Dooley invoice is legitimate and should not be counted in the loss calculation.

Like the other Premier Produce invoices, the invoice Mr. Alphas submitted in connection with the 312 claim was fraudulent.  However, Mr. Alphas routinely purchased replacement produce at retail prices when a load was spoiled.  The retail markup is typically at least 50% over wholesale costs.  Therefore, a reasonable estimate of the legitimate replacement costs for the 312

claim is $21,217.88, a 50% markup from the wholesale price of $14,145.25, including $7,906.25

for the lettuce, $6,100.00 in freight, and USDA inspection fees of $52.00 and $87.00.[4]

In sum, the 312 claim was for $38,094.00, including $30,355.00 in replacement lettuce,

$6,100.00 in freight, $52.00 and $87.00 in USDA inspection costs, and $1,500.00 in disposal

costs.  In fact, Mr. Alphas was entitled to claim $28,206.88, reflecting $21,217.88 in legitimate

replacement produce costs, $6,100.00 for freight, inspection costs of $52.00 and $87.00, and

$750.00 for disposal.  After the $1,000 deductible, Mr. Alphas intended that Zurich would pay

$37,094.00 even though the insurer would have only owed $27,206.88 in the absence of fraud.

Intended loss on the 312 claim is therefore $9,887.12.

Zurich paid $30.994.00 on the 312 claim, even though it would have only been obligated

to pay $27,206.88 had Mr. Alphas not inflated the claim.  Actual loss on the 312 claim is

therefore $3,787.12.

### Zurich Claim No. 573-0066514 (the "514 Claim")

On September 18, 2008, Mr. Alphas faxed Zurich a set of invoices in support of the 514

claim.  (Ex. 18, ALPHAS-GOV-002089-101.)  Those invoices were identical to the invoices

submitted in support of the 447 claim, except that the 514 claim accidentally omitted an invoice

for $207.48 in USDA inspection costs.  (Compare Ex. 18, ALPHAS-GOV-002089-101 at 2096-

100 with Ex. 16, ALPHAS-GOV-000001-14 at 2, 6, 9-10.)  This duplicate claim was submitted

in error.  When Zurich asked Mr. Alphas if the claim was a duplicate, Mr. Alphas agreed it was

---

[4] Mr. Alphas was not entitled to reimbursement for both the spoiled load and the replacement load.  Again, Mr. Alphas was transparent with Zurich that he was submitting invoices for both the original and replacement produce, although the replacement produce invoice was itself fraudulent.  The original produce invoice from Adam Bros. therefore should not be counted towards Mr. Alphas' claim because he did not intend to claim types of costs that were not covered by his policy.  The only produce invoice that should be considered part of the 312 claim is the Premier Produce invoice for $30,355.00 in replacement lettuce.

and immediately withdrew the claim.  (Ex. 19, ALPHAS-GOV-002469-73 at 69-70.)  Zurich

closed the 514 claim without payment on November 11, 2008.

The Government urges that the 514 claim should be considered a fraudulent claim.  The

Government's position is inconsistent with the evidence.  Mr. Alphas' scheme was to inflate

legitimate losses, supporting them with fabricated invoices.  He was not in the business of

intentionally submitting duplicate claims.  A close reading of the documents supports the view

that the 514 claim was simply an error; Mr. Alphas simply submitted the same invoices he

previously submitted in support of the 447 claim.  He did not, as he did with his fraudulent

claims, alter the invoices between the 447 and the 514 submissions.  If Mr. Alphas intended to

commit fraud as part of the 514 claim, he would have altered or fabricated the invoices as he did

with all of his fraudulent claims.  There is no evidence that the 514 claim was anything other

than an innocent mistake.  There is therefore no actual or intended loss associated with the 514

claim.

