UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 14-10121-DPW |
| JOHN S. ALPHAS, a/k/a "YANNI," | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Government's Memorandum on Resentencing**

This Court's sole tasks on remand are to determine the amount of intended loss, to determine the amount of restitution, and to impose a new sentence informed by those determinations. The loss and restitution amounts need not be different than they were at Alphas's original sentencing, and on the record before the Court, they should not be. Because Alphas has offered no evidence that he suffered any legitimate, insurable losses, the Court should find the same loss and restitution amounts it found at the first sentencing, and impose a sentence no lower than it did in the first instance.

**The Offense Conduct**

As this Court by now knows, John Alphas is the president of the Alphas Company, a wholesale distributor of produce that operates out of the Chelsea Produce Market. Between 2007 and 2008, and again in 2011, Alphas submitted at least ten fraudulent claims to the Alphas Company's insurers, Zurich North American and Selective Insurance Company. In each claim, he represented that a shipment of produce either had not arrived or had arrived in unusable condition. In at least some instances, that representation was false.

To increase his insurance payouts, Alphas often sent his insurers fraudulent, inflated invoices for the ostensibly spoiled or missing produce. PSR ¶¶ 17, 29, 32, 42, 55. Likewise, he

often submitted fraudulent—and much larger—invoices for replacement produce (produce that he said he needed to purchase to satisfy existing orders from customers). PSR ¶¶ 24, 36, 39, 42, 45, 51. Alphas also submitted fake invoices for disposing of the supposedly spoiled produce, PSR ¶¶ 28, 39, 45, 55, 60, another cost he did not always incur.

In all, Alphas made insurance claims on Zurich and Selective totaling $482,024, and he received insurance payouts from Zurich of $178,568. PSR ¶ 63.

## The Scope of the Resentencing

I.  **The Court's Only Task on Remand is To Determine the Amount of Alphas's Actual Losses, if He Can Show He Suffered Any**

The First Circuit made the scope of its remand very clear: "On remand, the only issues open to consideration shall be the appropriate amount of the intended loss for purposes of the guideline enhancement, the appropriate amount of actual loss for purposes of restitution, and, of course, the dimensions of the sentence to be imposed." *United States v. Alphas*, 785 F.3d 775, 787 (1st Cir. 2015). To determine the appropriate amount of intended loss, "the district court should compare what [Alphas] sought to bamboozle his insurers into paying with what they would have paid had [he] submitted only bona fide claims." *Id.* at 784. When conducting that calculation, the court "may use the face of value of [Alphas's] claims as a starting point." *Id.* "The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims." *Id.* "Depending on the defendant's offer of proof, the court might well conclude that the amount of loss is equal to the face value of the submitted claims." *Id.*

To determine the amount of restitution, the Court must perform essentially the same calculation, with the defendant again bearing the burden of producing evidence of the truth of his insurable losses. *See id.* at 787 ("[Alphas] has contended all along that some portion of his

claims represented legitimate losses. This remains to be proven."). The only difference is the number from which Alphas's legitimate losses should be subtracted. When calculating the intended loss under the sentencing guidelines, that number should be the face value of Alphas's insurance claims. *See id.* at 784. When calculating restitution, that number should be the amount of money paid by Alphas's insurer ($178,568.41, the parties agree).

## II. The Court Should Not Consider Evidence of Post-Sentencing Rehabilitation

When considering "the dimensions of the sentence to be imposed," *id.* at 787, the Court should not consider factual developments since Alphas's prior sentencing. Alphas correctly notes that, "when a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider evidence of a defendant's rehabilitation since his prior sentencing" and, if appropriate, use it to "support a downward variance from the advisory Guidelines range." Alphas Memo (Dkt. 47) at 6 (quoting *Pepper v. United States*, 562 U.S. 476, 490 (2011)). But the case from which Alphas draws that proposition involved a sentence that had been completely set aside and "remanded for a *de novo* resentencing." *Pepper*, 562 U.S. at 507. That is not what the First Circuit did in Alphas's appeal.

"Unlike some of [its] sister circuits, the First Circuit does not generally allow *de novo* sentencing on remand." *United States v. Dávila-Felix*, 763 F.3d 105, 109 (1st Cir. 2014); *accord United States v. Cruzado-Laureano*, 527 F.3d 231, 234 (1st Cir. 2008). That general practice is consistent with *Pepper*, which did not "preclude courts of appeals from issuing limited remand orders, in appropriate cases, that may render evidence of post sentencing rehabilitation irrelevant in light of the narrow purposes of the remand proceeding." *Pepper*, 562 U.S. at 505 n.17. To decide the scope of the *Alphas* remand, therefore, this Court must look to the language of the First Circuit's opinion.

