## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              )
UNITED STATES OF AMERICA,                     )
                                              )
     Plaintiff                            )
                                              )    No. 1:14-cr-10121-DPW
v.                                            )
                                              )
JOHN S. ALPHAS, a/k/a YANNI,                  )
                                              )
     Defendant.                           )
_____)

### DEFENDANT JOHN S. ALPHAS'
### POST-HEARING SENTENCING MEMORANDUM

Mr. Alphas pleaded guilty to one count of wire fraud as a result of his scheme to inflate the value of insurance claims for loads of spoiled produce that were delivered to his business, The Alphas Company.  Mr. Alphas has maintained throughout the sentencing process that a portion of his claims were legitimate, and three days of testimony have born out that contention. Taking into account the extensive record before the Court, a reasonable estimate of the intended loss attributable to Mr. Alphas' scheme is $144,107.85 and actual loss is $70,659.02.  With a base offense level of 7, a loss enhancement of 8, a 2 point reduction for acceptance of responsibility, Mr. Alphas' total offense level is 13, 5 points lower than the total offense level that the Court found at the initial sentencing.  The sentencing guidelines range is therefore 12 to 18 months of incarceration as Mr. Alphas' criminal history category is I.

Mr. Alphas has made mistakes.  He pleaded guilty to a scheme to defraud his insurers. He recently submitted an application for a PACA license that falsely stated he has never been convicted of a crime.  There is no explanation or excuse for those actions.  However, any

reasonable sentence must consider the totality of Mr. Alphas' actions, including his extraordinary contributions to the community and his employees.[1]  Mr. Alphas' dedication to employing vulnerable members of the community has not waivered since his initial sentencing, despite slow business during our unprecedented winter, even though some people facing a possible term of imprisonment would be too concerned about their own difficulties to help others.  The Court initially departed downward from the sentencing guidelines range in light of Mr. Alphas' demonstrated commitment to the community and his employees, and it would be appropriate for the Court to do so again.

Prior to Mr. Alphas' appeal, the Court found that the applicable total offense level was 18.  The Court ultimately sentenced Mr. Alphas to one year and one day of imprisonment, effectively a 5 to 7 level departure below the guidelines sentence.  On remand, a similar 5 to 7 level downward departure below the total offense level of 13 would put Mr. Alphas squarely in Zone A, where a sentence of home confinement in lieu of imprisonment is appropriate.  U.S.S.G. § 5C1.1(b).  Mr. Alphas therefore respectfully requests that the Court impose a sentence of probation with sixty days of intermittent confinement or six months of home confinement, a fine within the guidelines range of $5,500 and $55,000, a $100 special assessment, and restitution in the amount of $70,659.02.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Alphas is the President and sole owner of The Alphas Company, a wholesale produce distributor located in Chelsea, Massachusetts.  As discussed in detail below, Mr. Alphas is devoted to his family and his employees, many of whom are homeless veterans, and has a long

---

[1] The Court expressed some concern that Mr. Alphas may not be permitted to operate his business in light of the termination of this PACA license.  As will be explained below, The Alphas Company has changed its business model since its license was revoked, and there is no evidence that the company requires a PACA license to continue operating.

track record of helping his employees and community.  Unfortunately, Mr. Alphas also engaged in a scheme to defraud two insurance companies by submitting inflated claims when his company received spoiled loads of produce.  All but one of these claims were filed during the financial crisis of 2007 and 2008.

The parties disagreed at the initial sentencing on the amount of actual and intended loss attributable to Mr. Alphas' offense.  The Court adopted the Government's view that Mr. Alphas should not be credited for the legitimate portions of his claims, and therefore found that actual loss was the entire amount the insurance companies paid ($178,568.41) and intended loss was the entire amount Mr. Alphas claimed ($482,024.72).  On that basis, the Court found that the total offense level was 18.[2]  With a criminal history category of I, the advisory guidelines sentence under the Court's calculation was 27 to 33 months incarceration, 1 to 3 years supervised release, a fine between $6,000 and $60,000, and a $100 special assessment.  (11/6/14 Sentencing Tr. 25:2-12.)

In light of the evidence of Mr. Alphas' remarkable contributions to the community and his employees, the Court ultimately concluded that a downward departure from the guidelines range was appropriate, and sentenced Mr. Alphas to incarceration for a period of one year and one day, three years of supervised release, the maximum guidelines fine of $60,000, and a $100 special assessment.  (11/6/14 Sentencing Tr. 44:11-13; 44:25-45:3.)  The Court also imposed restitution in the amount of $178,568.41, representing the entire amount that Mr. Alphas' insurers paid on the partially fraudulent claims.  (11/6/14 Sentencing Tr. 25:10-11; 45:2-3.)

On appeal, the First Circuit held that intended loss in an insurance fraud case "excludes any sums that the fraudster would have been paid absent the fraud."  United States v. Alphas,

---

[2] The Court also sustained Mr. Alphas' objection to an obstruction enhancement.  (11/6/14 Sentence Tr. 23:5-6.) That determination is not at issue on remand.

785 F.3d 775, 783 (1st Cir. 2015).  The First Circuit also held that the insurance companies are entitled to recover as restitution only "the amount they insurer would not have paid but for the fraud."  Id. at 786.  The First Circuit vacated and remanded for resentencing so that this Court may determine which portions of Mr. Alphas' claims were legitimate and accordingly recalculate the guidelines range and restitution award.  Id. at 787.

After the appeal, the Government initially argued the Court should find the same loss amount on remand.  That approach would, of course, ignore the First Circuit's decision.  The Court subsequently allowed the parties to present testimony on the loss calculation.  After three days of testimony it is apparent that the intended loss calculation should be significantly reduced to account for Mr. Alphas' legitimate claims.

## LEGAL BACKGROUND

### I.  Burden of Proof

On remand the Government bears the burden of proving the applicability of any sentencing enhancements by a preponderance of the evidence, although the defense may bear a burden of production to offer some evidence of the amounts of Mr. Alphas' claims that were legitimate.  Alphas, 785 F.3d at 784.  Once "the record is fully formed," this Court "must determine the amount of loss that the government (which retains the burden of proof) is able to establish," and "need only make a reasonable estimate of the loss."  Id.

### II.  Issues on Remand

The First Circuit directed this Court to determine the amount of intended loss and actual loss, and "of course, the dimensions of the sentence to be imposed."  Id. at 787.  This final remark should be read in the context of the First Circuit's other precedents and other applicable law.  On remand, the Court's task is to recalculate loss and to determine the sentence that is sufficient but not greater than necessary to comply with the factors outlined in 18 U.S.C.

§ 3553(a), given the new loss figure.  The Court should therefore take into account the character evidence that was presented at the first sentencing, and any post-sentencing character or other evidence that is relevant under § 3553(a).  See id. at 481 (finding district court may consider evidence of post-sentencing rehabilitation on remand); see also United States v. Bryant, 643 F.3d 28, 34 (1st Cir. 2011) (noting district court may consider post-sentencing rehabilitative efforts).

The defense asks the Court to consider the character evidence presented at Mr. Alphas' initial sentencing, which remains relevant under § 3553(a), and evidence of Mr. Alphas' post-sentencing rehabilitation that could not have been raised previously.  The only new character or rehabilitation evidence that Mr. Alphas asks the Court to consider relates to post-sentencing matters that could not have been raised at the first sentencing.  However, the Government asks the Court to also consider evidence of certain pre-sentencing matters relating to PACA that it failed to raise at the first sentencing.  The Government, however, waived any issues it could have brought, but chose not to, at the first sentencing.  The First Circuit does not permit de novo resentencing on remand, unless the appellate decision expressly states otherwise.  United States v. Ticchiarelli, 171 F.3d 24, 32 (1st Cir. 1999).  An issue not relevant to the appeal that a party had reason to raise below, but chose not to raise, has been waived.  Id. ("Under our approach a defendant may argue at resentencing that the court of appeals' decision has breathed life into a previously dormant issue, but he may not revive in the second round an issue he allowed to die in the first.") (quoting United States v. Whren, 111 F.3d 956, 960 (D.C. Cir. 1997)).  The Government certainly had reason to raise any evidence relating to the § 3553(a) factors at Mr. Alphas' initial sentencing.  As will be discussed below, the Government was aware of the newly introduced pre-sentencing evidence at Mr. Alphas' initial sentencing, and chose not to bring it at

that time.  Nothing in the First Circuit's decision on appeal renders this evidence newly relevant.

The Government therefore waived these matters on remand.

### III. Sentencing Guidelines Amendments

This Court is also permitted to consider on remand changes in law that are relevant under

the First Circuit's decision.  See Ticchiarelli, 171 F.3d at 32.  Several amendments to the

Sentencing Guidelines pertain to the loss calculation in this case.  First, the applicable loss table

has been recalibrated to adjust for inflation.  U.S.S.G. § 2B1.1(b)(1) (2015).  Second, the

definition of intended loss has been revised.  Intended loss now means "the pecuniary harm that

the defendant purposely sought to inflict."  Id. at § 2B1.1 cmt. 3(A)(ii).  The Sentencing

Commission has explained that this change was intended to clarify that intended loss is a

subjective inquiry.  (DX46 at 24.)

