# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 14-10121-DPW |
| JOHN S. ALPHAS, a/k/a "YANNI," | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## Government's Second Memorandum on Resentencing

In this memorandum, the government addresses the intended loss calculation, the applicable Guidelines Sentencing Range ("GSR"), restitution, and the scope of the resentencing. For the reasons explained below, the Court should find that the intended loss was no lower than $460,078.24, making Alphas's GSR under the November 2015 Sentencing Guidelines 21–27 months.

This intended loss figure reflects evidence presented during the evidentiary hearing concerning the amount of money Alphas tried to obtain through his fraudulent insurance claims (at least $475,252.47) and the amount of any legitimate, insurable losses he suffered in connection with those claims (no more than $15,174.23). The evidence proves that, more likely than not, Alphas did not pay replacement or disposal costs in connection with his insurance claims, and in most instances, never suffered a loss to begin with.

The same factors inform the restitution award. After giving Alphas credit for two insurable losses that the evidence suggests he did, in fact suffer, the Court should award restitution in the amount of $160,876.24.

## I.     The Intended Loss Calculation

To calculate Alphas's intended loss under the Sentencing Guidelines, this Court must subtract Alphas's legitimate, insurable losses (if any) from the payouts he sought in his fraudulent insurance claims. *See United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015) (holding that, to determine the loss amount, "the district court should compare what [Alphas] sought to bamboozle his insurers into paying with what they would have paid had [he] submitted only bona fide claims"). Doing this requires determining total claim amount—the amount Alphas sought from his insurers[1]—and the amount of Alphas's legitimate losses, then subtracting the legitimate losses from the claim amount.

During the August 31, 2015 hearing, the Court indicated that it would take as given any losses conceded by Alphas. The government therefore begins with the intended loss calculation from Alphas's July 2015 sentencing memo:

|  |  |
|---|---|
| $334,322.85 | Claim Minus Deductible (Total Claim Amount) |
| -  $194,431.39 | Amount Insurer Owed (Alphas's Legitimate Losses) |
| $139,891.46 | Intended Loss |

Dkt. 47 at 12. At a minimum, therefore, the Court should find that the intended loss amount was $139,891.46. Under the recently amended Sentencing Guidelines, this loss amount, which triggers an 8-level increase in offense level under U.S.S.G. § 2B1.1(b)(1)(E), would result in a GSR of 10–16 months.

---

[1] For the reasons articulated in the government's first memorandum on resentencing (Dkt. 48 at 6–9), the government believes that the total claim amount has already been determined and is not open to recalculation. It is $482,024.72, the value given in the PSR (at ¶ 63), accepted by the Court during the initial sentencing, and left unchallenged on appeal. However, in light of the manner in which the Court has chosen to proceed and the additional evidence presented to the Court since the first sentencing, the government treats the claim amount as an open question in this filing.

Alphas's intended loss was greater, however. He both claimed more from his insurers than he has acknowledged and had fewer legitimate losses than he now asserts. For the reasons explained below, the total claim amount should be adjusted up to at least $475,252.47. In addition, Alphas's so-called legitimate loss amount should be lowered to, at most, $15,174.23 because he did not pay replacement or disposal costs, and in most instances, he did not suffer a loss at all. Making both these adjustments results in the following revised calculation, which should serve as the foundation for the Court's calculation of the GSR:

| | |
|---|---|
| $475,252.47 | Revised Total claim amount |
| - $15,174.23 | Revised Legitimate Losses |
| **$460,078.24** | Revised Intended Loss |

This intended loss amount triggers a 12-level increase in offense level under U.S.S.G. § 2B1.1(b)(1)(G), which results in a GSR of **21–27 months**.[2]

## A.      Overview of the Intended Loss Calculation

Here, the government outlines the steps the government used to derive the intended loss figure:

**Step 1** – Part I (page 2)

Begin with Alphas's intended loss calculation, taken from his July 2015 sentencing memo (Dkt. 47 at 12):

| | |
|---|---|
| $334,322.85 | Total Claim Amount (Claim Minus Deductible) |
| - $194,431.39 | Alphas's Legitimate Losses (Amount Insurer Owed) |
| $139,891.46 | Intended Loss |

---

[2] Under the version of the Sentencing Guidelines applicable at the time of the original sentencing, this intended loss amount would have triggered a 14-level increase, *see* U.S.S.G. § 2B1.1(b)(1)(H) (Nov. 2014), resulting in a total offense level of 18 and a GSR of 27–33 months—the range found by the Court at the initial sentencing.

**Step 2** – Part I.B.1 (pages 5–7)

Increase the Total Claim Amount to reflect both original *and* replacement costs—not just one or the other—for claims that included both (with the exception of the 514 claim, which is addressed in the next step):

$409,410.50   Revised Total Claim Amount

   -  $194,431.39   Legitimate Losses
$214,979.46   Revised Intended Loss

**Step 3** – Part I.B.2 (pages 8–10)

Further increase the Total Claim Amount to include the 514 claim (worth $78,374.12), which was omitted from Alphas's calculation of the claim amount:

$487,784.62   Revised Total Claim Amount

   -  $194,431.39   Legitimate Losses
$293,335.23   Revised Intended Loss

**Step 4** – Part I.B.2 (page 10)

Reduce the Total Claim Amount to reflect the testimony of insurance company witnesses about claim amounts, giving Alphas the benefit of a $1,000 deductible per claim:

$475,252.47   Revised Total Claim Amount

   -  $194,431.39   Legitimate Losses
$280,821.08   Revised Intended Loss

**Step 5** – Part I.C.1 (pages 13–19)

Reduce Alphas's Legitimate Losses by the value of his claimed replacement and disposal costs ($134,449.66), which the evidence proves he did not pay:

$475,252.47   – Revised Total Claim Amount

   -  $59,981.73   – Revised Legitimate Losses
$415,270.74   – Revised Intended Loss

4

**Step 6** – Part I.C.2 (pages 19–36)

Further Reduce Alphas's Legitimate Losses by the remaining value of the seven claims that the evidence has shown were based on fictional losses ($44,807.50):

$475,252.47   Revised Total Claim Amount

- $15,174.23   Revised Legitimate Losses
**$460,078.24**   Revised Intended Loss

**B.    The Total Claim Amount**

1.    The Total Claim Amount Should Include Original and Replacement Produce Costs

As the government noted in its last sentencing memo, Alphas's calculation depended heavily on the erroneous contention that he was not seeking insurance payouts for both original and replacement loads of produce—only for replacement loads. For each claim involving invoices for original and replacement loads, Alphas took the position that the claim value should include only the amount sought for replacement loads, not original *and* replacement loads. *See, e.g.*, Dkt. 47 at 14–15 (concluding that the claim value was $32,750 when Alphas had submitted invoices totaling $49,081.40, including an invoice for $16,331.40 in original produce costs). The total of the invoices that Alphas asked the Court to ignore is substantial—$75,088 over five claims.[3] *See* Appendix A.

Contrary to Alphas's position, the Court should include original and replacement loads in the total claim amount because Alphas was trying to obtain insurance payouts for both, and he intended for his insurers to reimburse him for both. As the government recounted in its last sentencing memo, Alphas first tried to obtain dual payouts in connection with the 869 claim, in

---

[3] This total excludes the original invoice from the 514 claim, the near duplicate of the 447 claim. The 514 claim is addressed separately in the next section, beginning at page 8. Had the 514 claim been included, the total claimed for original produce purchases would have been $102,573.50 over six claims.

5

February 2008. From the beginning, he claimed that he "had 2 losses," even though he only had one (supposedly) stolen load of produce. Ex. 18 at ALPHAS-GOV-001988. He gave Zurich an inflated invoice for his original produce, *see* Ex. 32 at ALPHAS-GOV-003049, and Zurich paid him for it, *see id.*; *see also* Ex. 19, 20 at ALPHAS-GOV-002118. Unsatisfied, the same day that he received (and deposited) the payment, Alphas faxed Zurich again, seeking replacement costs, too, and supporting that request with more fraudulent invoices. *See* Ex. 22.

Alphas has argued that "he did not intend to cause any pecuniary harm by submitting invoices for both original and replacement produce." Dkt. 49 at 6. He simply "intended that his insurers would reimburse him for his original or replacement produce as appropriate." Dkt. 47 at 14 n.2. To support this position, Alphas has pointed out that insurance companies do not purposefully pay for losses outside of their policies, *see, e.g.*, Day 1 Tr. 108:8–12,[4] and that, no later than July 2, 2008, Zurich had informed Alphas that his policy did not cover both kinds of losses, *see* Ex. 34 at ALPHAS-GOV-003280–81 From this, Alphas reasons that he must not have been seeking both original and replacement costs. He knew that was pointless.