### Zurich Claim No. 557-0068563 (the "563 Claim")

On October 10, 2008 Mr. Alphas reported that a load of lettuce had spoiled after it was

delivered days late in April 2008.  (Ex. 20, ALPHAS-GOV-003147-49.)  Mr. Alphas submitted 3

invoices in support of the 563 claim, a $5,600.00 freight invoice from U-W Logistics, a Premier

Produce invoice for $42,454.00 in replacement costs, and a $1,500.00 invoice from William

Dooley Disposal for disposal of the spoiled produce.  (Ex. 21, ALPHAS-GOV-002073-75.)  The

U-W Logistics invoice shows that the load was picked up on March 29, 2008 and was not

delivered to The Alphas Company until 6 days later, on April 4, 2008.  (Ex. 21, ALPHAS-GOV-

002073-75 at 73.)  Mr. Alphas noted on the bill of lading that the truck was late.  (Ex. 22,

ALPHAS-DEF-00003-06 at 5.)  In total, Mr. Alphas claimed $49,554.00 with the 563 claim.

As before, the Premier Produce invoice was forged but includes some legitimate replacement costs.  The original load of lettuce cost $7,174.60.  (Ex. 23, ALPHAS-DEF-00007-08.  Mr. Alphas typically obtained replacement produce at retail prices, commonly at a markup of at least 50% over the wholesale cost.  (Ex. 13, Ciolino Affidavit at ¶ 3.)  Here, the wholesale cost of the original produce was $12,774.60, including $7,174.60 in produce and $5,600.00 in freight charges.  Therefore, a reasonable estimate of the replacement produce cost is $19,161.90, a markup of 50% over the wholesale cost.

The William Dooley Disposal invoice was also forged, but reflects legitimate disposal costs.  Mr. Alphas paid William Dooley $750 in cash per load, so $750 of this invoice is legitimate and should not be counted in the loss calculation.

In sum, Mr. Alphas claimed $49,554.00 under the 563 claim.  However, he was only entitled to claim $25,511.90, including $19,161.90 in replacement produce, $750.00 in disposal, and $5,600.00 in freight.  After the $1,000 deductible, Mr. Alphas anticipated a payment of $48,554.00 although Zurich would have only owed $24,511.90 had he not inflated the claim.  Intended loss on the 563 claim is therefore $24,042.10.

Zurich paid Mr. Alphas $48,554.00 for the 563 claim.  Zurich would have owed $24,511.90 in the absence of fraud.  Actual loss on the 563 claim is therefore also $24,042.10.

**Zurich Claim No. 573-0033246 (the "246 Claim")**

Mr. Alphas submitted the 246 claim on October 27, 2008 to report a load of lettuce that was damaged during unloading the prior year.  (Ex. 24, ALPHAS-GOV-002885-88.)  In support of the 246 claim, Mr. Alphas submitted an invoice for the original lettuce from Nunes Company for $7,225.00, a freight invoice from NCD Transport for $5,000.00, and an invoice for $19,680.00 in replacement produce from Premier Produce.  Mr. Alphas also subtracted

$2,200.00 in sales revenue from the claim.  In sum, the invoices Mr. Alphas submitted in support of the 246 claim totaled $29,705.00.

The Premier Produce invoice was forged.  However, as with prior claims, Mr. Alphas did incur legitimate replacement costs.  Again, as explained in Ms. Ciolino's affidavit, a conservative estimate of the legitimate replacement costs is the retail price, which is typically at least a 50% markup from the total wholesale cost.  With respect to the 246 claim, the legitimate replacement produce cost is $18,337.50, a 50% from the wholesale cost of $7,225.00 in produce and $5,000.00 in freight.

In sum, the 246 claim is $22,480.00, including $19,680.00 in replacement produce costs, $5,000.00 in freight, excluding $2,200.00 in sales revenue.  After the $1,000 deductible, Mr. Alphas sought $21,480.00 from Zurich.  However, the legitimate amount that Mr. Alphas was entitled to claim was only $21,137.50, including $18,337.50 in legitimate replacement produce costs, $5,000.00 in freight, and deduction of $2,200.00 in sales revenue.  After the $1,000 deductible, Zurich owed only $20,137.50.  Intended loss on the 246 claim is therefore $1,342.50.

Mr. Alphas cancelled the 246 claim in December 2008.  Zurich paid nothing on the claim, and therefore there is no actual loss for the 246 claim.