In Alphas's case, the First Circuit made plain its intention to preclude this Court from reexamining any issue other than the loss and restitution calculations at resentencing.[1] *See Alphas*, 785 F.3d at 787 (directing that, "[o]n remand, the only issues open to consideration shall be" intended loss, restitution, and the dimensions of the sentence). Consequently, the Court should simply decide whether there are any changes to be made to the loss and restitution figures, and then consider whether a different sentence is warranted in light of any changes to those figures.

### III. The Court Has the Power to Impose a Higher Sentence on Resentencing, But Doing So May Result in a Presumption of Judicial Vindictiveness

Notwithstanding Alphas's flat statement to the contrary (Alphas Memo at 2), the Court has the authority to impose a higher sentence on remand than at the original sentencing, although doing so might create a presumption of judicial vindictiveness that could result in the sentence being overturned. Alluding generally to *North Carolina v. Pearce*, 395 U.S. 711 (1969), Alphas asserts that he "cannot be subjected to a more severe sentence on remand than the Court originally imposed." Alphas Memo at 5–6. As the Supreme Court has explained, however, "'the evil the [*Pearce*] Court sought to prevent' was not the imposition of 'enlarged sentences after a new trial,' but 'vindictiveness of a sentencing judge.'" *Alabama v. Smith*, 490 U.S. 794, 799 (1989) (quoting *Texas v. McCullough*, 475 U.S. 134, 138 (1986)). Provided the Court has some reason, other than vindictiveness, for imposing a higher sentence on Alphas on remand, it has the power to do so without violating the Due Process Clause. *See United States v. Rowe*,

---

[1] It is true that the First Circuit vacated Alphas's sentence, *see Alphas*, 785 F.3d at 787, but that is typical, even in cases in which the court intends a limited remand, *see United States v. Bryant*, 643 F.3d 28, 33 (1st Cir. 2011) ("[M]ost remands of a sentence vacate the existing sentence regardless of the further proceedings required.").

268 F.3d 34, 40 (1st Cir. 2001) (stating that a sentence on remand "may be more severe than the original sentence, so long as it is not vindictive").

The circumstances presented by this resentencing, however, create a risk that imposing a higher sentence could be interpreted as the result of judicial vindictiveness. A presumption of vindictiveness arises whenever "there is a reasonable likelihood that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Smith*, 490 U.S. at 799. Although the scope of this presumption has been the subject of widespread disagreement among the courts of appeals, see *Plumley v. Austin*, 135 S. Ct. 828 (2015) (Thomas, J., dissenting from denial of *certiorari*), the First Circuit has stated that the presumption applies when, for example, "a criminal defendant successfully appeals his conviction and the same trial judge imposes a stiff sentence following retrial," *Correia v. Hall*, 364 F.3d 385, 388 (1st Cir. 2004).

In Alphas's resentencing, the only variable in play (Alphas's legitimate loss figure, which controls the intended loss and restitution calculations) could either remain constant or move in Alphas's favor; the loss and restitution numbers can get no worse for him. In light of those facts, a sentence higher than the original one could be called into question.[2] *See United States v. Pimienta-Redondo*, 874 F.2d 9, 13 (1st Cir. 1989) (assuming, *arguendo*, that the *Pearce* presumption applied when the district court imposed higher sentence per count on remand, even though the aggregate punishment had not increased); *United States v. Resendez-Mendez*, 251 F.3d 514, 517 (5th Cir. 2001) (applying the *Pearce* presumption when defendant received harsher

---

[2] The same would not be true if the increased sentence were based on "events which occurred subsequent to the original sentencing proceeding, or on intervening changes in sentencing law." *United States v. Weingarten*, 713 F.3d 704, 714 (2d Cir. 2013). But there have been no changes in sentencing law, and the government has urged the Court not to consider events since Alphas's last sentencing.

sentence on remand, and finding due process violation).There should be no risk, however, if the Court were to re-impose its original sentence, even if the Court determined that the Guidelines range is lower than it calculated at Alphas's original sentencing. *See Pimienta-Redondo*, 874 F.2d at 13 (finding no vindictiveness, despite the *arguendo* application of the presumption); *United States v. Twitty*, 104 F.3d 1, 2 (1st Cir. 1997) (upholding sentence where district court departed upward on remand to reach the original aggregate sentence after the offense level had been decreased on appeal); *see also United States v. Rodgers*, 278 F.3d 599, 603–04 (6th Cir. 2002) (finding that *Pearce* presumption does not arise "where the resentence term is equal to the original sentence," but does arise when the resentence term is longer).