### ARGUMENT

The Sentencing Guidelines are advisory, and are but one factor for this Court's

consideration in imposing a sentence.  United States v. Booker, 543 U.S. 220 (2005).  The

Supreme Court held in Gall that a district court should begin all sentencing proceedings by

calculating the guideline range; and, after arguments by the parties, the "district judge should

then consider all of the § 3553(a) factors to determine whether they support a sentence requested

by a party" and in so doing, the district judge "may not presume that the Guidelines range is

reasonable."  United States v. Gall, 552 U.S. 38, 49-50 (2007).  Instead, the Court must craft a

sentence that is "minimally sufficient to achieve the broad goals of sentencing."  United States v.

Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008).  Taking into account the specific circumstance of

Mr. Alphas as instructed by the statute, and weighing the guidelines calculation as but one factor,

supports Mr. Alphas' requested sentence of probation with 60 days of intermittent confinement

or 6 months of home confinement, a fine within the guideline range of $5,500 to $55,000, a $100 special assessment, and restitution in the amount of $70,659.02.

## IV. Guidelines Calculation, 18 U.S.C. § 3553(a)(4)

Mr. Alphas waived indictment and has plead guilty to one count of wire fraud in violation of 18 U.S.C. § 1343.  In the plea agreement, Mr. Alphas and the Government agreed that Mr. Alphas' base offense level was 7 pursuant to U.S.S.G. § 2B1.1(a)(1).  See Plea Agreement at 2. The parties also agreed at sentencing that Mr. Alphas is entitled to a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 (the relevant reduction is 2 points) and that the appropriate criminal history category is I.  The sole guidelines calculation issue for the Court at resentencing is the amount of loss after Mr. Alphas is credited for the legitimate portions of his claims.  As detailed below, intended loss in this case is $144,107.85 and actual loss is $70,659.02.  Loss, the greater of actual or intended loss, is therefore $144,107.85.  See U.S.S.G. § 2B1.1 cmt. 3(A). The appropriate specific offense characteristic enhancement is 8 points, for a loss greater than $95,000 and up to $150,000.  See id. at § 2B1.1(b)(1)(E).  The total offense level is therefore 13. With a criminal history category of I, the guideline sentencing range is 12-18 months incarceration, 1 to 3 years of supervised release, a fine between $5,500 and $55,000, and a $100 special assessment.  See id. at §§ 5D1.2(a)(2), 5E1.2(c)(3), 5E1.3.

The losses caused by Mr. Alphas are summarized in the following chart.

| Claim Number | Claim Minus Deductible | Amount Insurer Owed | Amount Insurer Paid | Actual Loss | Intended Loss |
|---|---|---|---|---|---|
| Zurich 759 | $13,227.75 | $13,227.75 | $13,204.25 | $0.00 | $0.00 |
| Zurich 869 | $31,750.00 | $22,035.50 | $30,200.00 | $8,164.50 | $9,714.50 |
| Zurich 257 | $19,435.00 | $12,985.00 | $19,435.00 | $6,450.00 | $6,450.00 |
| Zurich 447 | $50,000.00 | $19,874.36 | $36,181.16 | $16,306.80 | $30,125.64 |
| Zurich 312 | $30,994.00 | $20,898.38 | $30,994.00 | $10,095.62 | $10,095.62 |
| Zurich 514 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Zurich 563 | $48,554.00 | $18,911.90 | $48,554.00 | $29,642.10 | $29,642.10 |
| Zurich 246 | $16,480.00 | $2,900.01 | $0.00 | $0.00 | $13,579.99 |
| Zurich 652 | $45,533.50 | $1,033.50 | $0.00 | $0.00 | $44,500.00 |
| Selective 609 | $25,000.00 | $25,000.00 | $0.00 | $0.00 | $0.00 |
| **TOTAL** | **$280,974.25** | **$136, 866.40** | **$178,568.41** | **$70,659.02** | **$144,107.85** |

The insurers paid a total of $178,568.41 on Mr. Alphas' inflated claims.  Had Mr. Alphas not inflated his claims, after the $1,000 deductible is taken into account, his insurers would have owed him $136,866.40 on those claims.  Actual loss, the amount of money the insurers paid above what they would have owed Mr. Alphas absent any fraud, is $70,659.02.

Mr. Alphas initially submitted claims totaling $482,024.72 after the $1,000 deductible is taken into account.  One claim was an accidental duplicate, which Mr. Alphas withdrew.  When that duplicate claim is removed from consideration, the total claimed amount (minus the deductible) is $404,650.60.  As Mr. Alphas only intended for the insurance company to pay what was covered by the policy, and as Mr. Alphas revised the amount of one claim after it was initially submitted, the total claimed amount is reduced to $280,974.25.  Mr. Alphas would have been entitled to receive $136,866.40 in the absence of fraud.  Intended loss, therefore, is $144,107.85 – i.e., the difference between the total claim amount and the amount the insurers would have been obligated to pay in the absence of fraud.

In further detail, Mr. Alphas submitted the following claims:

**Zurich Claim No. 573-0019759 (the "759 Claim")**

Mr. Alphas submitted the 759 claim to Zurich Insurance ("Zurich") on April 2, 2007 after a load of lettuce purchased from West Coast Distributing, Inc. was stolen in transit.  (GX40; GX31 at ALPHAS-GOV-002684.)[3]  There is no dispute that the load was stolen; freight broker 2K Logistics confirmed to Zurich that the load was diverted and donated to charity due to a payment dispute.  (GX 31 at ALPHAS-GOV-00268182; Brown 10/6/15 Tr. 44:25–45:3.)  The Government introduced no evidence to the contrary.

Mr. Alphas initially submitted a West Coast sales confirmation in the amount of $25,760.25 in support of the 759 claim.  (GX87 at ALPHAS-GOV-002748.)  Before any amount owed was determined by Zurich, Mr. Alphas submitted a revised invoice for $14,227.75, thereby reducing his claim.  (GX86 at ALPHAS-GOV-002712.)  West Coast verified this invoice was legitimate.  (GX31 at ALPHAS-GOV-002668; Graves 10/5/15 Tr. 93:14-17.)  Accordingly, as Zurich acknowledged, the revised amount of Mr. Alphas' claim was $14,227.75.  (GX31 at ALPHAS-GOV-002666; Graves 10/5/15 Tr. 79:4-8.)

Zurich owed $13,227.75 on the 759 claim, including the revised West Coast invoice minus the $1,000 deductible.  (Graves 10/5/15 Tr. 16:9-14.)  Zurich paid $13,204.25, less than what it owed.  (GX31 at ALPHAS-GOV-002666-67; Graves 10/5/15 Tr. 79:24–80:6.)  Therefore, there is no actual loss associated with the 759 claim.

Likewise, as the Court recognized at the August 31, 2015 hearing, there is no evidence that Mr. Alphas' submission of the larger initial invoice was fraudulent.  In other words, there is no evidence that Mr. Alphas intended any loss at all with respect to the 759 claim.  Therefore, there is also no intended loss associated with the 759 claim.

---

[3] "GX" refers to the Government's exhibits, and "DX" refers to Defense exhibits.

**Zurich Claim No. 557-0053869 (the "869 Claim")**

Mr. Alphas submitted the 869 claim on February 4, 2008 after the freight company,

Regal Trucking, drove off with the load.  (GX41.)  Dave Singh, the owner of Regal Trucking,

testified that he instructed his driver to hold this load hostage as leverage to extract a payment

from Mr. Alphas for prior loads.[4]  (Singh 10/5/15 Tr. 114:17–115:8, 121:4-7.)  Mr. Alphas

claimed that the truck driver drove off because he did not want to wait in line to be unloaded.

(GX32 at ALPHAS-GOV-003052.)  Regardless of why the load was not unloaded, the

undisputed evidence is that the produce was not unloaded in Mr. Alphas' bay to supply The

Alphas Company's customers.

In connection with the 869 claim, Mr. Alphas submitted an invoice for $16,331.40 for the

original produce from Manny Lawrence Sales, Inc. and a $32,750.00 invoice for replacement

produce from Premier Produce.  (GX32 at ALPHAS-GOV-003044, 3049.)  Both invoices were

---

[4] Mr. Singh's testimony as a whole is utterly implausible and lacks credibility.  Mr. Singh testified that Mr. Alphas offered the Regal driver a bribe of $5,000 to deliver the load, and Regal ultimately accepted a payment of $971 to deliver the load to another location at Mr. Alphas' request.  (GX104, Singh 10/5/15 Tr. 116:15-21, 117:7-9, 130:17-20.)  Mr. Singh did not tell the Government about this alleged bribery until the night before his testimony.  (Singh 10/5/15 Tr. 117:11-20, 118:4-6, 134:24–135:5.)  Mr. Singh also could not identify the alternative location where Mr. Alphas allegedly requested the load be delivered.  (Singh 10/5/15 Tr. 153:11-14.)  Moreover, it does not make sense that Mr. Singh would accept a payment of less than $5,000, either in the form of a cash payment in the custody of the driver or by check, when he knew Mr. Alphas was offering to pay that amount.  Mr. Singh tried to explain this inconsistency by claiming he did not know Mr. Alphas had offered the bribe at the time he accepted $971, but then changed his story to say that he knew of the $5,000 offer before his driver delivered the load.  (Singh 10/5/15 Tr. 130:17–131:6132:23–133:23.)  Mr. Singh then testified that he did not know Mr. Alphas paid less than $5,000 until after the load was already delivered.  (Singh 10/5/15 Tr. 121:7-11, 131:7-17; 140:9-15.)  That explanation is also spurious; the $971 check was deposited on January 17, 2008, the same day the load was delivered.  (GX104; Singh 10/5/15 Tr. 138:23–139:3.)