The flaw in this argument is most starkly illustrated by Alphas's handling of the 312 claim, which he had supported with an itemized list of losses that included original and replacement costs. *See* Ex. 52 at ALPHAS-GOV-002919. Alphas submitted the 312 claim on August 1, 2008 (PSR ¶ 38)—less than a month after he had been informed that, under his policy, he was not entitled to reimbursement for both original and replacement costs, and less than five months after his efforts to obtain payment for both on the 869 claim had failed, resulting in payment for only replacement costs. *See* Day 1 Tr. 105:7–10, 22–24 (discussing payment of the 869 claim). Yet when Alphas received his payout for the 312 claim in September 2008, he

---

[4] Citations to "Day 1 Tr." refer to the transcript from the first day of the evidentiary hearing in this matter, October 5, 2015. Citations to "Day 2 Tr." and "Day 3 Tr." refer to transcripts from the second and third days, respectively.

immediately protested that "the check is only for the replacement cost." Ex. 98. Alphas

explained that he had "submitted a claim with all costs incurred with this loss of $46,000.25,"

but the "check received is only for $30,994.00."[5] *Id.* Alphas informed Zurich that he would be

depositing the check, but he "fe[lt] strongly about this balance due."[6] *Id.*

    This correspondence leaves no question that, despite previously having been informed

that he was not entitled to both original and replacement costs, Alphas nevertheless intended that

Zurich pay for them. Whether or not Alphas could have succeeded in getting Zurich to pay both

is not the question. Under the Sentencing Guidelines, "intended loss" includes "intended

pecuniary harm that would have been impossible or unlikely to occur." *See* U.S.S.G. § 2B1.1

cmt. n.3(A)(ii)(II). What matters is "the pecuniary harm that the defendant purposely sought to

inflict." *Id.* As the 312 claim demonstrates, when Alphas submitted insurance claims with

multiple parts, he was seeking to be paid on every part, even if his ideal payout was unlikely.[7]

    Restoring the value of the original loads to the claims from which Alphas's loss

calculations omitted them brings Alphas's total claim amount up from $334,322.85 to

$409,410.85. With that revision, Alphas's loss calculation can be rewritten:

|  |  |
|---|---|
| $409,410.85 | Revised Total Claim Amount |
| - $194,431.39 | Legitimate Losses |
| $214,979.46 | Revised Intended Loss |

---

    [5] In Alphas's July 2015 sentencing memo, he wrote, with reference to the 312 claim:
"After the $1,000 deductible, Mr. Alphas intended that Zurich would pay $37,094.00." Dkt. 47 at
20. As this fax demonstrates, he clearly intended that Zurich would pay more.

    [6] Alphas's fax also asserted that "[b]oth suppliers (Adam Bros Produce & Jora & Sons
Freight) were paid in full." Ex. 98. This statement was likely false. Adam Bros. later filed a
PACA complaint against Alphas for non-payment of over $95,000 of invoices. *See* Ex. 112 at
ALPHAS-GOV-006693

    [7] The same logic applies to Alphas's submission of insurance claims that exceeded his
policy limits, as discussed in Part I.B.3, below.

This revision alone would put Alphas's intended loss within the range resulting in a GSR of 15–21 months. *See* U.S.S.G. § 2B1.1(b)(1)(F).

2.      Alphas Intended for Zurich to Pay the 514 Claim, so the 514 Claim
        Should Be Included In the Total Claim Amount

Even with the inflated costs of Alphas's original produce shipments added back into the claim value, the total claim amount is too low—it omits the 514 claim from the calculus. As the Court will recall, the 514 claim was a near, but not perfect, duplicate of the 447 claim. (Whereas the 447 claim sought $78,581.60, the 514 claim sought $78,374.12.[8] *See* Day 1 Tr. 42:5–7; Ex. 51 at ALPHAS-GOV-001957 (447 claim); Day 1 Tr. 48:18–20; Ex. 53 at ALPHAS-GOV-002096 (514 claim). In his filings thus far, Alphas has kept his total claim amount artificially low by reducing the 514 claim value to zero. *See, e.g.*, Dkt. 47 at 12.

For the reasons given in the government's previous two sentencing memos, the 514 claim should be included in the tally of Alphas's intended loss. *See* Dkt. 22 at 12–13; Dkt 48 at 13–15. Whether or not Alphas had forgotten about the 447 claim before submitting the 514 claim a few months later,[9] he submitted the 514 claim with the intent that Zurich pay him for it. His decision to "voluntarily" withdraw the claim after being questioned by a Zurich fraud investigator does not mean he had innocent intentions when he submitted it. It was simply a pragmatic move by a fraudster who had been caught, but wanted to ameliorate suspicions so he could try his fraud again (as he did).

---

[8] The difference between the two is due to Alphas's omission from the 514 claim of USDA inspection fees he had included in the 447 claim. *Compare* Ex. 53 at ALPHAS-GOV-002096 *with* 51 at ALPHAS-GOV-001957.

[9] Alphas's argument that he would not notice an insurance payout because another employee was in charge of the company's finances (Dkt. 49 at 8–9) is refuted by the substantial evidence showing Alphas, personally, was very involved in the receipt and tracking of his insurance payouts. *See, e.g.*, Ex. 37 (563 claim) at ALPHAS-GOV-003116 ("Recv'd call from Mr. Alphas – he wanted info on the clm pymt; Gave him the amt, check # & date issued").

Independently, the Court should reject Alphas's argument about the 514 claim because this question was decided during the first sentencing and was not appealed. Before the first sentencing, Alphas raised the 514 claim in his objections to the PSR, *see* PSR Obj. #11, and the government briefed it in response, *see* Dkt. 22 at 12–13. By accepting the government's intended loss figure at the initial sentencing, the Court implicitly rejected Alphas's position, and Alphas did not raise the 514 claim on appeal. The propriety of including the 514 claim in the loss calculation was independent from the question on which Alphas appealed, and was equally important to him then as it is now (as reflected in his decision to raise it in his PSR objections). The Court should therefore reject the invitation to exclude the 514 claim from its calculations, both because Alphas has waived his argument about it, and because the Court's decision to include the 514 claim is now the law of the case. *See United States v. Ticchiarelli*, 171 F.3d 24, 32 (1st Cir. 1999) (holding that, on remand, the district court may consider "only such new arguments or new facts as are made newly relevant by the court of appeals' decision"); *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993) (holding that a district court determination that went "unchallenged in a subsequent appeal despite the existence of ample opportunity to [raise it] becomes the law of the case for future stages of the same litigation").

Once the 514 claim is reintroduced, Alphas's total claim amount increases to $487,784.62—within $6,000 of the claim value found by the Court during the initial sentencing. This claim value also accords with the total claim amount obtained by summing the claim values to which Zurich and Selective witnesses testified during the evidentiary hearing. Together, those come to $485,252.47 before taking Alphas's deductible into account. *See* Appendix B. After subtracting Alphas's deductible, the total claim amount derived from the testimony of the witnesses and the exhibits on which they relied is $475,252.47.

Because $475,252.47 is based on evidence presented during the October hearing—and because it is lower than the total derived using Alphas's total claim amount as a starting point—the government uses that figure as the total claim amount for the calculations that follow. Consequently, the intended loss calculation, to this point, looks like this:

$475,252.47   Revised Total Claim Amount

- $194,431.39   Legitimate Losses
$280,821.08   Revised Intended Loss

Therefore, even before reaching the question of Alphas's legitimate losses—recall that this calculation thus far has used the legitimate loss amount from Alphas's July 2015 sentencing memo—Alphas's offense level has increased by four, bringing his GSR to 21–27 months under the November 2015 Sentencing Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(G). And for the reasons discussed below, Alphas's legitimate losses were much lower than he has asserted thus far, increasing the intended loss figure commensurately.

3.   *Alphas's Total Claim Amount Is Not Limited by His Insurance Policy Coverage Limits*

In earlier briefing and through questions posed in the evidentiary hearing, Alphas has advanced the position that his intended loss for each claim should be capped by his policy limit.[10] This argument has intuitive appeal, but it conflicts with the Sentencing Guidelines, with applicable precedent, and with the facts of his case.

As noted above, the definition of "intended loss" under U.S.S.G. § 2B1.1 specifically includes "pecuniary harm that would have been impossible or unlikely to occur (e.g., as in . . . an

---

[10] Four of Alphas's fraudulent insurance claims exceeded his policy limit. Those claims were 447 ($78,581.60), 514 ($78,374.12), 652 ($53,933.50), and 609 ($65,359.85). For the first three (all Zurich claims), his policy limit was $50,000. *See* Day 1 Tr. 104:17–18. For the last, it was $25,000. *See* Day 3 Tr. 68:3–11; Ex. 69 at ALPHAS-GOV-003493. At stake, therefore, is $101,249.07, the difference between the sum of those claims and the maximum Alphas could have recovered for them.

insurance fraud in which the claim exceeded the insured value)." *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(ii)(II). This application note all but settles the issue. Even when a fraudulent insurance claim exceeds some obvious limitation on the fraudster's ability to recover under the policy, the money the fraudster was seeking should nevertheless be treated as intended loss.

This conclusion aligns with First Circuit precedent, which holds that "the face amount of a bill is presumptive evidence of the amount that the person who submits it expects to obtain." *United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015). As the First Circuit pointed out, "[t]his is a variation of the hoary rule that the face value of a fraudulent instrument may be treated as evidence of the amount that the fraudster intended to swindle." *Id.* (citing *Alphas*, 785 F.3d at 784 as an example of the application of this rule). Applying this general rule to cases involving fraudulent insurance claims leads to the conclusion that the intended loss amount is—at least presumptively—the amount the fraudster specified in his insurance claim, regardless of the policy limit. *See United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008) (finding no error in the district court's conclusion that the intended loss in an insurance fraud case was the full amount sought, "irrespective of deductibles and policy limits").