**Zurich Claim No. 557-0070652 (the "652 Claim")**

Mr. Alphas submitted the 652 claim on November 25, 2008 after a May 2008 shipment of lettuce froze due to a refrigerator malfunction.  (Ex. 25, ALPHAS-GOV-003395-400.)  In support of the 652 claim, Mr. Alphas submitted a Greenfield Fresh invoice for $45,033.50 in lettuce costs, an Amber Trucking invoice for $7,400.00 in freight, and a William Dooley Disposal invoice for $1,500.00 in disposal costs, for a total of $53,933.50.

The Greenfield Fresh invoice was forged.  Mr. Alphas did purchase lettuce from Greenfield Fresh, but the legitimate cost of that load was $1,283.50.  (Ex. 26, ALPHAS-GOV-000027-37 at 37.)

The William Dooley Disposal invoice was, as with previous claims, also forged. However, some of these disposal costs are legitimate and should not be considered in the loss calculation.  Mr. Alphas did incur legitimate disposal costs, although William Dooley did not supply invoices for those costs.  As noted in the Ciolino Affidavit, Mr. Alphas typically paid William Dooley at least $750 per load, so $750.00 of this invoice should not be considered in the loss calculation.

In sum, Mr. Alphas submitted the 652 claim for $53,933.50, but was only entitled to claim $9,433.50, including $1,283.5 in produce, $7,400.00 in freight, and $750.00 for disposal of the frozen produce.  After the $1,000 deductible, Mr. Alphas sought reimbursement for $52,933.50 but would have only been entitled to $8,433.50 if he had not inflated the claim. Intended loss on the 652 claim is therefore $44,500.00.

Mr. Alphas withdrew the 652 claim on February 13, 2009 and Zurich paid nothing on that claim.  Therefore, there is no actual loss associated with the 652 claim.

**Selective Claim No. 21103609 (the "609 Claim")**

Mr. Alphas submitted the last fraudulent claim in 2011 to his new insurer, Selective Insurance, after a load of produce spoiled.  In support of the 609 claim, Mr. Alphas submitted an invoice from Adams Farm for $2,500.00 in disposal costs, an invoice for $16,139.85 in produce from Fresh Roots, a Fastrac invoice for $37,720.00 in replacement produce, and a $9,000.00

24

shipping invoice from Freightquote.com.[5]  (Ex. 27, ALPHAS-GOV-1460-72 at 1465-66, 1471;

Ex. 29, ALPHAS-GOV-001761.)  In total, Mr. Alphas submitted $65,359.85 worth of invoices

in support of the 609 claim.

The Adams Farm invoice was fraudulent.

The Fastrac invoice inflates the cost of replacement produce.  Mr. Alphas typically paid a

markup of at least 50% for replacement produce, equivalent to the typical retail markup.  (Ex. 13,

Ciolino Affidavit at ¶ 3.)  Therefore, $37,709.78 is a reasonable estimate of the legitimate

replacement produce costs, a markup of 50% over the $16,139.85 cost of the original produce

plus $9,000.00 in freight.

In sum, Mr. Alphas claimed a total of $49,220.00 with the 609 claim, including

$37,720.00 in replacement produce, $2,500.00 in disposal costs, and $9,000.00 in shipping.  He

was only entitled to claim $46,709.78, including $37,709.78 in legitimate replacement produce

costs, and $9,000.00 in freight costs.  After the $1,000 deductible, Mr. Alphas sought

reimbursement for $48,220.00, although he was only entitled to be reimbursed $45,709.78.

Intended loss for the 609 claim is therefore $2,510.22.

Selective did not pay anything on the 609 claim.  Therefore, there is no actual loss

associated with the 609 claim.

## IV. Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities, 18 U.S.C. § 3553(a)(3) & (6)

A sentence of probation with sixty days intermittent or six months of home confinement

would be consistent with sentences imposed on similar defendants.  Courts routinely depart

downward from the guidelines in similar cases and fashion alternative sentences.  This Court has

---

[5] Mr. Alphas submitted invoices for the original and replacement produce because Selective asked him for "all invoices pertaining to the food product that was spoiled. . . ."  (Ex. 28, ALPHAS-DEF-00009-10 at 10.)  As with his other claims, he only intended to claim the invoice pertaining to reimbursable produce costs.

made use of weekend intermittent confinement in prior cases.  See Sentencing Tr. 37:13-38:18.