## The Intended Loss Calculation

Alphas's new intended loss figure (which is lower than the figure he put forth at his original sentencing by about $40,000), suffers from two major flaws: First, it is reached by decreasing the amount of Alphas's claimed insurance losses by nearly $150,000 without sound justification—a change in position that Alphas is estopped from taking. And second, it is not supported by actual proof, which it is Alphas's burden to provide. Because the face value of Alphas's insurance claims has remained constant, and he has not demonstrated any legitimate, insurable losses on his part, this Court should find, as it did in the original sentencing, that the intended loss amount is $482,024.72.

**I.      Alphas's Claimed Losses Were $482,024.72, Not $334,322.85**

Alphas's current intended loss figure ($139,891.46) is driven almost as much by a reduction in the amount of the face value of his insurance claims as by his recalculations of insurable loss. Between his last sentencing and this one, Alphas dropped his estimation of the total claim amount from around $478,000—just $4,000 shy of the figure in the PSR—to approximately $334,322.85.

For the reasons given below, the Court should not alter its original finding, consistent with the PSR (¶¶ 63–64) that the total face value of Alphas's fraudulent insurance claims was $482,024.72. By doing that alone, even if the Court accepts Alphas's current tally of his actual, insurable losses ($194,431.39), the intended loss figure would rebound from Alphas's $334,000 to $287,593.33—a total that would support a Guidelines sentencing range of 15–21 months.

A.     **Alphas Is Precluded From Arguing That His Claimed Losses Were Lower Than $478,301.87, The Figure He Gave At His Original Sentencing**

In Alphas's objections to the PSR and in his original sentencing memo, he took the position that the face value of his fraudulent claims was $478,301.87. PSR ¶ 14; Orig. Alphas Sent. Memo (Dkt. 21) at 9. Now, he lists the face value at $334,322.85, a much lower figure. He has waived the right to take that position.

The total amount of Alphas's insurance claims was essentially undisputed at the original sentencing, and the Court was justified in accepting the PSR's calculation of it.[3] The figure that Alphas offered in his PSR objections and his sentencing memo ($478,301.87) was trivially different from the figure in the PSR ($482,024.72), which the Court at least implicitly accepted when accepting the PSR's and the government's loss calculation. *Compare* PSR Obj. 14 *and* Orig. Alphas Sent. Memo (Dkt. 21) at 9 *with* PSR ¶ 63. In his objections to the PSR, Alphas did contend that the claim amount for one claim, the 759 claim, should be lowered because Alphas "openly and honestly" provided Zurich with what he called a revised invoice for the (supposedly) stolen produce, but he offered no proof to support his rationale.[4] *See* PSR Obj. 3.

---

[3] As the First Circuit has observed, "[Fed. R. Crim. P.] 32(i)(3)(A) is explicit that the court may accept any undisputed portion of the PSR as a finding of fact." *United States v. Olivero*, 552 F.3d 34, 39 (1st Cir. 2009).

[4] As the government argued in its original sentencing memo, the claimed insurance loss amount should not be reduced because Alphas only sent Zurich the "revised" invoice (which

7

And in his original sentencing memo, Alphas, without discussion, lowered the claim amount for the 514 claim to $0—but he did so while, somewhat inexplicably, holding the total claim amount constant at approximately $478,000.[5] Eight of the ten claim amounts in the PSR, however, went completely unchallenged.

Whatever the differences in individual claim amounts, the total claim amount that Alphas used for his loss calculations at the first sentencing was nearly identical to the figure in the PSR. Given that Alphas's modification to the total claim amount at his first sentencing was insignificant, and that he did not support it with proof, the Court was justified in accepting the PSR's figure of $482,024.72. *See United States v. Olivero*, 552 F.3d 34, 39 (1st Cir. 2009).

It is too late for Alphas to challenge that figure now. "The rule of this circuit is that 'upon a resentencing occasioned by a remand, unless the court of appeals [has expressly directed otherwise], the district court may consider only such new arguments or new facts as are made newly relevant by the court of appeals' decision.'" *Dávila-Felix*, 763 F.3d at 110 (quoting *United States v. Ticchiarelli*, 171 F.3d 24, 32 (1st Cir. 1999)). The face value of Alphas's fraudulent insurance claims is not newly relevant; that value was foundational to both the government's and Alphas's intended loss calculations during the first sentencing. Any disputes Alphas had with the PSR's insurance claim figure needed to have been raised then. *See Dávila-Felix*, 763 F.3d at 114 ("Our waiver doctrine ensures that a party *must* present all relevant arguments before the district court in the first instance to avoid waiver.").