Additional evidence confirms that Mr. Singh is not credible.  Dalbir Gill, a former Regal driver, testified that Mr. Singh "cheated" and did not pay his drivers.  (Gill 10/6/15 Tr. 97:9-20, 99:20-22, 100:18-20.)  Even though there was a police report of the incident, Mr. Singh denied he was ever contacted by Everett Police regarding the 869 load. (DX37; Singh 10/5/15 Tr. 136:9-15.)  Mr. Singh also refused to cooperate with Zurich's investigation, claiming he never received certified mail that was delivered to his company.  (DX32 at ALPHAS-GOV-003041, 3045-46, 3048-49; DX38; DX39; DX42; Singh 10/5/15 Tr. 136:16-23, 137:18-20; 138:13-19; Brown 10/6/15 Tr. 47:6-10, 49:6-8, 49:22–50:7, 50:21-23, 51:18-24, 52:16-18, 53:1-4, 53:22-24.)  In fact Mr. Singh testified that he had no idea there was a dispute relating to the 869 load until the FBI contacted him recently, but that testimony is false.  (Singh 10/5/15 Tr. 141:15-23.)  Regal listed Alphas as a creditor in its bankruptcy filing, even though Mr. Singh unconvincingly tried to argue that a creditor owed Regal money.  (DX40; Singh 10/5/15 Tr. 142:10–143:1.)

fraudulent.  Manny Lawrence verified that the legitimate original produce invoice was invoice number 98539 (DX9; DX10; GX32 at ALPHAS-GOV-003052; Graves 10/5/15 Tr. 90:20-25) in the amount of $15,357.00.

Replacement Costs:  The Premier Produce invoice was also forged, but Mr. Alphas did incur legitimate replacement costs in connection with the 869 claim.  As Jerry Pimental of Stop & Shop testified, timely produce deliveries are important to Stop & Shop.  (Pimental 10/5/15 Tr. 185:15-21.)  That company buys from hundreds of produce vendors, and if a vendor is late Stop & Shop might choose a different vendor.  (Pimental 10/5/15 Tr. 185:22–186:8.)  The Alphas Company therefore risks losing customers if it is unable to make deliveries in a timely manner. Angela Ciolino, a longtime former employee of The Alphas Company, testified that when a distressed load arrived Mr. Alphas would have to scramble to find replacement product to cover outstanding orders.  (DX13 at ¶ 3; Ciolino 10/8/15 Tr. 94:7-9, 98:14-24.)  He would purchase replacement produce across the Eastern Seaboard, often from the Hunts Point Produce Market in New York for cash.  (DX13 at ¶ 3; Ciolino 10/8/15 Tr. 97:2-6, 98:14-24.)

Ms. Ciolino provided the Court with a reasonable estimate of Mr. Alphas' replacement costs, based on her years of experience at The Alphas Company.[5]  She recalls that Mr. Alphas had to pay retail prices for replacement produce, and that delivered retail prices were 50% higher than delivered wholesale prices, if not more.[6]  (DX13 at ¶ 3; Ciolino 10/8/15 Tr. 98:25–99:7, 109:3-4.)  Replacement costs were higher for several reasons.  First, Hunts Point vendors would

_____

[5] The Court should find that Ms. Ciolino's testimony is highly credible.  She worked at The Alphas Company for over a decade and has extensive knowledge of its operations.  (Ciolino 10/8/15 Tr. 90:16-19.)  While she can certainly attest to Mr. Alphas' generosity towards his employees, she does not feel indebted to him for any assistance he may have provided because she contributed years of work to his company.  (Ciolino 10/8/15 Tr. 114:7–115:7.)

[6] The Government may argue that replacement costs might be lower than wholesale prices days before due to fluctuations in produce prices.  However, there is no evidence to support this theory and Ms. Ciolino expressly denied that replacement costs were ever lower than wholesale.  (Ciolino 10/8/15 Tr. 104:19-20, 105:10-15.)

not sell at wholesale prices.  (DX13 at ¶ 3; Ciolino 10/8/15 Tr. 105:10-15.)  Second, freight costs were higher because partial loads from multiple vendors cost more per carton than full loads.[7]  (DX13 at ¶ 3; Ciolino 10/8/15 Tr. 99:8-16, 107:21-108:5.)  A reasonable estimate of the legitimate replacement costs on the 869 claim is $23,035.50, a 50% markup from the legitimate original produce price of $15,357.00.

Stop & Shop:  Mr. Alphas submitted a bill of lading and purchase order in support of his claim that he had to purchase replacement produce on the 869 claim to fulfill an existing order.  (GX88.)  The Government will argue that these documents are forged and that there was no outstanding Stop & Shop order.  The evidence does not support the Government's theory.  Both Mr. Pimental and Ms. Ciolino confirmed that Stop & Shop ordered produce from The Alphas Company.  (Pimental 10/5/15 Tr. 179:18–180:3; Ciolino 10/8/15 Tr. 96:9-17.)  Mr. Pimental denied that the purchase order number in GX88 was a valid Stop & Shop number or that the signature in GX88 belonged to a Stop & Shop employee.  However, he also admitted that Stop & Shop also works with external brokers, and Mr. Pimental would not know if GX88 reflects a sale through an external broker, or an external broker's purchase order number.[8]  (Pimental 10/5/15/ Tr. 189:3-13, 189:19–190:3, 193:20-24.)

Original and Replacement Invoices:  Mr. Alphas submitted invoices for both the original and replacement loads with the 869 claim.  Although the invoices were inflated, he did not intend to defraud Zurich by submitting both of these invoices, and they should not both count towards intended loss.  When a produce company has to replace a spoiled load, Zurich will pay for only

---

[7] The Government may argue that freight costs from New York should have been lower than freight costs from California.  That argument misconstrues freight pricing.  As Ms. Ciolino explained, the per carton cost of shipping a partial load (an LTL, or Less Than Truckload shipment) is "extremely higher" than the per carton cost on a full load. (Ciolino 10/8/15 Tr. 107:21–108:5.)

[8] GX88 contains Alphas Company-generated documents, not Stop & Shop records.  As Ms. Ciolino testified, she sometimes took orders over the phone, including the order contained in GX88.  (Ciolino 10/8/15 Tr. 95:16-18, 118:22-23.)

one load (typically the more expensive replacement load).  (Graves 10/5/15 Tr. 15:25–16:8.)

Zurich will naturally want all documentation of the claim that the insured can provide, including

both the original and replacement invoices, and in fact expressly asked for both in connection

with a different claim.  (GX50 at ALPHAS-GOV-003025; Graves 10/5/15 Tr. 35:10-14; Brown

10/6/15 Tr. 39:9-12.)  Insureds routinely submit all invoices relating to a claim, and the claims

adjuster will determine what is or is not covered.  (Graves 10/5/15 Tr. 10:21–11:1, 95:24–96:7;

Brown 10/6/15 Tr. 39:13-16.)  Provided that the insured truthfully identifies the purpose of each

invoice, there is nothing unusual or fraudulent about this approach.  Zurich will not be tricked

into paying for two loads provided that it is told which invoice is for original produce and which

is for replacement produce.  (Graves 10/5/15 Tr. 108:13-16.)

     The Government elicited testimony that Zurich considered the claim amount to include

both the original and replacement invoices, but indicated that the claim adjuster understood that

one invoice was for the original load and one for the replacement load.[9]  Mr. Alphas did not

intend to defraud Zurich by submitting invoices for both the original and replacement load.  He

did not hide the fact that he was submitting original and replacement invoices.  (Graves 10/5/15

Tr. 92:13-17.)  Mr. Alphas clearly identified the Manny Lawrence invoice as the original

produce load, and Zurich understood it to be an invoice for the original load.  (GX32 at

ALPHAS-GOV-003049 (identifying the $16,331.40 invoice as "for the load of produce stolen

from the insured").)  Mr. Alphas then followed up with Zurich with the Premier Produce invoice,

which he identified as an invoice for replacement produce.  (GX32 at ALPHAS-GOV-003048.)

Zurich ultimately paid for the replacement load only, and Mr. Alphas did not seek further

---

[9] In any event, Zurich's employees do not have a uniform view of what constitutes the amount of the claim.  One
Zurich employee told Mr. Alphas that his claim amount is only the original produce cost.  (GX34 at ALPHAS-
GOV-003280-81.)

payment.  (GX32 at ALPHAS-GOV-003048 (subtracting original produce invoice from total payment); Graves 10/5/15 Tr. 92:4-12, 92:18-21.)  Although the invoices were inflated, Mr. Alphas did not intend to inflict a pecuniary harm on Zurich by submitting both.  Only the replacement invoice should count towards intended loss.

Loss Calculation:  Zurich owed $22,035.50 on the 869 claim, i.e., the $23,035.50 replacement cost minus the $1,000 deductible.  Zurich made two payments, of $15,331.40 and $14,868.60, for a total of $30,200.  (GX32 at ALPHAS-GOV-003046.)  The actual loss associated with the 869 claim is therefore $8,164.50.

Mr. Alphas fraudulently intended for Zurich to pay $31,750.00, i.e., the inflated Premier Produce invoice of $32,750.00 minus the $1,000 deductible.  Intended loss on the 869 claim is therefore $9,714.50, i.e., the difference between what Mr. Alphas fraudulently intended Zurich to pay and the amount Zurich legitimately owed.