Even if the general rule could be overcome by some showing about the defendant's subjective intent, Alphas could not make such a showing. Here, the evidence supports the conclusion that Alphas was seeking payment for more than his policy limit (if he even knew the limit at the time he submitted the claims).

Consider the 609 claim, in which Alphas made a claim for $65,359.85 on a policy that had a $25,000 limit for this kind of loss. The components of that claim were:

- Original load of produce – $16,239.85;
- Shipping – $9,000;
- Replacement produce – $37,720; and
- Disposal – $2,500

11

Alphas has conceded that the invoices for the replacement and disposal costs were inflated. *See* Dkt. 47 at 24–25. (In actuality, they likely were completely fictional, as discussed below.) For this claim, Alphas's original loss and the associated shipping costs already exceeded his policy limit. If he was not trying to obtain an insurance payout greater than $25,000, he had no reason to forge invoices for his replacement and disposal costs. He could have submitted authentic invoices for his original produce and shipping and still obtained the maximum possible payout. His decision to create the fraudulent documents and submit them is evidence that his intent was to have his insurance company pay him more, in this case, $65,359.85.[11]

It is true, as Alphas has pointed out, that Alphas professed to know about his $50,000 policy limit in a written statement he gave to Zurich concerning the 514 claim (Ex. 14), but this proves little about his intent at the time he submitted the claim. Alphas gave the statement to one of Zurich's fraud investigators in October of 2008, about a month after he submitted the 514 claim. *See* Ex. 14. The investigator had gotten involved because of Zurich's suspicions about Alphas, *see, e.g.*, Ex. 36 at ALPHAS-GOV-002479, and the written statement reflects close questioning by the investigator, *see* Ex. 14. It is not surprising that Alphas admitted to knowing his policy limit in that setting—doing so would be helpful to his attempts to convince the investigator that he had not been trying to defraud Zurich when submitting the larger claim.

In short, neither the law nor the evidence supports Alphas's contention that his intended loss amount should be capped by his policy limit. The Court should reject the argument and find that the total claim amount is $475,252.47, for the reasons given above.

---

[11] There was some possibility of success. As the testimony of the Selective claims adjuster demonstrates, even determining the applicable policy limit was not always an easy task. *See* Day 3 Tr. 75:12–15. With every claim, there existed the possibility that the insurance company would make a mistake and pay Alphas for more than he was entitled.

### C.     The Legitimate Loss Amount

      1.     Alphas Did Not Actually Pay Any Replacement or Disposal Costs, So Those Should Be Subtracted From His Supposedly Legitimate Losses

The evidence presented during the October hearing established that Alphas did not pay any replacement costs, which made up the bulk of the supposedly legitimate losses he identified in his July 2015 sentencing memo. The only evidence that he did pay them was the testimony of his former office worker, Angela Ciolino, and her testimony should not be credited. At best, it consisted of vague memories offered in support of her friend, and is insufficient to establish the existence of the particular expenses at issue in this case. At worst, it was the story of an accomplice—someone who helped Alphas perpetrate his fraud, and who is still trying to help him now. Once the replacement costs are removed from Alphas's tally of legitimate losses, those losses shrink to $59,981.73, and the intended loss figure grows commensurately to $415,270.74.

Alphas has admitted that every invoice for replacement produce that he sent to his insurers was fake.[12] Yet now, based solely on Ciolino's testimony, Alphas would have the Court find that, even though the *invoices* were fake; even though the checks he submitted to his insurers in support of those invoices were fake; and even though there apparently exists no documentary evidence, even in his bank records, to prove he actually paid any replacement costs—he really *did* pay them. The amount he supposedly paid also comes from Ciolino's testimony, based on her memory alone. *See* Day 3 Tr. 110:14–21. The same is true of Alphas's supposed disposal costs.

Ciolino's testimony cannot support this much weight. In many important respects, her testimony is inherently implausible. At times, it is directly contradicted by other evidence. And

---

    [12] *See* Dkt. 47 at 14 (869 claim), 17 (447 claim), 19 (312 claim), 22 (563 claim), 23 (246 claim), and 25 (609 claim). The admission regarding the 514 claim, which reused the replacement invoice from the 447 claim, is tacit.

all of it is called into question by her apparent participation in the generation of the fraudulent Stop & Shop documents submitted to Zurich as part of the 869 claim.

Of Ciolino's assertions, perhaps most implausible are those relating to Fastrac Logistics, and the 609 claim in particular. Ciolino has testified both that The Alphas Company would use Fastrac to obtain replacement produce, and that The Alphas Company and Fastrac Logistics invoiced one another for almost perfectly offsetting amounts in most years, such that money never had to change hands between the two companies.[13] *See* Ciolino Aff. (Def. Ex. 13) ¶ 5;  3 Tr. 94:14–24. Neither assertion is believable.

The idea that Fastrac could provide replacement produce is at odds with the evidence. As Ciolino herself testified, Fastrac was "a freight brokerage company," not a produce supplier. Day 3 Tr. 93:4; 111:17–18. Nevertheless, Ciolino testified that Fastrac would sometimes "be involved in the purchasing of produce on behalf of the Alphas Company." Day 3 Tr. 93:24–94:1 (agreeing with the quoted question from counsel). She never explained how or why.

That is because there was no reason or way for Fastrac to be involved other than, at most, as a shipping broker.[14] As Ciolini agreed, Fastrac had no way of finding replacement produce on its own. Day 3 Tr. 111:19–22; *see also* Day 1 Tr. 217:17–218:2 (USDA inspector Albert never observed Fastrac buying or selling produce). If The Alphas Company needed replacement produce, it would not have purchased it from Fastrac.

---

[13] This latter contention also relates to Alphas's contention that he really did pay Fastrac certain fees associated with trucking in connection with, for instance, the 447 and 514 claims (Exs. 51, 53), even though the check he sent Zurich as proof of that payment was never negotiated (Day 3 Tr. 87:10–22).

[14] And if Fastrac *had* operated as the shipping broker for the 609 claim, the Fastrac invoice in the 609 claim (Ex. 106) should have been for shipping, not the underlying produce itself. There should have been a separate invoice from the supplier of the produce.

The Alphas Company's need for Fastrac's services relates to Ciolino's second implausible claim about Fastrac: that The Alphas Company never needed to pay Fastrac for services rendered because, each year, The Alphas Company and Fastrac billed each other for amounts that netted out "close to zero." Ciolino Aff. ¶ 5.

The likelihood that these expenses would cancel each other out, year after year, is vanishingly small. Ciolino testified that The Alpas Company used Fastrac both for shipping (around $9,000 a shipment, judging from the (unpaid) invoice in the 447 claim, *see* Ex. 51 at ALPHAS-GOV-001961) and for replacement produce, which, according to Ciolino's calculations, might have cost around $15,000 a shipment. Meanwhile, the only thing Fastrac ever owed The Alphas Company was "a small rent fee." Day 3 Tr. 111:23–112:20.

The chance that these two categories of expenses would net out each year is made even lower by the existence of payments between the two companies (Dkt. 96)—payments that undermine Ciolino's testimony that there were never payments between the two companies, just a balance sheet that she maintained perpetually (Day 3 Tr. 113:18–21).[15] Those payments—six or seven of them a year—show the flow of money back and forth between Fastrac and The Alphas Company, notwithstanding Ciolino's agreement that, because she kept track of debits and credits, "there was never a need [ ] for one company to write a check to [the other]." Day 3 Tr. 113:24–114:1.

The more likely explanation for the Fastrac replacement invoice in the 609 claim was that it was completely fraudulent—illegitimately generated and never paid. Accordingly, the Court

---

[15] It is worth noting that Ciolino gave this testimony despite having written and deposited some of the checks between Fastrac and The Alphas Company herself. *See* Ex. 105; Day 3 Tr. 114:2–6.

should conclude that Fastrac did not supply The Alphas Company with replacement produce for the 609 claim. Alphas's claim that it did, along with the invoice supporting it, was false.[16]

But there is no reason to think Alphas paid any replacement or disposal costs for the other insurance claims, either. Again, his contention that he did is supported only by Ciolino's testimony, and that testimony is not credible. Additional reasons to disbelieve Ciolino include (but are not limited to):

❖    Ciolino admitted that the fraudulent Stop & Shop documents sent to Zurich in support of the 869 claim were written in her handwriting—down to the forged signature of the fictional Stop & Shop employee—but she denied that she wrote either document. *See* Day 3 Tr. 118:17–121:13.

❖    Ciolino's testimony that larger customers, including Stop & Shop, placed regular, weekly orders from The Alphas Company (Day 3 Tr. 96:9–17) was contradicted by the testimony of Jerry Pimental, Vice President of Supply Chain for Stop & Shop New England. Pimental testified that Stop & Shop typically purchased from the Chelsea Produce Market only in emergencies, when a larger shipment had arrived partially spoiled and Stop & Shop needed a smaller, replacement order filled that day. *See* Day 1 Tr. 178:24–179:16. Ciolino was also contradicted on this point by the testimony of USDA inspector Donald Albert, who testified that vendors at the Chelsea Produce Market, including Alphas, generally place their produce orders from suppliers based on projected sales from customers (like Stop & Shop), not existing orders. *See* Day 1 Tr. 216:16–19, 217:6–12; 228:23–229:2 (Albert: "I don't know anyone that sells on ordered product before they have the product in hand.").