Mr. Alphas' guidelines range of 15-21 months is at the very low end of Zone D of the guidelines

table.  The United States Sentencing Commission's May 2015 report on Alternative Sentencing

in the Federal Criminal Justice System found that, on average, 12% of offenders in Zone D

received alternative sentences over the last decade.  (Ex. 30, Alternative Sentencing Report at

17.)  Fraud offenses were more common among Zone D offenders sentenced to alternatives than

those sentenced to imprisonment.  (Ex. 30, Alternative Sentencing Report at 18.)  The median

loss in Zone D fraud cases where the offender received an alternative sentence was $391,461 in

2014, well above Mr. Alphas' loss of $139,891.46.  (Ex. 30, Alternative Sentencing Report at

19.)  Where Mr. Alphas is at the very low end of Zone D, and caused a loss well below the

median loss in Zone D alternative sentencing cases, an alternative sentence would be consistent

with similar offenders and would avoid imposing unwarranted sentencing disparities.[6]

Sixty days intermittent confinement or six months home confinement is appropriate to

address the very real concern that Mr. Alphas' incarceration will permanently cripple his

company and leave his vulnerable employees and their families with no means of support.  As

the Court recognized at the initial sentencing, there is concern "about the dislocation that is going

to be visited upon" Mr. Alphas' employees should he be unable to run to company.  Sentencing

Tr. 38:23-24.  The Court was "not sure" at sentencing what impact Mr. Alphas' incarceration

will have on his employees and felt "very sorry for the family" and "the people who work for the

company," but noted that the fate of his company is Mr. Alphas' responsibility.  Id. at 44:15-24.

A sentence of intermittent or home confinement will meet both the Court's concern that Mr.

---

[6] Under the amended sentencing guidelines scheduled to go into effect in November, Mr. Alphas' guideline range of 10 to 16 months would fall in Zone C.  Over 58% of defendants in Zone C receive alternative sentences.  (Ex. 30, Alternative Sentencing Report at 14.)

Alphas must be held responsible for his actions while minimizing any impact on innocent employees and family members.

In additional to probation with sixty days intermittent confinement or six months of home confinement, Mr. Alphas also recommends a fine within the guideline range of $4,000 to $40,000 and a $100 special assessment.

## V. Restitution

Restitution to Zurich is also appropriate pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. As the First Circuit noted on appeal, the MVRA authorizes restitution only in the amount of the victim's actual loss. United States v. Alphas, No. 14-2228, slip op. at 23 (1st Cir. May 7, 2015). Zurich's recoverable loss is limited to "the amount the insurers would not have paid but for the fraud." Id. at 24. The restitution award should therefore be the amount of actual loss Mr. Alphas caused, i.e., $58,439.30. Mr. Alphas has already paid $50,000 of that amount, and intends to pay the remainder before sentencing. (Ex. 1, ALPHAS-DEF-00192-97, Ex. 2, ALPHAS-DEF-00198-201 at 198-200.)

**CONCLUSION**

For the foregoing reasons, Defendant John Alphas respectfully requests that this Court depart below the applicable guideline sentencing range and impose a sentence of probation with sixty days of intermittent confinement or six months of home confinement, a fine in the guideline range of $4,000 to $40,000, a $100 special assessment, and restitution in the amount of $58,439.30.  Such a sentence is sufficient, but no greater than necessary, to effect the goals of 18 U.S.C. § 3553(a) and takes into account all of the relevant sentencing factors and considerations.

Respectfully submitted,

Defendant John Alphas,
By his attorney,

/s/ Tracy A. Miner
Tracy A. Miner, BBO # 547137
DEMEO LLP
200 State Street
Boston, MA 02109
Tel:  (617) 263-2600
Fax:  (617) 263-2300
Email: tminer@demeollp.com

Dated: July 31, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served by ECF on counsel for the government on July 31, 2015.


/s/ Tracy A. Miner
Tracy A. Miner