Moreover, this Court's determination of the face value of Alphas's claims is now the law of the case. This Court decided that value in a setting in which Alphas had every incentive to

---

was, in fact, the original invoice) after Zurich questioned the veracity of the 759 claim. *See* Orig. Gov. Sent. Memo (Dkt. 22) at 11–12 and Exs. 8–12.

[5] For a discussion of the reasons it was—and is—incorrect to lower the 514 claim amount to zero, see below at 13–15.

challenge it, if he saw a problem with it. A determination of that sort, "unchallenged in a subsequent appeal despite the existence of ample opportunity to do so, becomes the law of the case for future states of the litigation, and the aggrieved party is deemed to have forfeited any right to challenge that particular decision at a subsequent date." *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993).

Finally, Alphas's argument for reducing his claimed losses should also be deemed waived because he makes it, in extremely cursory fashion, entirely in footnotes. In the body of his sentencing memo, he gives no explanation for the reduction in his claimed loss amount. The government and the Court are left to infer his justification from comments he makes in footnotes. In one, he says that "[a]lthough Mr. Alphas frequently submitted invoices for both the original produce and the replacement produce, he did not intend to defraud his insurance companies by submitting both." Alphas Memo (Dkt. 47) at 14 n.2. In another, he says, "Zurich would typically only pay the replacement product invoice, and therefore the original produce invoice . . . should not be considered part of the [ ] claim." *Id.* at 18 n.3; *see also id.* at 20 n.4 (taking the same position regarding the 312 claim); *id.* at 25 n.5 (taking the same position regarding the 609 claim). As the First Circuit has admonished repeatedly, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990 ); *see, e.g.*, *United States v. Sevilla-Oyola*, 770 F.3d 1, at 13 (1st Cir. 2014).

    **B.**    **Alphas Was Seeking Reimbursement For Both Original And Replacement Produce**

Even if Alphas were not prohibited from arguing that his claimed insurance losses are lower than he once contended, his argument for lowering them would be unsupportable. As just explained, Alphas argues that he never intended to defraud his insurance companies by

9

submitting invoices for both original and replacement produce. *See, e.g.*, Alphas Memo at 14 n.2. Even though, as he has now admitted, the invoices he submitted overwhelmingly were fraudulent, Alphas now avows that, by submitting both kinds of invoices, he was simply responding to Zurich's request for documents, and that he "intended that his insurers would reimburse him for his original or replacement produce as appropriate." *Id.* The more natural inference—and the inference more consistent with the evidence—is that Alphas submitted (fraudulent) invoices for both original and replacement produce because he hoped Zurich would pay him for both.

Alphas first submitted invoices for original and replacement shipments in connection with the 869 claim, which he filed on February 5, 2008.[6] PSR ¶ 20. Alphas reported to Zurich that he had purchased a load of produce, but the truck driver had stolen it. *Id.* As Zurich's notes reflect, from the beginning, Alphas claimed that he "had 2 losses," even though he only had one stolen load of produce. Ex. 18[7] at ALPHAS-GOV-001988. Alphas provided Zurich with an invoice for $16,331.40 ( inflated by $1,000, the amount of Alphas's deductible). *See* PSR ¶ 21 n.2; Alphas Memo at 14; Alphas Ex. 9.[8] In response, Zurich issued Alphas a check for that loss amount, minus a $1,000 deductible, on February 12, 2008, *see* Exs. 19, 20 at ALPHAS-GOV-2118. The day he received it, Alphas deposited the check into The Alphas Company's checking account. Ex. 21.

---

[6] Alphas's prior fraudulent insurance claim had only involved an attempt at reimbursement for an allegedly stolen load of produce, not for a replacement load. *See* PSR ¶¶ 14–19.

[7] Because this sentencing memo uses some of the same exhibits as the government's original sentencing memo, the government has attached the exhibits from that memo to this one, as well. New exhibits begin at number 18.

[8] Cites to "Alphas Ex. __" refer to exhibits to Alphas's current sentencing memo (Dkts. 47-1 – 47-4).