**Zurich Claim No. 573-0028257 (the "257 Claim")**

Mr. Alphas reported the 257 claim on February 14, 2008 after the refrigeration unit on a delivery truck failed, spoiling a load of celery and other items.  (GX42; GX50 at ALPHAS-GOV-003026.)  As proof that the reefer unit failed, Mr. Alphas submitted an invoice for repairs to that unit that took place in Massachusetts on December 27, 2007, seven days after the load left California on December 20.  (DX43, GX50 at ALPHAS-GOV-003030; Graves 10/5/15 Tr. 36:6-11.)  Mr. Gill, the truck driver, confirmed that the repair invoice matched the trailer number he used on the trip, and that he had to stay in the Boston area over Christmas.[10]  (DX43, GX50 at ALPHAS-GOV-003030; Gill 10/6/15 Tr. 103:4-10, 104:5-8.)

---

[10] Mr. Singh denied that the 257 load arrived spoiled.  For the reasons explained supra, Mr. Singh is not a credible witness.  Moreover, Mr. Singh's claim that he was unaware of any problems with the 257 load is contradicted by the

Mr. Alphas submitted multiple invoices in support of the 257 claim, including an $11,225.00 invoice for celery from Manny Lawrence, a $2,870.00 produce invoice from Lucky Star Marketing, LLC,[11] a $5,300.00 freight invoice, $900.00 in storage and fuel costs, $800.00 in disposal costs from William Dooley Disposal, and the $140.00 reefer unit invoice from Always Cool.  Mr. Alphas also deducted $800.00 in sales revenue from the claim.  (GX50.)

The Manny Lawrence invoice was forged.  The legitimate cost of the celery, as reflected in an invoice located in Manny Lawrence's files, was $4,825.00.  (DX15 at ALPHAS-GOV-001312.)

The Williams Dooley Disposal invoice was also forged, but it does reflect some legitimate disposal costs.  Ms. Ciolino testified that Mr. Alphas did incur disposal costs when he received a spoiled load.  (DX13 at ¶ 4.)  She also recalled that William Dooley was one of the farmers Mr. Alphas paid to dispose of spoiled produce, and he only accepted cash.  (Ciolino 10/8/15 Tr. 98:3-9.)  She has recalled that Williams Dooley charged anywhere from $700 to $1200 per load, depending on the load.  (DX13 at ¶ 4; Ciolino 10/8/15 Tr. 98:10-13.)  William Dooley himself indicated that he charged $750 per load.  (PSR ¶ 28.)  Therefore, a conservative estimate of Mr. Alphas' legitimate disposal costs associated with the 257 claim is $750.

---

evidence, which demonstrates that Mr. Alphas emailed a Regal employee concerning the heated load in January 2008.  (DX41; Singh 10/5/15 Tr. 144:7-9, 144:14-20.)

Additionally, Mr. Singh acknowledged that his equipment was not brand new.  (Singh 10/5/15 Tr. 125:13-14.)  His assertion that he had sufficient funds to maintain his trucks in good working order months before Regal filed for bankruptcy in May 2008 simply makes no sense.  (DX40; Singh 10/5/15 Tr. 145:15-23, 146:6-15, 146:19–147:1.)  If Mr. Singh had any funds shortly before his company went bankrupt, he would have used those funds to make payments on the trucks to avoid repossession.

[11] The Government may argue that only a portion of the Lucky Star order arrived spoiled because a claim notification indicates that 30 cases of yams were disputed but does not mention the remaining produce.  However, in light of the evidence demonstrating that the reefer unit malfunctioned, there is no evidence that the remaining Lucky Star produce did not spoil.  Zurich does not know the circumstances surrounding this claim notice.  (Brown 10/6/15 Tr. 36:1-6.)  Mr. Alphas could have negotiated a credit for only a portion of the load as part of an agreement to resolve the claim.  Moreover, Mr. Alphas did deduct $800 in sales revenue from the claim, indicating that he sold the portion that was salvageable.

Zurich owed $12,985.00 on the 257 claim, including the $4,825.00 legitimate Manny Lawrence invoice, $2,870.00 from Lucky Star, $5,300.00 in freight, $900.00 in storage and fuel costs, $750.00 in estimated disposal costs, $140.00 for the reefer unit repair, minus $800.00 in sales revenue and the $1,000 deductible.  Zurich paid $19,435.00 on the 257 claim.  (GX13.) Therefore, the actual loss associated with the 257 claim is $6,450.00, i.e., the $19,435.00 Zurich paid minus the $12,985.00 Zurich legitimately owed.

Mr. Alphas sought a payment of $19,435.00 on the 257 claim, i.e., the total invoices he submitted minus the $1,000 deductible.  Therefore, intended loss (the difference between the amount Mr. Alphas fraudulently sought and what Zurich legitimately owed) is also $6,450.00.

**Zurich Claim No. 573-0030447 (the "447 Claim")**

The Alphas Company submitted the 4447 claim on June 5, 2008 after a load of lettuce spoiled en route.  (GX43.)  The USDA inspected the load in Missouri and found that it was spoiled.  (GX51 at ALPHAS-GOV-001963; Graves 10/5/15 Tr. 101:19–102:10; Albert 10/5/15 Tr. 229:16–230:1.)  In connection with a duplicate of this claim, the freight company White Hawk Trucking confirmed that it had to dispose of a load of lettuce when a truck broke down in transit.  (GX36 at ALPHAS-GOV-002476-77; Graves 10/5/15 Tr. 100:7-10; Brown 10/6/15 Tr. 45:17-22.)

In support of the 447 claim, Mr. Alphas submitted a Greenfield Fresh invoice for $27,485.50, a Fastrac Logistics, Inc. invoice for $9,000.00 in freight for obtaining replacement produce, an invoice for a USDA inspection charge of $207.48, an invoice for $488.62 in disposal costs, and a Premier Produce invoice for $41,400.00 in replacement lettuce.  (GX51.)

Both the Greenfield Fresh and Premier Produce invoices were fraudulent.  The legitimate Greenfield Fresh invoice was for $7,452.17.[12]  (DX17 at ALPHAS-GOV-003351.)  As with the other Premier Produce invoices Mr. Alphas submitted, that invoice includes some legitimate replacement costs.  As Ms. Ciolino explained, a reasonable estimate of the replacement costs is 50% over the wholesale costs.  Here, the wholesale cost was $7,452.17 for the original produce.  A reasonable estimate of the replacement produce for the 447 claim is therefore $11,178.26.

It is clear that Mr. Alphas did not intend for Zurich to pay for both the original produce invoice from Greenfield Fresh and the replacement produce invoice from Premier Produce.  As with the 257 claim, Zurich would only reimburse one load and Mr. Alphas clearly disclosed which invoice was for the original load and which invoice was for replacement produce.  (GX51 at ALPHAS-GOV-001957.)  In conversations with Zurich, Mr. Alphas requested that he be reimbursed up to the amount of his replacement costs, not both loads.  (GX34 at ALPHAS-GOV-003280-81; Brown 10/6/15 Tr. 44:10-12.)   In any event, Zurich would never pay any amount above the $50,000 policy limit, and there is no evidence that Mr. Alphas ever believed otherwise.  (Graves 10/5/15 Tr. 102:11-19, 108:8-16; Brown 10/6/15 Tr. 38:20-21.)  Likewise, Mr. Alphas did not try to avoid the $50,000 policy limit.  For example, he never altered any policy documents to suggest a higher policy limit and he did not break up single occurrences into multiple claims to avoid the policy limit.

The Fastrac invoice was not fraudulent.  As Ms. Ciolino testified, Mr. Alphas did use Fastrac to obtain replacement produce.  (DX13 at ¶ 5; Ciolino 10/8/15 Tr. 93:24–94:9.)  The

---

[12] That invoice was paid as part of a civil settlement between Greenfield Fresh and The Alphas Company.  (PSR ¶ 34 n.6.)  Whether Mr. Alphas paid the invoice before or after submitting the 447 is irrelevant.  Mr. Alphas was obligated to pay the invoice when the claim was submitted. (Graves 10/5/15 Tr. 17:7-9, 91:25–92:2, 94:23-25; Brown 10/6/15 Tr. 9:13-23, 38:2-14.)  Zurich did pay out claims before invoices were paid.  As long as Mr. Alphas was obligated to pay some portion of the original load, Zurich would reimburse him for the replacement load. Therefore, what Zurich owed is a function of the replacement costs, not the amount that Mr. Alphas actually paid for the original produce.

Alphas Company paid for Fastrac's services in the form of rent, payroll, and other expenses. Fastrac, which is owned by Mr. Alphas, rents office space from The Alphas Company.  (Ciolino 10/8/15 Tr. 112:5-8.)  The Alphas Company also gives money to Fastrac to cover payroll and cash from time to time.  (Ciolino 10/8/15 Tr. 94:25–95:6.)   Ms. Ciolino would reconcile the accounts between Fastrac and The Alphas Company on a monthly or yearly basis, and the account generally netted out to zero.  (DX13 at ¶ 5; Ciolino 10/8/15 Tr. 94:14-24; 133:7-17.)

Zurich owed $19,874.36 on the 447 claim, including $11,178.26 in replacement produce costs, $9,000.00 in replacement freight, the $207.48 inspection fee, and $488.62 in disposal costs, minus the $1,000 deductible.  Zurich paid $36,181.16.  (GX13.)  The actual loss associated with the 447 claim is therefore $16,306.80.

There is no evidence that Mr. Alphas sought a payment above the $50,000 policy limit. The intended loss associated with the 447 claim, i.e. the amount Mr. Alphas fraudulently sought beyond the $19,874.36 he was entitled to, is therefore $30,125.64.