---

[16] For an additional reason to conclude that Alphas did not incur any replacement costs in connection with the 609 claim, see the discussion at pages 32–35 below, explaining why the evidence proves Alphas did not even sustain an initial loss in connection with the 609 claim.

❖ Ciolino's testimony that The Alphas Company would have to dispose of spoiled produce when it received spoiled shipments (Day 3 Tr. 97:23–25) was contradicted by the testimony of truck driver Dalbir Gill and former trucking executive Dave Singh. Both men testified that, if a load arrived spoiled, the truck driver would not leave it with it with the customer for disposal. *See* Day 2 Tr. 99:9–11; Day 1 Tr. 123:13–124:13. In addition, USDA inspector Donald Albert, testified that many vendors like Alphas are able to repackage and sell lower quality produce, suggesting that The Alphas Company would not need to dispose of even partially spoiled produce, and whatever disposal it did require would be for less than a full load. *See* Day 1 Tr. 220:21–221:4; *accord* Day 2 Tr. 87:17–22 (Nelson: even delayed produce can sometimes be sold at a discounted rate). Albert's testimony accords with the testimony of Doug Nelson of Blue Book, who described how vendors like Alphas could sometimes sell even defective loads of produce. *See* Day 2 Tr. 71:9–21.

❖ Ciolino's affidavit testimony about "increased transportation costs" being a reason retail prices were higher than wholesale prices was not supported by her live testimony. During her live testimony, Ciolino explained that local, rush shipping costs might well be higher *per pound of produce*, (Day 3 Tr. 107:21–108:5), but that does not mean they would be higher, as an absolute matter, than the original shipping costs. Unlike the replacement shipping costs, the original shipping costs were shipments originating on the west coast. As even Ciolino seemed to agree, it is hard to imagine how shipping for a four-hour trip from Hunt's Point could ever cost more than shipping for a four-day trip from California. *See* Day 3 Tr. 107:4–20.

There were other flaws with Ciolino's testimony as well. For starters, Ciolino's testimony about the cost of buying replacement produce was based solely on her memory of market conditions in the relevant time period, *see* Day 3 Tr. 109:8–110:21, and her testimony showed that her memory was not consistent. Whereas she had testified in her affidavit that disposal costs

17

were "at least $750 to $800 per load, if not more," during her live testimony, that range jumped to "$700 to $1200 a load," if not more. Def. Ex. 13 ¶ 4; Day 3 Tr. 98:10–13, 111:1–6. And although she could recall the relationship between retail and wholesale produce costs well enough to swear to them, she could not recall Fastrac's monthly rent, despite having kept track of it for years. *See* Day 3 Tr. 112:9–10.

In addition, Ciolino testified categorically that retail prices were "never" lower than wholesale prices (*see, e.g.*, Day 3 Tr. 103:23–25), and that Alphas always had to buy replacement produce at retail prices (Def. Ex. 13 ¶ 3). She never explained why that was, considering that she also testified that Alphas purchased produce from Hunt's Point *wholesale* market at least once a week, and sometimes bought his replacement produce there, too.[17] *See* Day 3 Tr. 97:2–9; 104:8–12. Even allowing for the possibility that east coast wholesale prices would be higher than west coast wholesale prices (something the government assumes is true, given Alphas's usual purchasing practices), Ciolino does not explain why she used *retail* prices as the basis of her estimate for replacement costs.

Moreover, Ciolino's insistence that retail prices were always higher than wholesale prices glosses over the more important question: whether the prices available to Alphas when he needed replacement produce might ever be equal to or lower than the prices he paid when he ordered the produce initially. As Ciolino confirmed, the price for a shipment of produce was set at the time Alphas placed an order from his west coast supplier (Day 3 Tr. 105:18–23), and Ciolino admitted the market price for the shipment might drop during the days it took to reach Chelsea (Day 3 Tr. 104:19–25, 105:4–9). She refused to admit, however, that it might drop enough to make retail

---

[17] In Alphas's objections to the PSR, he, too, acknowledged that Hunt's Point is a wholesale market, not a retail market. PSR Obj. #1 (PSR at 24).

prices at the time of the produce's arrival equal to or lower than the wholesale price at the time the produce was ordered (Day 3 Tr. 105:10–106:18).

The finding that best fits the evidence is that Alphas did not pay replacement or disposal costs. This finding would explain the lack of genuine invoices for replacement produce and the absence of checks or cash withdrawals in his bank records to pay for the supposed produce. And it would accord with the evidence, presented below, that Alphas did not suffer most of the losses underlying his insurance claims, which would render disposal and replacement unnecessary.

Consequently, the Court should conclude that Alphas did not pay the replacement or disposal costs that he listed in his July 2015 sentencing memo. Those costs, which are itemized in Appendix C, come to $134,449.66.[18] When subtracted from the total losses he says were legitimate ($194,431.39), the legitimate losses shrink to $59,981.73. Accordingly, Alphas's intended loss calculation can be revised to look this:

$475,252.47 – Revised Total Claim Amount

-  $59,981.73 – Revised Legitimate Losses
$415,270.74 – Revised Intended Loss

2.     Alphas Did Not Suffer Most of the Original Losses That He Claimed

The evidence presented during the October evidentiary hearing proved that at least seven of the losses underlying Alphas's ten fraudulent insurance claims most likely did not occur. When the remaining losses associated with those seven claims are subtracted from the legitimate

---

[18] The government notes here that, for several claims, citing Ciolino's affidavit, Alphas took the position that his legitimate replacement costs were not just 1.5 times his original produce invoice, but also 1.5 times his original shipping costs. *See, e.g.*, Dkt. 47 at 23 (discussing the 246 claim). (He then included shipping costs again in the calculation of his legitimate losses.) This maneuver is not supported by Ciolino's testimony. When she referred, in her affidavit, to retail costs being at least 50% higher than wholesale costs (Def. Ex. 13 ¶ 3), the wholesale costs included only the underlying produce, not the produce *and* the shipping. *See* Day 3 Tr. 108:22–109:7.

loss figure just given ($59,981.73), it shrinks again, this time to $15,174.23, bringing the intended loss amount up to $460,078.24.

Two points are worth keeping in mind throughout the discussion that follows. First, the evidence that each of these losses was fictional should not be considered in isolation. The conclusion that any one claimed loss was fabricated increases the likelihood that the others were as well. Second, and relatedly, the rate at which Alphas claims to have been receiving spoiled or unusable loads of produce was simply too high to be believed. USDA inspector Donald Albert testified that, for all thirty vendors in the Chelsea Produce Market, the USDA inspected around twenty loads a year that were completely spoiled or unusable. *See* Day 1 Tr. 216:2–4; 220:14–20. Consequently, one would expect each vendor to have one or two completely spoiled loads each year. Between May 2007 and May 2008, Alphas had six, with another following in 2011.[19] *See* Appendix D (timeline). Of the six between 2007 and 2008, four were from April and May 2008 alone. *Id.* The frequency of these losses constitutes good reason to conclude they were not real. *See also* Ex. 30 ("[D]ue to the number of claims you have presented, I am required to have [SIU] review the file before I can continue.").

(a)     The 869 Claim

The evidence that the 869 claim was based on a fictional loss comes primarily from the testimony of Dave Singh, the former CEO of Regal Transport. Alphas filed the 869 claim in February 2008 for a loss he supposedly sustained on January 16, 2008. *See* Ex. 41. In it, Alphas told Zurich that, when the Regal Transport driver found out that his was second or third in line to be unloaded at Alphas's loading dock, he said, "I'm out of here" and drove away with Alphas's

---

[19] The government counts the loss underlying the 447 and 514 claims only once, for purposes of this calculation.

load of produce.[20] *See* Ex. 32 at ALPHAS-GOV-003052–53. When Alphas made his claim to

Zurich, he described the load as having been stolen. *See, e.g.*, Ex. 32 at ALPHAS-GOV-003055.

Singh's testimony established that the shipment was not stolen, although it was briefly

held hostage. As Singh explained, in early 2008, Alphas owed Regal money for seven or more

unpaid shipments. *See* Day 1 Tr. 113:20–25; 115:12–15. While the shipment underlying the 869

claim was being delivered,[21] Singh contacted Alphas and told him that Regal would not deliver

the load until Alphas arranged to pay down his debt. *See, e.g.*, *id.* at 114:17–115:1. Singh

testified that he told his driver to go to Alphas's loading dock, but not to unload his produce until

instructed by Singh. *See, e.g.*, *id.* at 116:9–13. Eventually, Alphas agreed to make partial

payment, and Singh agreed to release the shipment to him. *See id.* at 117:7–9. Alphas made the

partial payment, and the Regal driver took Alphas's load where Alphas directed him. *See id.* at

118:12–119:8.

Singh's testimony is corroborated by several independent pieces of evidence, including

the January 15, 2008 check from Fastrac to Regal for $971. Ex. 104. Both the size and the timing

of the check align with Singh's testimony—partial payment for a shipment, tendered around the

time the shipment would be arriving in Chelsea.[22] Singh's testimony is also consistent with the

shipping broker's account of the theft underlying the 759 claim, which involved the same sort of

self-help. According to Zurich's notes of investigation, the broker in the 759 claim reported "that

---

[20] The story Alphas gave to the police was slightly different. In that version of events, the
driver told Alphas that he wanted to sell the produce to another party. *See* Def. Ex. 37 at
ALPHAS-GOV-006335.