The same day he deposited the check, Alphas sent the Zurich claim handler a fax containing invoices supporting a larger insurance claim. Ex. 22. The fax contained a purported bill of lading from January 2008 that sported references to both Alphas's company and a Stop & Shop in Assonet, Massachusetts. The bill of lading was followed by a fraudulent invoice from Premier Produce for replacement produce and a handwritten document purporting to be a revised Stop & Shop purchase order, also from January. Both Stop & Shop documents were likely fake, included in the packet as a means of justifying the purchase of such expensive replacement produce. *See* Ex. 23 ("Stop & Shop advised on 6/03/09 that they cannot find any documentation for PO#69355.");[9] *see also* Ex. 24 (showing that Zurich believed Alphas "had to go out and repurchase the stolen produce . . . to live up to his commitment to Stop and Shop" and "fulfill his contract with Stop and Shop"). Alphas's fax added another $32,750 in alleged losses to his insurance claim.

Zurich had no reason to be soliciting these documents; it had already paid Alphas on his claim.[10] Nevertheless, after receiving Alphas's additional documentation, Zurich increased his insurance payout. *See* Exs. 24, 20 at ALPHAS-GOV-002119 (showing issuance of check for $14,868.60 on March 12, 2008). Alphas deposited Zurich's supplemental check on March 17, 2008. Ex. 25.

---

[9] These Zurich notes also corroborate what the PSR (¶ 24) and the government both contended about Premier Produce in connection with Alphas's initial sentencing: that Premier was "incapable of supply produce valued in amounts of $30,000, $42,000, etc. as indicated in documents submitted by Alphas." Ex. 23.

[10] Alphas's suggestion that Zurich asked Alphas for the replacement invoice is misleading. *See* Alphas Memo at 14 n.2, 17 n.3. The documents to which Alphas cites quite clearly relate to the 257 claim, not the 869 claim. *See* Alphas Ex. 12 at ALPHAS-GOV-003025 ("Subject: Fw: claim 573 0028257 spoiled celery"). The 257 claim did not involve a claim for replacement costs. *See id.* at ALPHAS-GOV-003026 (itemizing claimed losses). Moreover, Alphas faxed Zurich the documents supporting the 869 claim fully three weeks before Zurich sent the e-mail in Alphas Ex. 12.

From then on, Alphas frequently included invoices for both original and replacement loads in his fraudulent insurance claims. *See, e.g.*, PSR ¶¶ 31–36 (447 claim), 28–40 (312 claim); Ex. 26 (246 claim). Whenever he did, he included an itemized list of his losses. *See, e.g.*, Alphas Ex. 16 (447 claim) at ALPHAS-GOV-000002. Each of those lists contained a total at the bottom—a sum that included both the original *and* the replacement invoice amounts. *See id.* Each time, the implication was clear: Alphas suffered two reimbursable losses, not just one.

Alphas's original experiment with submitting both kinds of invoices did not meet with complete success, but everything else about his conduct suggests that he was seeking payment on both the original and the replacement invoices. In the 869 claim alone, the evidence demonstrates that Alphas submitted an inflated invoice for his original produce (PSR ¶ 21 n.2; Alphas Ex. 9), a fraudulent invoice for the supposed replacement produce (PSR ¶ 24; Alphas Memo at 14), a likely fraudulent purchase order and bill of lading from Stop & Shop (to establish the need for replacement produce) (Ex. 23), and a likely fraudulent invoice from the trucking company, which denied having a contract with Alphas for the delivery (Ex. 27 ("Regal denies having contract with the insured for such delivery . . . .")).

In the face of all this, Alphas simply asserts that he "did not intend to defraud his insurance companies by submitting both" kinds of invoices, and then uses that assertion to justify reducing the amount of his insurance claims by nearly $150,000. Alphas Memo at 14 n.2. "In the absence of any rebuttal evidence beyond defendant's self-serving words," *United States v. Prochner*, 417 F.3d 54, 66 (1st Cir. 2005), the Court should conclude that, when Alphas sent his insurers invoices for both original and replacement produce shipments, he was seeking payment for both of them.

### C. The 514 Claim Was An Attempt To Defraud Zurich, And Should Be Counted Toward Intended Loss

In his current sentencing memo, Alphas incorrectly argues, as he did before, that there was no intended loss associated with the 514 claim because "[t]his duplicate claim was submitted in error." Alphas Memo at 20–21; *see* PSR Obj. 11. By taking that position, Alphas hopes to reduce the face value of his insurance claims by over $77,000 at a stroke. *Compare* PSR ¶¶ 42, 63 (showing $77,374.12 claimed in the 514 claim) *with* Alphas Memo at 12 (showing $0 claimed in the 514 claim). As the government argued before, Alphas's argument should be rejected because the 514 claim was an independent attempt to defraud Zurich.