**Zurich Claim No. 557-0064312 (the "312 Claim")**

Mr. Alphas reported the 312 claim on August 1, 2008, after a load of lettuce arrived spoiled because the refrigeration unit failed.  Donald Albert, an inspector with the USDA, confirmed that the USDA inspection revealed that the load was in poor condition.  (GX52 at ALPHAS-GOV-002922-23; Albert 10/5/15 Tr. 222:7-12, 222:21-22, 225:18-25, 227:2-3.)  The Government speculates that this load arrived on July 25, 2007, days before the USDA inspection, and that the produce was not spoiled upon arrival.  However, there is simply no evidence for that theory.  The produce invoice from Adam Bros Produce Sales, Inc. indicates the load left California on July 23, 2007, and it would typically take anywhere from 4 to 7 days for the load to reach Massachusetts.  (GX52 at ALPHAS-GOV-002920; Albert 10/5/15 Tr. 227:22–228:11.)

There is no evidence indicating what temperature the load was transported at, or when the load was unloaded at The Alphas Company.  (Albert 10/5/15 Tr. 228:6-11, 230:6-9.)

In support of the 312 claim, Mr. Alphas submitted a $7,906.25 invoice from Adam Bros[13] for the original produce, a $6,100.00 freight invoice from Jora & Sons Freight, USDA inspections costing $52.00 and $87.00, a $1,500.00 disposal invoice from William Dooley, and a $30,355.00 invoice for replacement produce from Premier Produce.  (GX52.)  The William Dooley and Premier Produce invoices were fraudulent.  As with the other Dooley invoices, a reasonable estimate of the disposal costs for the 312 load is $750.  Likewise, a reasonable estimate of the replacement produce costs is 50% over wholesale.  In this case, wholesale costs were $14,006.25, including $7,906.25 for the original produce and $6,100.00 in freight. Therefore a reasonable estimate of the replacement produce cost is $21,009.38.

Zurich does not reimburse claimants for two loads of produce, and in this case the insurer reimbursed Mr. Alphas only for the replacement load minus the deductible.  (GX35 at ALPHAS-GOV-002893; Graves 10/5/15 Tr. 27:20–28:5, 38:11-14, 28:19-24, 103:2-9; Brown 10/6/15 Tr. 60:1-8.)  Mr. Alphas did ask Zurich to increase its payment to also include the original load, but he did not do so fraudulently.  (GX98.)  He clearly identified the Premier Produce invoice as being for the replacement produce and Zurich readily understood what each invoice was for. (GX35 at ALPHAS-GOV-002893; GX52 at ALPHAS-GOV-002919; GX98.)  The relevant question at sentencing is not whether Mr. Alphas submitted both invoices, but whether he sought to defraud Zurich by doing so.  It is not fraudulent to seek reimbursement for an item that is not covered by an insurance policy, provided that the insured transparently identifies what he is

---

[13] The Government contends that only 70 cartons from Adam Bros were spoiled because that company ultimately deducted 70 cartons from the order due to a "bad arrival."  (GX97 at ALPHAS-GOV-000074.)  However, this deduction is equally consistent with a negotiated settlement between Mr. Alphas and Adam Bros, and does not prove that only 70 cartons were damaged.  (Graves 10/5/15 Tr. 103:13-24.)

seeking and the insurer is able to accurately assess the claim. Therefore, the original produce invoice and the original freight invoice that was not covered by the policy should not count towards the loss calculation.

Zurich owed $20,898.38 on the 312 claim, including $21,009.38 in replacement produce, $750 in disposal costs, and $52.00 and $87.00 in USDA inspection costs, minus the $1,000 deductible. Zurich paid $30,994.00. (GX13.) The actual loss associated with the 312 claim is therefore $10,095.62.

Mr. Alphas fraudulently sought a payment of $30,994.00, including the $30,355.00 Premier Produce invoice, $1,500.00 in disposal costs, and $52.00 and $87.00 in USDA inspection costs, minus the $1,000 deductible. The intended loss associated with the 312 claim is therefore also $10,095.62.

**Zurich Claim No. 573-0066514 (the "514 Claim")**

After the 447 claim was submitted, Mr. Alphas faxed the same documents in support of a second claim, except he omitted an invoice for the USDA inspection. (Compare GX51 with GX53.) The duplicate submission was readily apparent to Zurich, and Mr. Alphas withdrew the claim shortly after Zurich brought the duplication to his attention. (GX16; GX36 at ALPHAS-GOV-002470; Graves 10/5/15 Tr. 50:2-4; 100:22–101:14.)

There is no evidence that Mr. Alphas intended to defraud Zurich with this duplicate submission. Mr. Alphas' scheme was to submit altered or fraudulent invoices. Submission of duplicate invoices was not part of that scheme. If Mr. Alphas had intended to defraud Zurich with the 514 claim, he would have altered those invoices so they were not easily identified as

duplicates.  The 514 claim was simply an innocent mistake, and there is no actual or intended loss associated with that claim.[14]

**Zurich Claim No. 557-0068563 (the "563 Claim")**

Mr. Alphas reported the 563 claim on October 10, 2008, after a late load of lettuce arrived spoiled.  (GX45.)  He submitted an altered bill of lading suggesting that the truck arrived 4 days late.  (GX91.)  The truck was actually only 2 days late, as indicated on the unaltered bill of lading.[15]  (DX22 at ALPHAS-DEF-00005; Graves 10/5/15 Tr. 99:4-6.)  The true bill of lading also notes that the temperature of the lettuce when it arrived was between 33-39 degrees, even though we know that Mr. Alphas asked for lettuce on another load to be shipped at 34 degrees.  (DX22 at ALPHAS-DEF-00005; GX7 at ALPHAS-GOV-000119.)

In support of the 563 claim, Mr. Alphas submitted a $5,600.00 freight invoice from U-W Logistics, a $42,454.00 invoice for replacement produce from Premier Produce, and a $1,500.00 invoice from William Dooley Disposal.  (GX89; GX90, GX92.)  The Dooley invoice was forged, but, as with the previous claims, a reasonable estimate of the disposal costs is $750.00.

The Premier Produce invoice was also forged.  The original produce from Greenfield Fresh cost $7,174.60.  (DX23 at ALPHAS-DEF-00008.)  As with prior claims, a reasonable estimate of the true replacement cost is a 50% markup above the wholesale cost.  The wholesale cost was $12,774.60, including the $7,174.60 in produce and $5,600.00 in freight.  The estimated replacement cost is therefore $19,161.90.

---

[14] In any event, it is clear that Mr. Alphas could not have sought more than $50,000 from the 514 claim.  He was aware that the policy limit was $50,000.  (GX36 at ALPHAS-GOV-002481; Graves 10/5/15 Tr. 102:20-22.)
[15] The bill of lading also indicates that the load was originally shipped to Schenectady, New York.  However, it is not unusual for a load to be redirected after it is shipped.  (Graves 10/5/15 Tr. 99:7-15.)

Zurich owed $18,911.90 for the 563 claim, including $19,161.90 for replacement produce and $750.00 in disposal costs, minus the $1,000 deductible.   Zurich paid $48,554.00.  (GX13.) The actual loss associated with the 563 claim is therefore $29,642.10.

Mr. Alphas sought a payment of $48,554.00, including the $42,454.00 replacement invoice, $5,600.00 in freight, and $1,500.00 in disposal costs, minus the $1,000 deductible. Intended loss is therefore also $29,642.10.

## Zurich Claim No. 573-0033246 (the "246 Claim")

Mr. Alphas reported the 246 claim on October 27, 2008, after a load of produce arrived damaged the prior year, with produce strewn about the truck.  (DX24; Graves 10/5/15 Tr. 63:16-19.)  Mr. Alphas complained to the vendor that 320 cases of lettuce had been rejected on the day the load arrived, and provided photos of the damaged produce.[16]  (GX80 at ALPHAS-GOV-001214.)  Susan Powers of Nunes confirmed that the company did ship a load of lettuce to The Alphas Company and that Mr. Alphas' complaint was emailed to a Nunes employee.[17]  (Powers 10/5/15 Tr. 159:10-13, 162:15-20.)

In support of the 246 claim, Mr. Alphas submitted an invoice for the original produce from Nunes in the amount of $7,225.00, a freight invoice from NCD Transport for $5,000.00, and an invoice for $19,680.00 in replacement produce from Premier Produce.  (GX54.)  Mr. Alphas also subtracted $2,200.00 in sales revenue from the claim.  (GX54 at ALPHAS-GOV-002862.)

---

[16] The Government may argue that only 60 cases were in fact damaged, relying on a handwritten note indicating that Mr. Alphas would deduct 60 cartons from the invoice.  (GX80 at ALPHAS-GOV-001206.)  There is no evidence in the record explaining this note, or who wrote it.  (Brown 10/6/15 Tr. 32:16-23.)

[17] There is some confusion regarding the destination of the shipment because the bill of lading indicates that it was going to Schenectady, New York.  (GX54 at ALPHAS-GOV-002868.)  However, loads are sometimes redirected after the bill of lading is signed.  (Graves 10/5/15 Tr. 99:12-15; Powers 10/5/15 Tr. 168:4-9.)