[21] Singh's memory of the contents of this shipment was nearly correct, suggesting his
memory of his interactions with Alphas from this period are accurate. *Compare* Day 1 Tr.
115:22–23 (broccoli, celery, and lettuce) *with* Ex. 88 (broccoli, cauliflower, and lettuce) and Def.
Ex. 10 (same).

[22] The ship date given on the original produce invoice was January 11, 2008. *See* Def.
Ex. 10. Assuming a four-day trip from the west coast to Chelsea, it should have arrived on
January 15.

the load was diverted and donated to the hope foundation [sic] due tot he [sic] insured not paying his bills." Ex. 31 at ALPHAS-GOV-002681; *see also* Ex. 31 at ALPHAS-GOV-002677 (May 9, 2007 note indicating that "investigation to date has determined that there was no theft buy a payment dispute"). This fact pattern matches Regal's nearly exactly, except that, in Regal's case, Regal actually made delivery after Alphas made partial payment.

Singh's account is not diminished by Regal's bankruptcy petition, which lists "Alpha-Fast Track" as one of Regal's creditors, not a debtor. *See* Def. Ex. 40. As the petition reflects, Alphas's claim on Regal was disputed, *see id.*, which should not be surprising. It is easy to imagine how The Alphas Company would come to owe money to Regal, whom it hired to perform a service in exchange for payment. The record offers no explanation for the reverse.

The existence of Alphas's claim against Regal is not evidence of Regal's indebtedness to Alphas; it is further evidence of Alphas's business tactics.[23] When Alphas was accused of owing money, he used the counterclaim as a defense, accusing his accuser of owing *him* money. *See, e.g.*, Ex. 7 at ALPHAS-GOV-000119 (reflecting Alphas's counterclaim after Amber Trucking filed a Blue Book complaint against Alphas); Ex. 12 (telling Zurich "2K Logistics is now saying after the fact that we owe them money. This is 100% incorrect. 2K Logistics owes The Alphas Company $1372.30."). Each time, the evidence has supported Alphas's indebtedness, not the indebtedness of his counterparty.

Finally, the fraudulence of the 869 claim is also demonstrated by the fraudulence of Alphas's claim for replacement produce in connection with this claim. As Jerry Pimental established, the Stop & Shop paperwork submitted to Zurich in support of the replacement costs was fraudulent. Alphas has admitted that the Premier Produce invoice for replacement produce

---

[23] This assumes that Alphas had, in fact, made a claim on Regal. Given how illogical it would be for liability to flow in that direction, however, it is also possible that the bankruptcy petition was simply prepared incorrectly.

was fake as well. And as discussed above, there is no evidence that Alphas actually paid any replacement or disposal costs in connection with this claim. For this claim, as with others, the absence of evidence about replacement costs is also evidence of the absence of an underlying loss.[24]

Based on the above, the Court should conclude that the 869 claim was completely fraudulent and was not supported by any real loss. Consequently, the full claimed amount, $49,081.40, should be counted toward Alphas's intended loss.

(b)    The 257 Claim

Like the 869 claim, the 257 claim involved Regal Transport and was based on a loss that Alphas never suffered. According to Alphas, the 257 claim derived from a shipment of produce that was due to arrive in Chelsea around Christmas, 2007. *See* Ex. 50 at ALPHAS-GOV-003027. When it arrived, supposedly five days late, the entire shipment was spoiled because of overheating. *See* Ex. 50 at ALPHAS-GOV-003026; *see also* Ex. 33 at ALPHAS-GOV-002988 (itemizing claimed losses). Aside from the usual, inflated produce invoices, Alphas supported this claim with an invoice dated December 27, 2007 from a company called Always Cool to show that Regal's truck had been inspected and found to be damaged. Ex. 50 at ALPHAS-GOV-003030; *see also* Ex. 33 at ALPHAS-GOV-002988 (stating that Alphas said he paid for the inspection because "the shipping company refused to provide any information on what casued [sic] the spoilage").

Alphas's account is contradicted by the testimony of Dalbir Gill, the Regal Transport truck driver who delivered the shipment to Alphas. Gill testified that he worked for Regal for just two-and-a-half or three months, during which time he made only one delivery to the Chelsea

---

[24] Of the claims discussed in this section, all but the 257 claim contained fraudulent invoices for replacement and disposal costs.

Produce Market. *See* Day 2 Tr. 98:7–13. He did not recall the customer rejecting the entire load

of produce. *See id.* at 98:22–24. Neither did he remember taking the truck for repairs (suggesting

the inspection invoice was fake),[25] even though he recalled very well being "stuck here [in

Boston] on Christmas Day." *Id.* at 104:21–23, 103:4–6.

Gill's account aligns with the evidence; Alphas's does not. For one thing, Alphas's

insurance claim alleged that the produce shipment was five days late, *see* Ex. 50 at ALPHAS-

GOV-003026, but as Gill's testimony establishes, the shipment had arrived by December 25, *see*

Day 2 Tr. 103:4–6. This timing accords with the testimony of several witnesses that a shipment

from California to Chelsea might take about four days,[26] and with the invoices for this shipment,

both of which said the shipping date was December 20, 2007, *see* Ex. 50 at ALPHAS-GOV-

003027–28. Even if Gill's memory was slightly off, Alphas's own documents establish that the

truck had arrived by December 27, the date on the Always Cool inspection invoice—within the

time frame for a timely shipment, or at most, three days after one might expect the truck to

arrive. *See* Ex. 50 at ALPHAS-GOV-003030.

As for the possibility that the truck had overheated, the evidence is to the contrary.

According to Gill, the trailer of the Regal truck he drove—the part that did the cooling—was

"almost brand new." Day 2 Tr. 104:13–20. Singh, Regal's CEO, testified that the trucks were, in

general, in decent condition, "adequate to do the produce deliveries" (although Singh

acknowledged that Regal did sometimes have trucks whose reefer units malfunctioned). Day 1

---

[25] As additional evidence that the Always Cool invoice was fraudulent, compare its
appearance with other, admittedly fraudulent invoices submitted by Alphas, most of which seem
as though they were prepared with a word processor, in some cases using a business card as
letterhead. *Cf.* Ex. 106 at ALPHAS-GOV-001465 (fraudulent Adams Farm invoice); Ex. 66 at
ALPHAS-GOV-001742–43 (Rick Adams, explaining that the fake invoice used an Adams Farm
business card as the header).

[26] Witness estimates for the time needed to make the cross-country trip ranged from "two
days, two nights" (Day 2 Tr. 102:12–16) to seven days (Day 1 Tr. 227:25–228:5).

Tr. 111:17–112:1. When there was a problem with a truck, Regal made road service calls. *See* Day 1 Tr. 112:2–113:9. During the time it took to make the repairs, the temperature inside the truck could be maintained by keeping the doors to the trailer closed. Day 1 Tr. 113:6–9.

Finally, Alphas's claim to Zurich that the entire shipment had spoiled was at odds with the more restrained claim he made against Lucky Star Marketing, one of the two produce suppliers. On January 2, 2008, a month and a half before he filed his insurance claim with Zurich, Alphas made a claim on Lucky Star, alleging that a portion—but not the entirety—of his purchase was rotten on arrival. *See* Ex. 111. That portion, thirty cases of yams, accounted for $780 of the total invoice, and Alphas withheld approximately that amount from his payment. *See id.* (showing payment of $2,080); Ex. 50 at ALPHAS-GOV-003028 (invoice for $2,870). Alphas's contention that the yams were spoiled (although still suspect, given his track record) is plausible. Multiple witnesses testified that cross-country shipments of produce commonly arrive with spoiled or unusable portions. *See, e.g.*, Day 1 Tr. 178:7–15 (Pimental); *id.* at 219:19–22 (Albert).

If any portion of the shipment underlying the 257 claim was spoiled, it was limited to thirty cases of yams, and Alphas did not pay for that portion of the invoice, so he suffered no loss.[27] Consequently, he had no legitimate losses for the 257 claim, and the intended loss was the full claimed amount, $20,435.

(c)     The 312 Claim

The evidence that the 312 claim did not involve a real loss also comes from the contemporaneous records of money Alphas withheld from his produce supplier. When he made the 312 claim in August 2008, Alphas told Zurich that "[a] load of lettuce was spoiled when the

---

[27] A witness from each of Alphas's two insurance companies testified that, as a general matter, his or her insurance company would not cover losses never suffered by Alphas, including invoices he never paid. *See* Day 1 Tr. 17:12–18; Day 3 Tr. 38:25–39:3.

refer [sic] in the shipping truck failed and the temperature raised too high." Ex. 35 at ALPHAS-GOV-002893. He supported the claim with, among other things, an invoice showing that he paid $7,906.25 for 835 cartons of lettuce from Adam Bros. Produce Sales.[28] *See* Ex. 52 at ALPHAS-GOV-002920.

In fact, Alphas had paid just $7,162.50 for 765 cartons because he rejected a portion—but not all—of the shipment. Just as he had done with the yams in the 257 claim, Alphas withheld some of the payment to Adam Bros. because he claimed that a portion of the shipment had arrived in bad condition. Adam Bros. records show that, in July of 2007, Alphas deducted $665, the value of 70 cartons, from the original invoice. *See* Ex. 97 at ALPHAS-GOV-000074, 000072. The reason for the deduction was recorded as "Bad Arrival." *Id.* at ALPHAS-GOV-000074.