Alphas submitted the 514 claim in September 2008. *See* PSR ¶ 41. Alphas had submitted a nearly identical claim just three months earlier, in June, *see* PSR ¶ 30, and had been paid on that claim in July, *see* Ex. 13. Both claims were for approximately $78,000, all told. *See* PSR ¶ 63. Suspecting fraud, Zurich questioned Alphas several times about the 514 claim. In response, Alphas gave the company both written and oral statements about the claim, detailing the facts behind it. *See* Ex. 14–15. It was not until Zurich confronted Alphas about the duplicative claims that he withdrew the 514 claim. *See* Ex. 16.

The reason Alphas gave for not recognizing the duplication earlier is not credible, suggesting that Alphas's submission of the duplicate claim was not an oversight. When withdrawing the 514 claim, Alphas told Zurich that he thought the trucking companies involved in the two claims were different, so the claims must have been different, too. Ex. 16 at ALPHAS-GOV-002603. This explanation was spurious. The evidence shows that Alphas knew the trucking company for both claims was White Hawk. *Compare* Ex. 17 (documents submitted with the 447 claim) at ALPHAS-GOV-00302 (identifying White Hawk as the carrier) *with* Ex. 14

(statement submitted in support of 514 claim) ("[O]ur company had contracted with White Hawk Trucking.").

In addition, the size and recency of Alphas's payout on the 447 claim (the claim that the 514 claim duplicated) undermines any claim that he submitted the 514 claim without noticing the duplication. He had just been paid over $36,000 on the 447 claim in July. Ex. 13. He could not have forgotten that by September.

But even if Alphas did lose track of which fraudulent claims he had already submitted, he submitted the 514 claim—knowing that it consisted overwhelmingly of fraudulent elements—with the hope and intention that Zurich would pay it in full. The 514 claim, like all the others in this case, was materially false, and Alphas went to even greater lengths than usual to secure a payout on the claim. His efforts included giving a recorded statement to a Zurich investigator in which Alphas sought to conceal his ownership of Fastrac Logistics (Ex. 15 at ALPHAS-GOV-001945, 001948), which he had identified as the shipping broker on the claim (Alphas Ex. 18 at ALPHAS-GOV-002096). If he had admitted his relationship to Fastrac, Zurich might have questioned why he was entitled to reimbursement for a $9,000 shipping fee he had allegedly paid to himself.

Alphas's intended loss calculation should include the 514 claim. *See United States v. Torlai*, 728 F.3d 932, 941–42 (9th Cir. 2013) (including a claim in the intended loss calculation even though the defendant withdrew the claim after it was found to be illegitimate). For this claim, as distinct from the others, it likely remains appropriate to treat the entire value of the claim as intended loss because Alphas had already submitted the claim and been reimbursed for (more than) whatever actual losses he had suffered. Nevertheless, the government only seeks a finding of intended loss for the 514 claim that is equal in amount to whatever intended loss figure the Court finds in connection with the 447 claim that the 514 claim duplicated.

## II. Alphas Has Not Produced Sufficient Evidence of Actual Losses To Lower The Intended Loss Figure

Despite a clear statement from the First Circuit that Alphas bears the burden of producing evidence of his actual losses, he has produced almost none. He has produced no evidence at all of the actual theft, spoilage, or freezing of the produce shipments underlying his insurance claims, and as described below, there is good cause to doubt that at least some of those losses ever occurred. His only evidence of ever purchasing replacement produce and of its price is a non-specific affidavit by one of his character witnesses, who based her affidavit in part on review of documents she does not identify to the Court. Alphas has not so much as identified the supplier of the replacement produce he says he bought. Yet, by the government's tally, at least $125,000 of what he now says his insurer owed him is composed of replacement costs.

Moreover, the stark differences in the calculation of and explanations for Alphas's supposedly legitimate losses between Alphas's two sentencing memos undermine the credibility of both. *See* Ex. 28 (comparing loss tables). At both sentencings, Alphas has had the same objective: to establish as high a legitimate loss figure as possible in order to reduce the portion of his insurance claims that the Court would deem fraudulent. The First Circuit has confirmed the validity of this strategy, but the disparities in its execution from the first sentencing to the second call into question the support for Alphas's supposedly legitimate losses.