Susan Powers confirmed that the Nunes invoice was legitimate.  (Powers 10/5/15 Tr. 159:10-13.)  Mr. Alphas paid all but $450 of this invoice within a month (payment within 30 days is not unusual in the industry) and ultimately paid all but $225 as a result of a settlement of a PACA dispute filed by Nunes.  (GX80 at ALPHAS-GOV-001211; Powers 10/5/15 Tr. 170:6-10, 170:18–171:3, 171:13-16.)  Mr. Alphas did tell Zurich that the entire load was damaged, and that claim was false.  However, Mr. Alphas was entitled to claim the 320 damaged cartons, and the cost of those cartons should not count towards loss calculation.  The cartons cost $7.50 each, so the legitimate portion of the Nunes invoice was $2,400.00.  The fact that Mr. Alphas ultimately did not pay $225 of the invoice is not relevant to the loss calculation because Zurich ultimately would have paid for the replacement load.  As long as Mr. Alphas paid something for the original damaged produce, which he undeniably did, he was entitled to recoup the legitimate replacement cost.

The Premier Produce invoice was also fraudulent.  As with the prior claims, a reasonable estimate of the replacement produce cost is 50% above the wholesale price.  The wholesale price of the damaged portion of the 246 load is $4,066.67, including $2,400.00 in damaged original produce and $1,666.67 in freight (one third of the $5,000.00 NCD freight invoice attributable to the 320 damaged cartons).  A reasonable estimate of the replacement cost is therefore $6,100.01, a 50% markup from the wholesale cost.  As with prior claims, Mr. Alphas did not fraudulently intend for Zurich to pay both the original and replacement loads.  He clearly labeled the original and replacement invoices, and Zurich would not have paid for both.  (GX54 at ALPHAS-GOV-002862.)

Zurich owed $2,900.01 on the 246 claim, which represents the reasonable replacement cost of $6,100.01 minus the $2,200 in sales revenue Mr. Alphas received from selling the

damaged produce and minus the $1,000 deductible.  Zurich in fact paid nothing because Mr.

Alphas withdrew the claim when he was compensated by NCD.  (GX38 at ALPHAS-GOV-

002836.)  Therefore, there is no actual loss associated with the 246 claim.

Mr. Alphas fraudulently intended for Zurich to pay $16,480.00, including the inflated

$19,680.00 Premier Produce invoice minus the $2,200 in sales revenue and the $1,000

deductible.  Intended loss on the 246 claim is therefore $13,579.99, i.e. the amount Mr. Alphas

fraudulently intended Zurich to pay above the amount Zurich legitimately owed.

### Zurich Claim No. 557-0070652 (the "652 Claim")

Mr. Alphas submitted the 652 claim on November 25, 2008 after a shipment of lettuce

froze due to a refrigerator malfunction.  (GX46.)  The USDA inspection of the load confirmed

that it arrived damaged and did not meet the standards of U.S. Grade No. 1.  (DX36.)  As

Douglas Nelson of Blue Book Services acknowledged, the 19% checksum figure found by the

USDA indicates abnormal deterioration and a high number of defects.[18]  (Nelson 10/6/15 Tr.

73:2-9.)  In fact, the load was in worse condition than was found by the USDA.  By the time the

USDA inspector arrived, Mr. Alphas had already disposed of the most severely frozen top layer.

(Nelson 10/6/15 Tr. 94:23–95:18.)  The temperature tape for the shipment also confirms that the

load was frozen.  The tape shows temperatures up to five degrees below what the load should

have been shipped at, including temperatures below the 31.7 degree freezing point for lettuce.

---

[18] Blue Book ultimately concluded that the condition of the load was not a breach of contract, but the Court should reject that finding.  Blue Book reduced the 19% checksum to 12% because its internal procedures does not score discoloration following bruising.  (GX7 at ALPHAS-GOV-000119; Nelson 10/6/15 Tr. 73:10-23.)  However, it is apparent from the inspection certificate that the USDA did score discoloration following bruising.  (DX36.)  Blue Book is not privy to any contracts between The Alphas Company and its suppliers or shippers, and there is nothing in the record suggesting that the contract would have adopted the Blue Book approach.  (Nelson 10/6/15 Tr. 89:8-15.)  Moreover, the Blue Book required Mr. Alphas to prove that the load was spoiled, which is the reverse of the Government's burden of proof applicable at sentencing.  (Nelson 10/6/15 Tr. 94:14-18.)  Additionally, the Blue Book is incentivized to find in favor of its paying members, who are the only parties that can make use of the Blue Book's mediation procedures, because Blue Book collects a portion of any successful award.  (Nelson 10/6/15 Tr. 62:12-25, 64:3-9.)

(GX55 at ALPHAS-GOV-001984; Nelson 10/6/15 Tr. 85:17–86:19, 90:22–91:6.)  The temperature tape in fact shows readings from one of the warmer parts of the truck, away from the refrigeration unit, so cooler portions of the truck may in fact have been even further below the freezing point.  (Nelson 10/6/15 Tr. 89:23–90:15, 90:22–91:6.)

In support of the 652 claim, Mr. Alphas submitted a Greenfield Fresh invoice for $45,033.50 in lettuce costs, an Amber Trucking invoice for $7,400.00 in freight, and a William Dooley Disposal invoice for $1,500.00 in disposal costs.[19]  (GX55.)  The Greenfield Fresh and Dooley invoices were forged.  Mr. Alphas did purchase lettuce from Greenfield Fresh, but the legitimate cost of that load was $1,283.50.  (DX26.)  As with prior claims, a reasonable estimate of the Williams Dooley disposal charges is $750.00.

Zurich owed $1,033.50 on the 652 claim, including $1,283.50 for the original produce and $750.00 in disposal costs, minus the $1,000 deductible.  Zurich paid nothing, so there is no actual loss associated with the 652 claim.  (Graves 10/5/15 Tr. 74:4-6.)

Mr. Alphas fraudulently intended for Zurich to pay $45,533.50 on the 652 claim, including $45,033.50 for the produce and $1,500.00 for disposal, minus the $1,000 deductible.  Zurich determined that the freight invoice on the 652 claim would not be covered under Mr. Alphas' policy, and it should not be counted in the loss calculation.[20]  (GX39 at ALPHAS-GOV-003333; Graves 10/5/15 Tr. 96:13-22.)  The intended loss associated with the 652 claim is therefore $44,500.00, i.e., the difference between what Zurich owed and the payment Mr. Alphas sought.

---

[19] The Government may argue that Mr. Alphas also forged the truck driver's signature on a document stating that the load was frozen, and that the signature does not match the signature on the bill of lading.  The record on this issue is at best inconclusive.  Mr. Graves could not make out the driver's signature on the bill of lading.  (Graves 10/5/15 Tr. 97:3-11, 97:15-23.)

[20] In any event, even if the freight invoice were included, Mr. Alphas could not have intended for Zurich to pay above the $50,000 policy limit.

**Selective Claim No. 21103609 (the "609 Claim")**

Mr. Alphas submitted the last fraudulent claim in 2011 to his new insurer, Selective

Insurance ("Selective"), after a load of produce spoiled.  The truck driver confirmed that

someone went wrong with the load.  He sensed that something was wrong en route, the trailer

was making an unusual sound, the temperature was not taken with an accurate instrument at the

time the product was loaded, the weather was warm at the time of the trip, and The Alphas

Company indicated that there was a problem at the time of unloading.  (GX64 at ALPHAS-

GOV-001682-83, 1685-88; Diamantides 10/8/15 Tr. 73:15–75:6.)  Bruce Larson of Thermo

King also acknowledged that the reefer unit return control measurement was higher than

intended on June 15, 2011, and did not produce records for June 14, the day the truck was

loaded.  (GX108; Larson 10/5/15 Tr. 208:11–209:1, 209:9-17.)  Additionally, it is apparent from

the records Thermo King did produce that the return control temperature only briefly reached the

requested 35 degrees, and was warmer than the request temperature for most of the trip.

(GX108.)  Shortly after this load, the unit was repaired due to a problem that reduces cooling

ability, and typically a repair indicates that a trucker had a load refused.  (GX107; Larson

10/5/15 Tr. 205:23–206:9, 207:16-21, 210:12–211:1.)  Mr. Alphas also submitted photos of the

spoiled load.  (GX67.)  Ms. Ciolino confirmed that she usually took such photos, and was never

asked to photograph old produce.  (Ciolino 10/8/15 Tr. 97:10-22.)

In support of the 609 claim, Mr. Alphas submitted an invoice from Adams Farm for

$2,500.00 in disposal costs, an invoice for $16,139.85 in produce from Fresh Roots, a Fastrac

invoice for $37,720.00 in replacement produce, and a $9,000.00 shipping invoice from

Freightquote.com.  (GX106.)  He submitted the original and replacement invoices at Selective's

request.[21]  DX28 at ALPHAS-DEF-00010.)  The Adams Farm invoice was entirely fraudulent.

The Fastrac invoice inflated the cost of the replacement produce.  As with prior claims, a

reasonable estimate of the cost of the inflated produce is a 50% markup from wholesale costs.

Here, the legitimate wholesale costs were $25,139.85, including $16,139.85 in produce from

Fresh Roots and $9,000.00 in freight.  After the 50% markup, a reasonable estimate of the

replacement costs is $37,709.78.

     Selective paid nothing on the 609 claim, so there is no actual loss.

     The Alphas Company's applicable policy limit with Selective was $25,000, and Mr.