If any portion of this shipment arrived spoiled, it was limited to the 70 cartons of lettuce that Alphas rejected in July 2007. Alphas's deduction of $665, made over a year before Alphas filed his insurance claim, is consistent with witness testimony about typical spoilage on cross-country trips, and indicates that the loss was limited to that amount. Had Alphas received a load that was entirely spoiled, he would either have paid for none of it, because it was worthless, or all of it, because he intended to recoup the money from an insurance company. He would not have paid for *most* of it, giving "Bad Arrival" as his reason for withholding payment on the rest, when the whole load was equally unusable.

The evidence, therefore, shows that, at most, 70 cartons from the 312 claim were spoiled. Because Alphas withheld payment for them, however, he suffered no losses from their spoilage.

---

[28] Although the amount of the inflation is trivial, in the context of the case, the government notes that the invoice submitted to Zurich appears to have been inflated as well. *Compare* Ex. 52 at ALPHAS-GOV-002920 (pricing "Lettuce iceberg [sic] Wrap 24's" at $9.75 a carton) *with* Ex. 97 at ALPHAS-GOV-000072 (pricing them at $9.50 a carton). The difference comes to around $740.

Consequently, the 312 claim was entirely fraudulent, and the intended loss was the full claimed amount, $46,000.25.

(d)      The 563 Claim

Various pieces of documentary evidence prove that the shipment underlying the 563 claim was not late, as Alphas claimed, and therefore likely not spoiled, either. Alphas filed the 563 claim in October 2008, reporting that the truck driver was supposed to arrive on April 1, 2008, but did not arrive until "after hours" on April 4. *See* Ex. 37 at ALPHAS-GOV-003123. Because it was "a long weekend," Alphas said he was not able to sell the produce until April 8. *Id.* The produce was spoiled upon delivery "due to the delay to getting the load to the assigned destination." Ex. 37 at ALPHAS-GOV-003117; *see also* Ex. 37 at ALPHAS-GOV-003123. Alphas also mentioned a problem with the temperature on the truck. *See id.* at ALPHAS-GOV-003112, 003123.

To begin with, the shipment was not late. A purchase order that Alphas submitted to the Court shows that the "Receive By" date for the shipment was April 4, 2008—the date Alphas later told Zurich that the shipment arrived. *See* Def. Ex. 23 at ALPHAS-DEF-00008. The same scheduled arrival date appears on paperwork from U-W Logistics, the shipping broker. *See* Def. Ex. 22 at ALPHAS-DEF-00003 ("Pickup Date: 03/29/08 Delivery Date: 04/04/08"), ALPHAS-DEF-00004 ("Consignee 4/4/2008").

This scheduled arrival date directly conflicts with the bill of lading that Alphas sent to Zurich in support of the 563 claim, which bore a handwritten note, dated April 4, 2008, saying "Truck 4 Days late" and "Product very poor due to late arrival."[29] Ex. 91 at ALPHAS-GOV-

---

[29] As the government has observed before, the portion of the note saying "Truck 4 Days late" seems to overwrite a note saying "Truck 2 Days late." Ex. 91 at ALPHAS-GOV-003138. This is confirmed by Def. Ex. 22, which clearly says "Truck 2 Days late" (and also omits "Product very poor due to late arrival"). *See* Def. Ex. 22 at ALPHAS-DEF-00005.

003138. The purchase order, not the handwritten note, showed the correct due date. After consulting with U-W, Zurich eventually concluded: "The load was never supposed to arrive on 4/1. The load was supposed to arrive on the 4th." Ex. 37 at ALPHAS-GOV-003112. The Court should conclude the same.

The only documentary evidence supporting the supposed April 1 due date is the document Alphas submitted to Zurich purporting to show the agreement between him and U-W. That document, Ex. 93, which said that delivery was due on April 1, purported to be signed by someone from U-W, but the signature was an illegible scribble that U-W reported had been forged. *See* Ex. 37 at ALPHAS-GOV-003112 ("The sheet from your insured showing the fax from Yanni to UW logistics on 3/28 was forged.").

The Court should reject this document and conclude, as Zurich did, that "[the] truck was never broken down. The lettuce was fine." *Id.* The intended loss for the 563 claim was the full amount claimed, $49,554.

(e)     The 246 Claim

The principal evidence that Alphas never suffered the loss associated with the 246 claim comes from his contemporaneous correspondence with the produce vendor. In the 246 claim, Alphas reported to Zurich that a shipment of lettuce had arrived in unusable condition over a year and a half earlier, in May 2007. *See* Ex. 54 at ALPHAS-GOV-002861. This time, the shipment had not spoiled, but had somehow been "completely mangled" in transit. Ex. 38 at ALPHAS-GOV-002843. "Alot [sic] of the boxes were ripped or cut in half." *Id.* In his recorded statement with Zurich, Alphas gave a first-person account of the shipment's arrival, saying: "Um, the truck came here, he opened his doors, um, all the lettuce came pouring out onto the street. Uh, we looked at it and we just said, 'Oh my God.' I could never imagine such a load."

28

Ex. 49 at ALPHAS-GOV-002047. Alphas's claim with Zurich was for the entire load of produce.

But in 2007, long before he made his insurance claim, Alphas only contended that a portion of the shipment was rejected, not the whole load. When he first did so, on the day of the shipment's likely arrival, he said 320 of the 960 in the shipment were rejected. *See* Ex. 80 at ALPHAS-GOV-001214. Later, he reduced the quantity, withholding payment for only 60 cases of rejected produce. *See id.* at ALPHAS-GOV-001205–001209. As with the 257 and 312 claims, this is no reason to believe that a larger portion of this shipment was unusable than the portion Alphas identified in his dispute with the produce supplier.[30] And as with those claims, because Alphas withheld payment for the rejected portion of the load, he suffered no insurable loss from it.

Alphas's correspondence with the supplier contains another fact that suggests his story of the mangled produce was fabricated. In it, he refers to the load being rejected by Golub, Inc., which is the entity identified as the recipient on the Nunes invoice and bill of lading.[31] *See* Ex. 80 at ALPHAS-GOV-001214, 001209; Ex. 54 at ALPHAS-GOV-002868. As those documents reflect, Golub is located in Schenectady, New York, which is where the load was shipped. *See* Ex. 80 at ALPHAS-GOV-001208–001209; Ex. 54 at ALPHAS-GOV-002868. At a minimum, the paperwork showing delivery to Schenectady calls into question Alphas's story

---

[30] There is not much reason to believe that even 60 cases of produce were unusable, either. The note included on Alphas's invoice withholding payment said 60 cases were damaged "per conversation with Charlie." Ex. 80 at ALPHAS-GOV-. But when Susan Powers, the credit manager for the supplier, checked with Charlie, one the supplier's employees, she found he had not spoken with Alphas in over a year. *See id.* at ALPHAS-GOV-001207; Day 1 Tr. 167:5–19.

[31] Golub, Inc., owns Price Chopper, a chain of supermarkets in New York, Pennsylvania, and parts of New England.

about observing the shipment "pouring out onto the street" while he watched (Ex. 49 at ALPHAS-GOV-002047).

Between these two types of evidence, the record establishes that the shipment underlying the 246 claim did not arrive in the condition Alphas reported to Zurich. The intended loss for the 246 claim was therefore the full amount claimed, $29,705.

(f)     The 652 Claim

Alphas told Zurich that the shipment underlying the 652 claim was completely frozen, but the evidence supports the opposite finding. In the documents he submitted to Zurich, Alphas described the load as being "Destroyed by Amber Trucking," Ex. 55 at ALPHAS-GOV-001979, and he orally reported that "the lettuce all froze," Ex. 39 at ALPHAS-GOV-003339. As proof that the lettuce had arrived frozen, Alphas sent Zurich, among other documents, what purported to be a May 19, 2008 letter authorizing The Alphas Company "to unload this frozen load of lettuce delivered to our facility today" and sell it on consignment for Amber Trucking. Ex. 55 at ALPHAS-GOV-001981. The letter purported to be signed by "Drive for Amber Trucking," but as with the U-W Logistics signature described above, this signature was an illegible scrawl. *See id.*

The authorization letter and the signature on it were forgeries. Whereas the signature of the Amber driver on the bill of lading begins with a clearly articulated, capital letter *S*, (Ex. 55 at ALPHAS-GOV-001983), the signature on the authorization letter does not begin with any discernible letter—certainly not an *S*. Moreover, Amber Trucking (which went on to sue Alphas for non-payment of this shipping invoice, *see* PSR ¶ 56) denied that the signature on the letter belonged to its driver. *See* Exs. 4 ("Not my driver's signature"), 7 ("Amber denies that the driver signed the document"). Based on its review of the driver's license, Blue Book reached the same conclusion. *See id.* That conclusion makes sense, particularly because it would be very surprising

to find a truck driver's signature on such a document. As Doug Nelson of Blue Book testified, unless the truck driver was also an owner of the company, he would not have had the authority to sign over an entire load the way the driver purported to do in the letter Alphas sent to Zurich. *See* Day 2 Tr. 71:22–72:4; *see also* Ex. 7.