In the absence of evidence of legitimate, insurable losses, Alphas's intended loss figure should remain at the full, face value of the fraudulent insurance claims he submitted: $482,024.72.

### A. Alphas Has Provided No Proof That His Shipments Were Stolen, Spoiled, Or Frozen, And The Evidence Suggests That Several Were Not

In his sentencing memorandum, Alphas begins his discussion of each fraudulent insurance claim with an assertion that he suffered a loss, but he has produced no evidence that he

15

actually did. *See, e.g.*, Alphas Memo at 16 ("Mr. Alphas filed the 447 claim . . . after a refrigerated truck broke down en route to The Alphas Company, spoiling a load of lettuce."). It is true that Alphas supported these claims, when he originally made them, with written and oral statements, and with handwritten notes about the lateness or poor condition of produce on arrival (*see, e.g.*, Alphas Ex. 22 at ALPHAS-DEF-00005), but this support is only as robust as Alphas's credibility. When provided with this opportunity on resentencing to produce actual evidence of the legitimacy of his lost shipments, Alphas has produced none.

Given the burden of production announced by the First Circuit, *see Alphas*, 785 F.3d at 784, the Court's inquiry should end here. Alphas has provided no evidence of his supposedly lost shipments, so he has demonstrated no legitimate, insurable losses.[11] The intended loss figure is therefore $482,024.72—exactly what it was before.

But the Court need not rest on Alphas's failure to meet his burden of production. It may also consider the evidence that Alphas fabricated his accounts of various ostensibly insurable losses. As noted in the PSR and described in the government's original sentencing memo, at least two trucking companies disputed Alphas's allegations that they had delivered unusable loads of produce. *See* PSR ¶¶ 47, 56 (discussing the 563 and 652 claims). Both companies said that Alphas had forged the signatures of their employees on documents that tended to establish the improper delivery. *See* Exs. 3 (Zurich notes *re* 12/16/08 conversation with U-W) and 4 (exhibit to Amber Trucking's civil complaint against Alphas for nonpayment). From the records that survive, the trucking companies appear to have been correct. *Compare* Ex. 5 (signature submitted

---

[11] Ciolino's affidavit about replacement costs does not change this. Without lost shipments of produce, there could be no replacement costs (or disposal costs, *cf.* Alphas Ex. 13 ¶ 4).

to Zurich by Alphas) *with* Ex. 6 (signature attached to Amber Trucking's civil complaint against Alphas).

One of the trucking companies that fought Alphas, Amber Trucking, enlisted the assistance of Blue Book Services, a company that, among other things, offers dispute resolution services to companies in the produce industry. Blue Book concluded that the evidence Alphas had submitted, which included a certification from a USDA inspector, was inconsistent with his allegation that the load of lettuce Amber delivered had frozen. *See* Ex. 7. The USDA certification showed bruising, not freezing.[12] Moreover, the amount of damage to the lettuce, Blue Book concluded, was within commercially acceptable levels, meaning the shipment was usable, not spoiled. *See id.* (concluding that "the product arrived within industry standards").

There are reasons to suspect that the shipments behind some of Alphas's other insurance claims were not stolen or spoiled, either. The trucking company named in the 869 claim, for instance, denied having a delivery contract with Alphas, *see* Ex. 27, making it highly unlikely that the company's driver stole Alphas's load of produce—especially when one considers that the supposed motive for the theft was the driver's impatience at being the third truck in line to be unloaded, *see* Ex. 18 at ALPHAS-GOV-001989. To take another example, a review of the truck temperature readings for the shipment behind the 609 claim showed that "all temperatures were of acceptable levels," Ex. 29 at ALPHAS-GOV-001732, making it very doubtful that the shipment spoiled, as Alphas claimed.

---

[12] Even valid certifications of spoilage from the USDA, as Alphas sometimes presented to his insurers, are not guarantee that a shipment had arrived spoiled. Produce vendors like Alphas in the Chelsea Produce Market usually receive their shipments early in the morning, hours before USDA inspectors report to work in the morning. By the time the inspectors arrive, most shipments have been unloaded out of the trucks and into the vendors' bays. This means that USDA inspectors are unable to confirm the source of any given batch of produce in a vendor's bay. Produce vendors who routinely order the same kinds of produce can easily claim that an old load they were unable to sell is actually a new, spoiled load they just received.