Alphas could not have intended for Selective to pay more than the policy limit.  (Diamantides

10/8/15 Tr. 38:7-12, 68:3-11, 70:8-15.)  Mr. Alphas could not have expected to cause any loss to

Selective as part of the 609 claim because the legitimate portion of his claim exceeded the

$25,000 policy limit.  In other words, Mr. Alphas could not have expected Selective to pay

anything above what he was legitimately owed.  Therefore, there is also no intended loss

associated with the 609 claim.

## V. History and Characteristics of John Alphas and the Need for the Sentence Imposed, 18 U.S.C. § 3553(a)(1) and (2)

     The Court requested that the parties address character and deterrence issues from both

before and after Mr. Alphas' resentencing.

### A.    Pre-Sentencing Evidence

     The First Circuit generally does not permit de novo resentencing on remand.  See

Ticchiarelli, 171 F.3d at 32.  The only new matters that may be raised on remand are (1) any

evidence or changes in law relevant to the issue on appeal (i.e. the loss calculation) and (2) any

---

[21] Selective would not have paid for both the original and replacement loads.  (Diamantides 10/8/15 Tr. 73:4-7.)  It is not unusual for claimants to submit invoices that are not covered under the policy, and it is Selective's job to determine which expenses are covered.  (Diamantides 10/8/15 Tr. 72:23-25.)

new matters that could not have been raised at the first sentencing, or that the parties had no

reason to raise at the first sentencing.  The Court should reject the Government's attempt to

introduce character evidence that it chose not to bring at Mr. Alphas' initial sentencing.

### 1.        The Evidence Available at Initial Sentencing

To refresh the Court's recollection regarding the evidence that was available at the initial

sentencing, Mr. Alphas submits the following:

Mr. Alphas is devoted to his family, his business, his employees, many of whom are

homeless veterans, and his community, as discussed at length in Defendant's original sentencing

memorandum.  See Docket No. 21.  Mr. Alphas is a life-long resident of Massachusetts, where

he and his wife of 21 years have raised their teenage and adult children.  He is also an active

parishioner and volunteer at Saint Demetrios Greek Orthodox church in Weston, Massachusetts.

Mr. Alphas started in the produce industry when he joined his uncle's company after

graduating from Boston University in 1982.  He went on to found The Alphas Company in 1999.

Mr. Alphas has worked extremely hard to build his company and support his family, arriving at

work at 3 a.m. and working 12-hour days 5 or 6 times a week for over 30 years.  His presence is

essential to the company.  The business will almost certainly close if Mr. Alphas is incarcerated,

leaving his employees without work.

Mr. Alphas has shown extraordinary dedication to employing veterans who are struggling

to recover from addiction and homelessness, including many who struggled to find employment

before they were hired by the Alphas Company.  As the Court recognized at the initial

sentencing, Mr. Alphas has been "prepared to stand up for [homeless veterans]."  (11/6/14

Sentencing Tr. 40:20-21.)  He did not simply "drop a little money" to support them; Mr. Alphas

"actually employ[ed] the people, [got] them back into the workforce."  (11/6/14 Sentencing Tr. 40:21-23.)

Mr. Alphas' commitment to his employees is also demonstrated by his remarkable efforts to avoid staff reductions.  As the Court learned during his first sentencing, Mr. Alphas did not lay off any employees during the Market Basket strike.  Market Basket is a major customer for Mr. Alphas, and the strike was a significant financial burden for The Alphas Company.  One reason the Court found a downward departure was appropriate at the initial sentencing was the Court's concern "about the dislocation that is going to be visited upon" Mr. Alphas' employees should he be unable to run to company.  (11/6/14 Sentencing Tr. 38:23-24.)  This dislocation is particularly serious in light of Mr. Alphas' willingness to hire "people who are quite vulnerable and have very great difficulty finding their way into the workforce."  (11/6/14 Sentencing Tr. 40:18-20.)

Finally, the Court credited the "compelling" letters submitted on Mr. Alphas' behalf, recognizing that those letters were "not cookie-cutter in character" and covered "the wide gamut of [Mr. Alphas'] role in the community."  (11/6/14 Sentencing Tr. 40:12-14.)  In particular, the Court "credit[ed] heavily" a letter from Mr. Alphas' priest as evidence that he is "someone who clearly has been involved in his church in a way that is evidence of a very substantial sense of who he wants to be in his community."  (11/6/14 Sentencing Tr. 41:1-5.)  The Court also "treat[ed] as extraordinarily serious" Mr. Alphas' role with respect to his family.  (11/6/14 Sentencing Tr. 40:15-17.)

### 2.    Pre-Sentencing Matters Waived by the Government

At the most recent sentencing hearing, the Government introduced evidence regarding two related PACA issues:  (1) PACA complaints against The Alphas Company and (2) revocation of The Alphas Company's PACA license and the PACA employment restrictions

imposed on Mr. Alphas.  The Court should not rely on either category of evidence.  The Government could have brought this evidence at the initial sentencing, and certainly had reason to submit any character evidence relevant to sentencing, and therefore waived it on remand. Moreover, there is no evidence that The Alphas Company is the subject of any recent PACA complaints, or that Mr. Alphas or The Alphas Company has violated any of the restrictions placed on them.  Indeed, the only post-sentencing evidence with respect to the PACA claims is that Mr. Alphas has settled each and every one of them.

The PACA Complaints

The Government introduced evidence of numerous PACA complaints filed against The Alphas Company in the past.  (GX112.)  If anything, the PACA complaints demonstrate that Mr. Alphas has improved his behavior.  While there were complaints in the past, there have been no additional complaints filed since September 11, 2012, more than two years before Mr. Alphas' November 2014 sentencing.  (GX112; Coale 10/8/15 Tr. 28:13-16.)  Additionally, Mr. Alphas has successfully resolved all of the complaints.  (Coale 10/8/15 Tr. 28:17-19.)

In any event, the Government had notice of pending PACA complaints before Mr. Alphas' initial sentencing, and chose not to bring that evidence to the Court's attention.  The Government referenced the PACA complaints at the initial sentencing hearing, and chose not to present evidence relating to those complaints on the grounds that they relate to a distinct subject matter that might be relevant at another proceeding.  (11/6/14 Sentencing Tr. 3:13-25, 5:6-14.) The Government therefore waived this issue, and the Court should not consider it on remand.

The PACA License Revocation and Employment Restrictions

The Government also presented evidence that The Alphas Company's PACA license was suspended on August 19, 2013, and that Mr. Alphas was under PACA employment restrictions

as of July 2013.  (GX100, GX101, GX103, Coale 10/6/15 Tr. 119:22-24, 120:10-16.)  The Government also suggested, without presenting evidence that proves this suggestion, that Mr. Alphas has operated his company in violation of these restrictions since that time.  The Court should not consider the PACA license suspension and employment restrictions because (1) there is no evidence that Mr. Alphas is operating The Alphas Company in violation of any of those restrictions and (2) the Government waived this issue by failing to raise it at the first sentencing.

As the most recent hearing, the Court asked whether it should reconsider if Mr. Alphas should receive a downward departure to protect his employees if in fact the business is not permitted to operate.  The answer is that the Court should not revisit its willingness to consider the need to protect the employees of The Alphas Company because the company can continue to operate without a PACA license and despite any employment restrictions on Mr. Alphas.  There is no evidence that Mr. Alphas or The Alphas Company has been engaged in any activities that require a PACA license or that run afoul of the employment restrictions placed on him.

Mr. Alphas is not a PACA dealer, and therefore does not require a PACA license, unless he is buying or selling ton-lot quantities of produce that he did not grow.  See 7 U.S.C. § 499a(b)(6); 7 C.F.R. § 46.2(m) & (x).  (Coale 10/8/15 Tr. 10:20–11:13, 14:7-10, 28:20-23.)  Mr. Alphas does not require a PACA license if he is selling produce grown on his own farm.  As Mr. Alphas told PACA in July 2013, he has been engaged in the business of selling produce grown on a farm he owns in the Dominican Republic.  (GX101; GX103; Coale 10/8/15 Tr. 31:25–32:9.)  There is no evidence to the contrary.[22]  For example, no vendors have filed PACA complaints against The Alphas Company since that time.  (GX112; Coale 10/81/5 Tr. 28:13-16.)

---

[22] Likewise, there is evidence that The Alphas Company has made deliveries to Stop & Shop since its PACA license was revoked, but those deliveries have been less than the ton-lot quantities needed before PACA applies.  (Pimental 10/5/15 Tr. 186:9-18.)

Moreover, the customs records the Government relies on are consistent with Mr. Alphas importing produce from his own farm.  (GX110.)  Those records are import records, not sales records.  (DX44; Coale 10/8/15 Tr. 29:23–30:1.)  The invoices included in the import records reflect charges by an export company for packing the produce grown on Mr. Alphas' farm and exporting it to the United States.  The invoices say they are from exporting companies; nothing suggests these are invoices from a grower for the produce itself.  (GX110; Coale 10/8/15 Tr. 30:19-23, 31:31:4-12.)  Moreover, as Basil Coale, Jr. of PACA acknowledged, the per weight charges on these invoices are consistent with charges for packing the produce.  (Coale 10/8/15 Tr. 34:24–35:2.)