More fundamentally, the evidence reveals that the shipment of lettuce was not frozen through, as Alphas had reported to Zurich. Recall that, in Alphas's dispute with Amber, Alphas took the position that only the top layers of the lettuce had frozen, not the entire shipment. *See, e.g.*, Day 2 Tr. 93:8–12. And even that likely was not true. The temperature log from the shipment showed that the temperature dipped below freezing, but not by much, and probably not for long enough to freeze wrapped lettuce. Day 2 Tr. 76:22–77:5; 78:14–79:9. As Nelson and USDA inspector Albert both testified, wrapping lettuce lowers its freezing point. *See id.* at 77:7–78:3; Day 1 Tr. 214:23–3. The packaging helps it retain heat. Day 2 Tr. 77:20–25. To freeze an entire load of wrapped lettuce, the load would have to be kept at a low temperature for a prolonged period of time, something Alphas's temperature tape did not show. *See id.* at 92:21–93:7 (in Nelson's experience, usually only the top layers of lettuce on the rear pallets in a truck have frozen).

The USDA inspection certificate that Alphas submitted to Blue Book (but not Zurich) bolsters the conclusion that the load was not frozen. The certificate had no indication of freezing whatsoever, and noted that the temperature of the lettuce when it was unloaded from the truck was above freezing. *See* Day 2 Tr. 93:19–21; Ex. 7. The only deficiencies on the certificate were for normal amounts of discoloration following bruising, which Blue Book concluded were within commercially acceptable limits. *See* Ex. 7; Day 2 Tr. 74:4–12. To explain the absence of evidence of freezing, Alphas contended that he had disposed of the frozen parts of the lettuce before the USDA inspector arrived. *See* Ex. 73. This explanation should be disregarded. As is

evident from Alphas's use of USDA inspection certificates elsewhere in this case, *see, e.g.* Ex. 77 (supporting the 312 claim), Alphas understood that the entire point of a USDA inspection was to record the defects with the disputed product, *see* Day 2 Tr. 80:7–14 (explaining the purpose of the inspection). Given that understanding, there is no reason to conclude that he would throw out the defective portions of this load before the USDA inspectors arrived if it was, in fact, frozen. It is much more likely that there was no frozen produce to inspect, and his story about throwing the frozen portion away was a fabrication.

In light of this evidence, the Court should conclude that the shipment underlying the 652 claim was not frozen and that Alphas suffered no legitimate loss in connection with it. Consequently, the associated intended loss is the full amount claimed, $53,933.50.

(g)     The 609 Claim

Finally, the evidence also shows that the 609 claim was based on a shipment that was not spoiled. In that claim, reported in July 2011, Alphas sought coverage for a load of produce that he said had arrived spoiled as a result of shipping temperatures as high as 65°. *See, e.g.*, Ex. 68 at ALPHAS-GOV-006668. In support of the claim, along with a typical collection of fraudulent invoices, Alphas sent Selective photos showing decaying lettuce and broccoli, and strawberries that were overtaken with mold. *See* Ex. 67.

The data available about the shipping conditions for this load all but rule out the possibility that the produce arrived spoiled. Temperature logs from the reefer used to refrigerate this shipment establish that, for all but a period of approximately two hours, the reefer functioned normally.[32] *See* Day 1 Tr. 202:23–203:1, 204:7–12. During that period, the temperatures in the

____

[32] Although Thermo King service manager Bruce Larson did not know what had caused the elevated temperatures, *see* Day 1 Tr. 205:2–6, his company did find a problem with the reefer when it inspected the unit a few weeks after the delivery that gave rise to the 609 claim, *see id.* at

32

reefer were elevated, as Alphas reported, but their elevation did not last long enough to cause the produce to begin to rot. If it had, the temperature in the truck would have stayed elevated, even after the reefer resumed refrigerating normally, and in this case, the temperatures returned to normal. *See id.* at 205:7–21.

Although the available logs do not cover the duration of the shipment, the missing portion represents just over sixteen hours of a four-day trip. *Compare* Def. Ex. 27 (load time June 14, 2011 at 21:12, or 9:12 p.m.) *with* Ex. 108 (beginning at 13:32, or 1:32 p.m., on June 15, 2011). Circumstantial evidence suggests that the produce was not at elevated temperatures during that time. If it had been, the produce likely *would* have begun to rot, which would have resulted in elevated temperatures not seen in the later logs. *See* Day 1 Tr. 205:7–21 (discussing the effect of rotting produce on temperature). At the point at which the logs begin, the temperature readings for the reefer were within an acceptable range, considering the set point. *See id.* at 211:25–212:4.

Other, circumstantial evidence supports the inference that the truck making this shipment did not have an extended malfunction. That evidence includes the extent of the mold on the strawberries that were supposedly part of the shipment—strawberries that, by Alphas's own account, were harvested the morning they were loaded onto the delivery truck. *See* Ex. 62 at ALPHAS-GOV-001656. The amount of decay on the strawberries in the photos Alphas submitted to Zurich was far more advanced than would be expected of fresh strawberries exposed to elevated temperatures for such a short period.[33]

---

206:1–23, 207:5–12; Ex. 107. Despite the problem, the unit should have been able to maintain the designated temperature for the duration of a cross-country trip. *See* Day 1 Tr. 207:22–25.

[33] There is, of course, no reason to trust that the strawberries in the photo actually came off the truck whose temperature log Bruce Larson reviewed. As USDA inspector Albert testified, Chelsea Produce Market vendors like Alphas typically order from the same suppliers routinely,

The evidence also includes the statement given by the truck driver, who recalled, among other things:

(1)     that the produce was loaded onto his truck in a refrigerated warehouse (Ex. 64 at ALPHAS-GOV-001684);

(2)     that the doors to the trailer were not opened during transit (*id.*);

(3)     that, although the driver sensed something was wrong with the truck after he started driving, the truck's indicator light signaled that the refrigeration system was functioning normally (*id.* at ALPHAS-GOV-001685);

(4)     that, while at Alphas's loading dock, workers found something wrong with two boxes of lettuce and set them aside (*id.* at ALPHAS-GOV-001686); and

(5)     that he was not notified of a larger complaint until at least a day later (*id.* at ALPHAS-GOV-001687).

The first two of these points should serve to alleviate concerns that the temperature in the trailer was elevated during the period for which there are no logs; the produce went into the trailer cold, and the trailer doors stayed closed. The third, concerning the truck's indicator light, is consistent with Thermo King's findings when it later inspected the truck: there was a problem with the truck, but not one that would keep it from refrigerating properly. The fourth is consistent with witness testimony about how it was common for some portion of a shipment to be damaged during transport. And the fifth is significant because it conflicts with Alphas's account of the shipment's delivery. In his telling, Alphas's crew noticed "high temperatures" and showed them to the driver, who "seemed very upset." Ex. 62 at ALPHAS-GOV-001654. If this story were

---

and they sometimes are unable to sell it in time to keep it from spoiling while still in their possession. *See* Day 1 Tr. 216:20–217:3. It would be a simple matter for a vendor like Alphas to take a photograph of an old, spoiled selection of produce and tell his insurance company that it is a picture of new produce from the same supplier.

true, one would expect the truck driver—who, unlike Alphas, had nothing to gain or lose by lying about an equipment malfunction—to recall the event similarly.

The remaining pieces of circumstantial evidence that the 609 claim was entirely fraudulent relate to Alphas's handling of the claim. As Selective's claim adjuster, Claire Diamantides, testified, the timing of Alphas's claimed loss was already suspicious. Day 3 Tr. 50:22–51:6. He claimed to have suffered a loss on June 18, 2011, not even three weeks after his policy had become effective on June 1, 2011. *See id.* at 42:20–24. When asked for other warning signs, Diamantides identified two: (1) pressuring the insurance company to settle a claim and (2) having filed similar claims with other carriers. *Id.* at 51:7–14. Alphas, she said, exhibited both. *Id.* at 15–20.

On the basis of this evidence, the Court should conclude that the shipment underlying the 609 claim did not arrived spoiled, and that the intended loss associated with the claim was therefore the full amount claimed, $65,359.85.

\*     \*     \*

In his July 2015 sentencing memo, Alphas argued that he had legitimate losses of $168,612.56 in connection with these seven claims, including replacement costs, disposals cost, freight, and other expenses (USDA inspection fees, for example). *See* Appendix E. Because Alphas did not actually suffer *any* losses in connection with these seven claims, he is not entitled to credit for any of that amount.

In the government's loss calculations thus far, it has already reduced Alphas's legitimate loss amount by the amount of replacement and disposal costs that were included in these seven claims. *See* Part I.C.1 at 13, above. To avoid double counting, the value of those costs must be removed from the figure just given for the seven claims ($168,612.56). When replacement and

35

disposal costs are removed, the result is $44,807.50 in other expenses (freight, for example) that Alphas has argued were legitimate, insurable losses. *See* Appendix E.

Consequently, the Court should further reduce Alphas's legitimate loss amount by that amount, taking it from $59,981.73 (see page 13) to $15,174.23. With that figure inserted into the intended loss calculation, the following is the result:

$475,252.47   Revised Total Claim Amount

-  $15,174.23   Revised Legitimate Losses
**$460,078.24**   Revised Intended Loss

It is on this intended loss figure that the Court should base its Guidelines calculations.