Finally, the very volume and nature of Alphas's insurance claims provide additional reasons to doubt that Alphas suffered the underlying harms. Over a period of about a year-and-a-half, Alphas allegedly had two loads of produce stolen, four loads spoil, one load freeze, and two loads arrive in otherwise unusable condition. His uncommonly bad luck was enough to draw Zurich's suspicion, and rightly so. *See* Ex. 30 ("[D]ue to the number of claims you have presented, I am required to have Robert Gavell [a Zurich fraud investigator] review the file before I can continue.").

### B. The Ciolino Affidavit Is Insufficient To Establish That Alphas Paid The Replacement Costs He Uses In His Calculations

Alphas does provide support for one aspect of his loss calculation—his replacement produce costs—but the support is too flimsy to rely upon. It takes the form of an affidavit from Angela Ciolino, a former Alphas employee who has "experienced his generosity personally" and was once supported by him financially "for months." *See* Ciolino Letter of Support (Dkt. 21-1 at 6.) Leaving aside any potential bias on Ciolino's part, her affidavit is too imprecise to do the work Alphas asks of it. First, it admits of no exceptions, which seems unlikely.[13] But more importantly, it establishes Alphas's methodology for calculating replacement costs—a figure that explains fully $125,000 of his intended loss calculation—based solely on Ciolino's memory of Alphas's business from 2007 to 2011, her review of an undisclosed set of documents, and her resulting estimate of the wholesale-to-retail markup.[14] Alphas Ex. 13 ¶ 3. This is too much faith to place in Ciolino's few lines on the subject.

---

[13] As written, Ciolino's affidavit implies that Alphas *always* bought a load of replacement produce when there was a problem with a load he had ordered. Alphas Ex. 13 ¶ 3. Yet in the 759 claim—the first fraudulent claim that Alphas filed—he did not seek reimbursement for replacement produce, suggesting he did not purchase any.

[14] Ciolino cites "increased transportation costs" as one reason for the markup. The government notes that, in his PSR objections, Alphas said it was his standard practice to

## Restitution

The government agrees with Alphas that restitution should be the difference between what Zurich paid him and his legitimate, insurable losses on the relevant claims. However, because Alphas has not provided reliable proof of any legitimate, insurable losses, the government cannot agree with him regarding the amount. In the government's view, the proper restitution award, on the existing record, is the full amount of Zurich's payments to Alphas: $178,568.41.

## Conclusion

In this resentencing, as a means of determining both the intended loss and the restitution amounts, it is Alphas's burden to offer evidence to show what legitimate losses he suffered. He has not offered evidence that he suffered any. Consequently, this Court should conclude that the amount of intended loss under the Guidelines is equal to the face value of the insurance claims Alphas submitted. For the same reasons, it should also conclude that the restitution amount is the full value that Zurich paid to Alphas. Doing so would again set the intended loss amount at $482,024.72, with a resulting Guidelines sentencing range of 27–33 months. The restitution award should remain $178,568.41.

Even if the Court finds it appropriate to decrease the intended loss amount, it should not reduce Alphas's sentence below the year-and-a-day that the Court imposed at the first sentencing. As the Court noted in its order denying bail pending appeal, that sentence was already "one crafted outside the guidelines in consideration of the defendant's argument regarding loss calculation." (Dkt. 34.) It was also one crafted after considering Alphas's arguments in favor of probation and intermittent confinement, *see* Sent. Tr. 35—a disposition

---

purchase his replacement produce from a market in Brooklyn. PSR Obj. 1. Neither Alphas nor Ciolino explain why transportation costs from Brooklyn would be higher than costs of shipping from California, the usual source of Alphas's original produce purchases.

Alphas seeks again in his memo on resentencing, *see* Alphas Memo at 2. As the Court observed during Alphas's first sentencing, a non-incarcerative sentence, or one that would only impinge on Alphas's life on weekends, when he is away from the workplace, would be "absolutely contrary to the concepts of general deterrence," and "general deterrence is particularly important here." Sent. Tr. at 42, 41. Alphas's prior sentence should not be decreased.

                                              Respectfully submitted,

                                              CARMEN M. ORTIZ
                                              United States Attorney

By:   */s/ Brian Pérez-Daple*
       BRIAN A. PÉREZ-DAPLE
       Assistant United States Attorney
       United States Attorney's Office
       1 Courthouse Way, Suite 9200
       Boston, MA 02210
       (617) 748-3100

Dated:    August 14, 2015

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                              */s/ Brian A. Pérez-Daple*
                                              BRIAN A. PÉREZ-DAPLE
                                              Assistant United States Attorney