In any event, the Court should not consider whether Mr. Alphas has violated the revocation of his company's PACA license or the employment restrictions imposed on him because the Government has waived this issue on remand.  The Government was on notice of this issue before the first sentencing.  For example, the Government referenced appeals of PACA complaints against The Alphas Company at the initial sentencing.  (11/6/14 Sentencing Tr. 5:14-22.)  There is nothing to appeal until PACA renders a decision in a PACA case that is adverse to The Alphas Company.  Likewise, an unsatisfied reparation award is the event that triggers suspension of a PACA license and employment restrictions.  See 7 U.S.C. § 499h(a)-(b).  (Coale 10/6/15 Tr. 116:16-21.)  Therefore, the Government was on notice at the time of the initial sentencing that The Alphas Company's PACA license might have been suspended and that Mr. Alphas might be subject to employment restrictions.  As Mr. Coale testified, the United States Attorneys' Office was likely in contact with his office's general counsel regarding Mr. Alphas more than a year ago (i.e., before his November 2014 sentencing).  (Coale 10/8/15 Tr. 27:19–28:1.)  Moreover, the Government plainly knew The Alphas Company was continuing to operate

at the time of the first sentencing.  Mr. Alphas submitted letters from current employees for the

Court's consideration.  Mr. Alphas also advised PACA before his first sentencing that he would

continue to sell his own produce.  (GX101; GX103; Coale 10/8/15 Tr. 31:25–32:2.)  PACA did

not dispute that Mr. Alphas was permitted to do so.  (Coale 10/8/15 Tr. 32:7-9.)  Finally, the

customs records obtained by the Government reflect that The Alphas Company was openly

importing produce from the Dominican Republic before his November 2014 sentencing.

(GX110 summary.)

### B.        Post-Sentencing Evidence and Deterrence

The record contains evidence relating to several post-sentencing matters that are relevant

under 18 U.S.C. § 3553(a).

### 1.        The PACA License Application

After the second day of testimony, Mr. Alphas submitted an application for a new PACA

license.  In that application, Mr. Alphas falsely certified that he has never been convicted of a

felony.  (GX113 at ALPHAS-GOV-007239.)  There is no explanation for Mr. Alphas' conduct.

Mr. Alphas faxed the license application to PACA while Basil Coale, Jr., a PACA employee was

still testifying.  Mr. Alphas' statement was false, and he was aware that the Government would

likely learn of the statement during the sentencing hearing.  He withdrew the application the next

day.  (DX47.)  Although Mr. Alphas' action is inexplicable, the Court should balance it against

the other evidence of his good character.  He made a significant mistake, and is prepared to face

the consequences of that mistake, but he has also demonstrated extraordinary generosity and

dedication to his community, his employees, his family, and his church.  Mr. Alphas' ultimate

sentence should reflect all of these considerations.

## 2.     Additional Post-Sentencing Character Evidence

Mr. Alphas' commitment to employing vulnerable veterans has not waivered since his initial sentencing.  He currently employs six veterans, including three (two full time and one part time) who were hired after Mr. Alphas' initial sentencing.  David Dejesus, one of the veterans Mr. Alphas hired after his initial sentencing, has been able to turn his life around with Mr. Alphas' help.  Mr. Dejesus, a veteran of the United States Marines, suffers from PTSD, depression, and drug addiction related to his service.  Mr. Alphas was the only person who would hire him after Mr. Dejesus was placed in a halfway house.  As a result of Mr. Alphas' help, Mr. Dejesus now has a job, his own apartment, and looks forward to meeting his grandchildren for the first time.  (DX33.)

Mr. Alphas' dedication to his employees continued after his conviction.  He again refused to lay off a single employee during this past winter, even though the severe snow meant that there was no produce to unload or deliver.  As the company's Controller Judith Wilson writes in a letter to the Court, she recommended that Mr. Alphas lay off a third of his employees over the winter when cash flow was tight.  (DX31.)  Mr. Alphas refused to lay off a single person, and instead used his own money to meet payroll.  Mr. Alphas also hired three more veterans when asked to do so by the veterans' shelter, despite the hardship the business faced over the winter.  As Ronald Gullick, another of Mr. Alphas' veteran employees, says in his letter to the Court, Mr. Alphas nearly had to lay off the veterans until the First Circuit stayed his sentence.  He was very relieved when the sentence was stayed and lay-offs became unnecessary, but is very concerned that Mr. Alphas will be unable to continue employing veterans if he is incarcerated.  (DX32.)

Mr. Alphas' dedication to charitable works has also continued since his initial sentencing.  As his wife tells the Court in her most recent letter, Mr. Alphas and his children were the first to

help shovel out homebound neighbors this winter.  He was also the first to offer a donation for the high school graduation committee when it was needed this June.  (DX34.)  Mr. Alphas is very generous with his employees, as described by Angel Rodriguez.  Mr. Alphas lent money to one employee this year so he could return to the Dominican Republic to bury his mother and brother, and gave money to another employee so he could buy braces for his daughter.  (DX35.)

### 3.    Need for the Sentence Imposed

There is no need for a sentence of continuous incarceration.  Mr. Alphas has undergone noticeable rehabilitation since his initial sentencing, albeit imperfectly.  Although Mr. Alphas did err in submitting the PACA license application, he has avoided the kinds of insurance fraud that led to his conviction in the first instance.  Mr. Alphas has demonstrated that he will continue to contribute to the community by hiring veterans in need of employment and through charitable works.  Mr. Alphas has also made significant efforts to fulfill his restitution obligations to Zurich Insurance.  He has made regular restitution payments since his first sentencing.  As of today, Mr. Alphas has paid $58,931.36 in restitution, the amount of actual loss originally calculated, approximately 83% of the $70,659.02 actual loss that he caused.  (DX1; DX2 at ALPHAS-DEF-00198-200; DX48.)  Mr. Alphas has also paid $5,000 towards the fine ordered by the Court. (DX2 at ALPHAS-DEF-00198-99, 201.)  In light of Mr. Alphas' continued rehabilitation, a term of continuous incarceration is not necessary to protect the public or to dissuade him from future crimes.

With respect to general deterrence, probation with sixty days intermittent or six months of home confinement is sufficient to send a message to others in the produce industry that fraud is unacceptable, without risking damage to the livelihood of Mr. Alphas' innocent employees. Both intermittent and home confinement are substantial punishments, with significant

restrictions on Mr. Alphas' liberty.  If intermittent confinement is imposed, Mr. Alphas will be

forced to go to a halfway house on weekends when others go home to spend leisure time with

their families.  If home confinement is imposed, Mr. Alphas will be forced to wear a GPS

monitoring device, which the Massachusetts Supreme Judicial Court has referred to as a "modern

day scarlet letter."  Commonwealth v. Hanson, 464 Mass. 807, 815 (2013) (internal quotation

marks omitted).  Moreover, if Mr. Alphas is able to continue work at the produce market, he will

be a continual reminder to his colleagues that fraud has serious consequences.

## VI. Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities, 18 U.S.C. § 3553(a)(3) & (6)

A sentence of probation with sixty days intermittent or six months of home confinement

would be consistent with sentences imposed on similar defendants.  Courts routinely depart

downward from the guidelines in similar cases and fashion alternative sentences.  This Court has

made use of weekend intermittent confinement in prior cases.  (11/6/14 Sentencing Tr. 37:13-

38:18.)  Mr. Alphas' guidelines range of 12-18 months is in Zone C of the guidelines table.  The

United States Sentencing Commission's May 2015 report on Alternative Sentencing in the

Federal Criminal Justice System found that, on average, over 58% of offenders in Zone C

received alternative sentences over the last decade.  (DX30 at 14.)  An alternative sentence

would be consistent with similar offenders and would avoid imposing unwarranted sentencing

disparities.

Sixty days intermittent confinement or six months home confinement is appropriate to

address the very real concern that Mr. Alphas' incarceration will permanently cripple his

company and leave his vulnerable employees and their families with no means of support.  A

sentence of intermittent or home confinement will both hold Mr. Alphas responsible for his

actions while minimizing any impact on innocent employees and family members.

In additional to probation with sixty days intermittent confinement or six months of home confinement, Mr. Alphas also recommends a fine within the guideline range of $5,500 to $55,000 and a $100 special assessment.

## VII.  Restitution

Restitution to Zurich is also appropriate pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  As the First Circuit noted on appeal, the MVRA authorizes restitution only in the amount of the victim's actual loss.  Alphas, 785 F.3d 786.  Zurich's recoverable loss is limited to "the amount the insurers would not have paid but for the fraud."  Id. The restitution award should therefore be the amount of actual loss Mr. Alphas caused, i.e., $70,659.02.  Mr. Alphas has already paid $58,931.36 of that amount.  (DX1 at ALPHAS-DEF-00192-97; DX at ALPHAS-DEF-00198-200.)

**CONCLUSION**

For the foregoing reasons, Defendant John Alphas respectfully requests that this Court depart below the applicable guideline sentencing range and impose a sentence of probation with sixty days of intermittent confinement or six months of home confinement, a fine in the guideline range of $5,500 to $55,000, a $100 special assessment, and restitution in the amount of $70,659.02. Such a sentence is sufficient, but no greater than necessary, to effect the goals of 18 U.S.C. § 3553(a) and takes into account all of the relevant sentencing factors and considerations.

Respectfully submitted,

Defendant John Alphas,
By his attorney,

/s/ Tracy A. Miner
Tracy A. Miner, BBO # 547137
Megan A. Siddall (*pro hac vice*)
DEMEO LLP
200 State Street
Boston, MA 02109
Tel:  (617) 263-2600
Fax:  (617) 263-2300
Email: tminer@demeollp.com
Email:  msiddall@demeollp.com

Dated: November 17, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served by ECF on counsel for the Government on November 17, 2015.


/s/ Megan A. Siddall
Megan A. Siddall