As a way of assuring itself that this intended loss figure is reliable, the Court can check it against the total that would be obtained if one were simply to add up the value of each element of Alphas's insurance claims that the government has proven to be fraudulent. Those elements include the entirety of the seven claims just discussed (869, 257, 312, 563, 246, 652, and 609), and, for the remaining three claims (759, 447, and 514), any claimed replacement or disposals costs, shipping invoices for Fastrac that were never paid, plus the amount by which Alphas inflated his original produce invoices. The sum of these claim elements is $469,409.65—within $9,000 of the number obtained using the First Circuit's methodology. *See* Appendix F. Given the size of the numbers involved in the calculation, this difference is inconsequential. *See* U.S.S.G. § 2B1.1 cmt. n.3(C) ("The court need only make a reasonable estimate of the loss.").

36

### D. Guidelines Calculation

Using an intended loss figure of $460,078.24, Alphas's GSR should be calculated as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1) | 7 |
| Specific Offense Characteristics (U.S.S.G. § 2B1.1(b)(1)(G) | +12 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1) | -3 |
| **Total Offense Level** | **16** |
| **Criminal History Category** | **I** |
| **Guidelines Sentencing Range** | **21–27 months** |

## II. Restitution

Zurich paid Alphas on six of his nine fraudulent claims. *See* PSR ¶ 63. Of those, four (869, 257, 312, and 563) were completely fraudulent, and Alphas should pay restitution for them in the full amount of his payment from Zurich. For the remaining two, Alphas should pay only partial restitution.

During the evidentiary hearing, the government presented evidence that Alphas did suffer an insurable loss in connection with the other two claims for which he received insurance payouts, the 759 and 447 claims. *See* Ex. 31 at ALPHAS-GOV-002681 (noting Zurich's conversation with the shipping broker for the 759 claim, who said "the load was diverted and donated to the hope foundation [sic] due tot he [sic] insured not paying his bills"); Day 1 Tr. 76:13–17 (highlighting this issue for the Court); *id.* at 48:23–49:16 (truck with the 447 claim delivery broke down, and the truck company had to dispose of the produce); Ex. 36 at ALPHAS-GOV-002476 (same). For both claims, the loss was the true value of Alphas's original produce shipment. That loss was the only component of the two claims that has not been established to be fraudulent. Both losses were covered by Alphas's insurance policies.

For the 759 claim, the value of the lost produce was $14,227.75, although only $14,204.25 of that was covered by Alphas's insurance policy.[34] *See* Ex. 86. Because Alphas never paid $1,964.25 of the original invoice, the insurable loss was only $12,240. *See* Ex. 11 at ALPHAS-GOV-001921 (showing payment of only $12,263.50); Day 1 Tr. 16:16–17:1 (explaining that Zurich did not cover losses not actually suffered). For the 447 claim, the lost produce cost $7,452.17. *See* Def. Ex. 17.

To reach a restitution figure, giving Alphas credit for these two insurable losses, the Court may calculate restitution as follows: Restitution = Insurance Payout – (Insurable Loss – Deductible). Mathematically, this is equivalent to: Restitution = Insurance Payout – Insurable Loss + Deductible.

Restitution, therefore, should be calculated as follows, resulting in a restitution figure of $160,876.24.

| Claim No. | Insurance Payout | Insurable Loss | Deductible | Restitution |
|---|---|---|---|---|
| 759 | $13,204.25 | $12,240 | $1,000 | $1,964.25 |
| 869 | $30,200 | – | – | $30,200 |
| 257 | $19,435 | – | – | $19,435 |
| 447 | $36,181.16 | $7,452.17 | $1,000 | $29,728.99 |
| 312 | $30,994 | – | – | $30,994 |
| 563 | $48,554 | – | – | $48,554 |
| **Total:** | $178,568.41 | $19,692.17 | $2,000 | **$160,876.24** |

---

[34] The difference between the two figures is the price of the temperature recorder from the truck, which cost $23.50. Zurich's policy did not extend to cover the temperature recorder. *See* Ex. 31 ("Based on investigation, we owe for lettuce, not for a temp recorder. Subtracting the $23.50.").

III.   **The Scope of the Resentencing**

A.   **The Court Should Not Consider Evidence of Post-Sentencing Conduct, But If It Chooses To, It Should Consider All Such Evidence**

Notwithstanding evidence of Alphas's misconduct over the past year, the government maintains the position that the better synthesis of the First Circuit's remand and the existing case law is to limit the scope of the resentencing, and not to consider factual developments since Alphas's original sentencing. If the Court decides to consider Alphas's post-sentencing conduct, however, it should consider all of it, including the evidence that he was operating his business without the requisite PACA license.

"Unlike some of [its] sister circuits, the First Circuit does not generally allow *de novo* sentencing on remand." *United States v. Dávila-Felix*, 763 F.3d 105, 109 (1st Cir. 2014); *accord United States v. Cruzado-Laureano*, 527 F.3d 231, 234 (1st Cir. 2008). That general practice is consistent with *Pepper v. United States*, 562 U.S. 476 (2011), which did not "preclude courts of appeals from issuing limited remand orders, in appropriate cases, that may render evidence of post sentencing rehabilitation irrelevant in light of the narrow purposes of the remand proceeding." *Pepper*, 562 U.S. at 505 n.17. To decide the scope of the *Alphas* remand, therefore, this Court must look to the language of the First Circuit's opinion.

In the government's view, the better reading of the First Circuit's opinion precludes this Court from reexamining any issue other than the loss and restitution calculations at resentencing.[35] *See Alphas*, 785 F.3d at 787 (directing that, "[o]n remand, the only issues open to consideration shall be" intended loss, restitution, and the dimensions of the sentence).

---

[35] It is true that the First Circuit vacated Alphas's sentence, *see Alphas*, 785 F.3d at 787, but that is typical, even in cases in which the court intends a limited remand, *see United States v. Bryant*, 643 F.3d 28, 33 (1st Cir. 2011) ("[M]ost remands of a sentence vacate the existing sentence regardless of the further proceedings required.").

Consequently, the Court should simply decide whether there are any changes to be made to the loss and restitution figures, and then consider whether a different sentence is warranted in light of any changes to those figures. The § 3553(a) analysis should remain as it was at the last sentencing.

If the Court is to consider evidence of Alphas's post-sentencing rehabilitation, however, it should also consider other post-sentencing evidence relevant to the § 3553(a) balancing. *See Dávila-Felix*, 763 F.3d at 112, 113–14 (holding that the government, as well as the defendant, may introduce new evidence during resentencing, when it is made newly relevant). That includes evidence that predates the original sentencing, but is necessary to explain post-sentencing conduct or put it in context.

During the October hearing, Alphas objected to the Court's consideration of evidence that pre-dates Alphas's original sentencing, but that was not presented during that proceeding. The evidence in question, which consisted primarily of Alphas's correspondence with PACA about the loss of his license, was introduced by the government in connection with the post-sentence evidence, both to explain why the post-sentencing behavior constituted misconduct, and to put that behavior in context—to establish its place in a long-established course of misconduct. To appropriately weigh the post-sentencing evidence relating to Alphas's unlicensed operation of The Alphas Company, the Court must be able to determine whether Alphas had, in fact, lost his PACA license, and whether he understood the limitations on his ability to operate his business without one. The evidence concerning the loss of Alphas's PACA license in 2013 and his reaction to it is probative of both those questions. If the Court considers evidence of Alphas's post-sentencing conduct at all, it should consider all the evidence presented by the government relating to operation of The Alphas Company without a license.

40

**B.**     **The Court Has the Power to Impose a Higher Sentence on Resentencing**

The Court has the authority to impose a higher sentence on remand than at the original sentencing. As the Supreme Court has explained, "'the evil the [*North Carolina v. Pearce*, 395 U.S. 711 (1969)] Court sought to prevent' was not the imposition of 'enlarged sentences after a new trial,' but 'vindictiveness of a sentencing judge.'" *Alabama v. Smith*, 490 U.S. 794, 799 (1989) (quoting *Texas v. McCullough*, 475 U.S. 134, 138 (1986)). Provided the Court has a valid reason for imposing a higher sentence on Alphas on remand, it has the power to do so without violating the Due Process Clause. *See United States v. Rowe*, 268 F.3d 34, 40 (1st Cir. 2001) (stating that a sentence on remand "may be more severe than the original sentence, so long as it is not vindictive"). "[E]vents which occurred subsequent to the original sentencing proceeding" can offer sufficient reason to increase a sentence on remand. *See, e.g., United States v. Weingarten*, 713 F.3d 704, 714 (2d Cir. 2013).

**IV.     Conclusion**

For the foregoing reasons, the Court should find that Alphas's intended loss was $460,078.24, and the applicable GSR is therefore 21–27 months. The Court should order restitution of $160,876.24 and again impose a fine of $60,000, which falls within the Guidelines fine range for Alphas's offense level.

If, when determining the appropriate term of imprisonment, the Court is inclined to consider factors not presented to the Court as part of the initial sentencing (aside from the recalculated intended loss and restitution figures), it should consider all such factors, not just those presented by the defendant. If it does, the Court has the power to impose a sentence higher than the one imposed initially.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     */s/ Brian A. Pérez-Daple*
BRIAN A. PÉREZ-DAPLE
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated:     November 20, 2015

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Brian A. Pérez-Daple*
BRIAN A. PÉREZ-DAPLE
Assistant United States Attorney